Margaret A. Schimdt
Serena P. Hallowell (*pro hac vice forthcoming*)
Eric J. Belfi (*pro hac vice forthcoming*)
Thomas W. Watson (*pro hac vice forthcoming*)
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Tel: (212) 907-0700

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DELAWARE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, <br><br> Plaintiff, <br> v. <br><br> VALEANT PHARMACEUTICALS INTERNATIONAL, INC. n/k/a BAUSCH HEALTH COMPANIES INC.; J. MICHAEL PEARSON; HOWARD B. SCHILLER; ROBERT L. ROSIELLO; and TANYA CARRO, <br><br> Defendants. | Civil Case No. _____ <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................1

II.   JURISDICTION AND VENUE .........................................................................6

III.  PARTIES ...............................................................................................................6

   A.  Plaintiff ...........................................................................................................6

   B.  Defendants ......................................................................................................6

IV.   THE ENTERPRISE..............................................................................................8

   A.  The Valeant Enterprise Members ..............................................................9

      1.   Valeant ....................................................................................................9

      2.   Pearson ..................................................................................................10

      3.   Schiller ...................................................................................................11

      4.   Rosiello ..................................................................................................12

      5.   Carro ......................................................................................................12

      6.   Tanner ....................................................................................................12

      7.   Other Valeant Employees ...................................................................15

   B.  The Philidor Enterprise Members ............................................................16

      1.   Philidor...................................................................................................16

      2.   Andrew Davenport ..............................................................................17

      3.   Matthew Davenport .............................................................................18

   C.  Valeant Board Members And Audit Committee......................................18

   D.  Other Enterprise Members .......................................................................19

V.    THE CRIMINAL SCHEME.............................................................................20

   A.  Valeant's Deceptive Business Model.........................................................20

      1.   Growth By Acquisition ........................................................................20

      2.   Price Gouging........................................................................................21

      3.   The Enterprise Inflates Sales Through A Secret Network Of Captive Pharmacies ......24

      4.   The Enterprise Ensures Sales Of Price-Gouged Drugs By Manipulating Patient Assistant Programs And A Specially Designed Public Relations Campaign.......................27

      5.   Through Philidor, The Enterprise Creates A National Network Of Captive Pharmacies 30

      6.   Valeant Formalizes Its Control Over Philidor Through Execution Of An Undisclosed Purchase Option Agreement ...................................................................34

   B.  Defendant's Accounting Violations ..........................................................36

      1.   Valeant's GAAP Responsibilities .......................................................36

    2.   Valeant's Violations of GAAP .................................................................. 40

  C.   The Enterprise's Material Misrepresentations And Omissions ........................ 42

    1.   The Enterprise Falsely Attributed Valeant's Rapid Revenue Increases to Organic
    Volume Growth and Obscured Valeant's Reliance on Price Increases ........................... 45

    2.   Misrepresentations Concerning Philidor .................................................... 59

      (a)   Defendants' incomplete and misleading descriptions of the Alternate Fulfillment
      Program ........................................................................................................ 59

      (b)   Defendants' misrepresentations and omissions regarding Philidor prior to the
      December 2014 purchase option agreement ...................................................... 61

      (c)   Defendants' omissions and misstatements regarding Philidor after the December
      2014 purchase option agreement .................................................................... 64

    3.   Misrepresentations Related to the Manipulation of Revenue Recognition ............ 67

      (a)   Valeant Materially Overstates Its Reported Revenue .......................... 67

    4.   Valeant's Compliance With GAAP ........................................................... 72

    5.   Valeant's Certifications Of Internal Controls ............................................. 74

    6.   Defendants' Continued Misstatements and Omissions as the Enterprise's Criminal
    Scheme Begins to Unravel .............................................................................. 77

VI.   THE SCHEME'S CONNECTIONS TO NEW JERSEY ............................................. 101

VII.   SUMMARY OF DEFENDANTS' SCIENTER ..................................................... 102

  A.   The Individual Defendants' Role in Valeant's Unsustainable Business Model ............. 103

  B.   Individual Defendants' Control of Philidor ..................................................... 107

  C.   Valeant's Refusal to Pursue Remedies Against Wrongdoers .............................. 112

  D.   Executive Departures ............................................................................. 113

  E.   Executive Compensation .......................................................................... 115

  F.   Inflating Valeant's Stock Price To Facilitate Acquisitions ............................. 118

  G.   Internal Valeant Communications and Congressional Testimony ..................... 118

VIII.   RELIANCE ............................................................................................. 120

IX.   LOSS CAUSATION ..................................................................................... 124

X.   NO SAFE HARBOR ...................................................................................... 125

XI.   DAMAGES ............................................................................................... 125

XII.   CAUSES OF ACTION ................................................................................. 127

      COUNT I RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(c)
      (Against all Defendants) ............................................................................ 127

      COUNT II RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(d)
      (Against all Defendants) ............................................................................ 135

COUNT III AIDING AND ABETTING RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(c) AND (d) (Against all Defendants) ...................................137

COUNT IV VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 10b-5 (Against all Defendants)...................................137

COUNT V VIOLATIONS OF SECTION 18 OF THE SECURITIES EXCHANGE ACT OF 1934 (Against Defendants Valeant, Pearson, and Rosiello).......................139

COUNT VI VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934 (Against Defendants Pearson, Schiller, and Rosiello).......................141

COUNT VII COMMON LAW FRAUD / FRAUDULENT INDUCEMENT (Against all Defendants) ......................................................................................................142

COUNT VIII ...............................................................................................................143

NEGLIGENT MISREPRESENTATION (Against all Defendants) .........................143

XIII.    PRAYER FOR RELIEF .........................................................................................144

XIV.    JURY DEMAND......................................................................................................144

Plaintiff, as defined below, through its undersigned counsel, alleges the following based upon the investigation of counsel and personal knowledge as to Plaintiff and its purchase of securities of Valeant Pharmaceuticals International, Inc. ("Valeant" or "VRX" or the "Company").[1] The investigation included, but was not limited to, a review and analysis of: filings made by Valeant with the United States Securities and Exchange Commission ("SEC"); press releases issued by Valeant; transcripts of Valeant's public earnings calls and investor conferences; media reports concerning Valeant; pleadings in civil litigations, regulatory proceedings, and criminal actions; consultation with experts; testimony, interrogatory responses, and documents submitted to the U.S. Senate Special Committee on Aging; and other publicly available information.

## I.   INTRODUCTION

1.     This action arises from a massive, fraudulent scheme perpetrated by Valeant, its senior executives, and those working in concert with them to artificially inflate the price of Valeant's securities through a clandestine pharmacy network, deceptive pricing and reimbursement, and fictitious accounting.

2.     Valeant is a pharmaceutical and medical device company that is engaged in the manufacturing and marketing of branded and generic drugs. Traditional pharmaceutical companies spend 15–20% of revenues on research and development ("R&D") of new medications to treat and cure diseases. New drugs enjoy a period of exclusivity during which

---

[1] L. Civ. R. 10.1 Statement: Plaintiff Delaware Public Employees' Retirement System is located at 860 Silver Lake Blvd, Suite 1, Dover, Delaware 19904; Defendant Valeant Pharmaceuticals International, Inc. ("Valeant") has its U.S. Headquarters at 400 Somerset Corporate Blvd., Bridgewater, NJ 08807; Defendant Michael Pearson's ("Pearson") address is 74 Village Road, New Vernon, NJ 07976; Defendant Howard Schiller's ("Schiller") address is 40 Montview Ave., Short Hills, NJ 07078; Defendant Robert L. Rosiello's ("Rosiello") address is 55 Davis Hill Road, Weston, CT 06883-2003; and Defendant Tanya Carro's ("Carro") address is 231 Ronan Way, Branchburg, NJ 08853-4184.

1

time generic equivalents are excluded from the market to allow the pharmaceutical company to recoup its R&D costs and generate a profit.

3.      By contrast, Valeant implemented a growth-by-acquisition model, whereby Valeant acquired already-established pharmaceuticals from other companies, massively increased the prices of those products, and drove sales through deceptive and unlawful practices. In furtherance of this objective, Valeant targeted "orphan drugs" which treat rare medical conditions and face little or no generic competition. For example, in 2014, Valeant identified two medications used to treat emergency heart conditions, Nitropress and Isuprel, which the Company believed had pricing "flexibility by multiple orders of magnitude." Two days after acquiring the rights to Nitropress and Isuprel from Marathon Pharmaceuticals LLC ("Marathon"), Valeant massively increased the prices of the drugs by *212%* and *525%*, respectively. Valeant employed similar tactics with dozens of other drugs.

4.      The mastermind behind Valeant's growth-by-acquisition and price-gouging strategies was its former Chairman and Chief Executive Officer ("CEO"), Michael Pearson. A former McKinsey consultant, with no background in medicine or pharmaceuticals, Pearson, who joined Valeant in 2008, believed R&D investment to provide low returns because it often failed to result in marketable drugs. Accordingly, under Pearson's tenure, Valeant's R&D costs were scaled back to 3% of revenue. Instead of investing in research, between 2008 and 2015, Valeant completed over 100 acquisitions at a cost of over $40 billion, which the Company financed through its positive cash flow and newly issued debt and equity securities.

5.      To perpetuate the scheme and finance additional acquisitions, Pearson and those working in concert with him sought to convince investors of the long-term value of their strategy and assuage concerns that Valeant's growth-by-acquisition model was limited by the existence of

fewer acquisition targets and increasing levels of debt financing. In furtherance of this objective, Valeant and its senior executives consistently represented to investors that Valeant's dramatic growth in revenue and profitability was the result of Valeant's superior marketing, sales teams, and leadership—which resulted in sales volume increases that were "***greater than price in terms of our growth***." Defendants further assured investors that Valeant had strong internal controls and compliance, and that its accounting complied with Generally Accepted Accounting Principles ("GAAP"). These representations were knowingly, or recklessly, false.

6.      In response to these and other similar misrepresentations, between 2012 and 2015, Valeant's stock price soared nearly 350% from just over $60 to a high of $262 on August 5, 2015. Likewise, Valeant's misrepresentations about the strength of its business allowed it to issue billions of dollars in debt securities to the market at inflated prices.

7.      In fact, unbeknownst to investors, Valeant's revenue growth relied on a secret network of controlled pharmacies and deceptive business practices implemented to facilitate Valeant's extreme price-hikes and shield Valeant's products from generic competition. At the center of this network was Philidor, a Pennsylvania mail-order pharmacy founded in 2013 with the Valeant's assistance, which included the provision of financing, staffing, and supervision. Valeant then created a series of shell companies owned through Philidor, which Defendants used to acquire interests in additional retail pharmacies all over the United States.

8.      Philidor employees, as well as Valeant employees working at Philidor under aliases, were instructed to employ a host of deceptive and illegal "back door" practices to prevent the substitution of cheaper generic equivalents for Valeant-branded drugs. These backdoor practices were catalogued in employee manuals, and included: (i) changing prescription codes on claims to ensure that the prescription would be filled with Valeant's brand-name drugs rather

3

than a generic equivalent; (ii) making claims for refills without patient request; (iii) misrepresenting the identity of dispensing pharmacies to bypass denials of claims for Valeant drugs; (iv) waiving patient co-pays to remove patients' incentive to seek out cheaper drugs, and then misrepresenting the "actual charges" for Valeant drugs by failing to account for the co-pay waivers; and (v) utilizing pharmacies within the Enterprise, defined below, to enable Philidor to indirectly operate in states where it had been denied a license. Many of these practices violated applicable laws and regulations and/or Valeant's contracts with third party payors.

9.      To solidify its control over Philidor and artificially inflate its revenues, in December 2014, Valeant entered into an undisclosed "Purchase Option Agreement" with Philidor pursuant to which it paid $100 million, plus various milestone payments based on Philidor sales, for the ten-year option to acquire Philidor for $0.

10.     Notwithstanding Valeant's consolidation of Philidor in its financial results, Defendants deliberately concealed from regulators the ownership and control of Philidor in violation of GAAP, and issued numerous false and misleading statements to a multitude of other constituencies, including investors and government regulators.

11.     The fallout from the unmasking of Valeant's fraudulent scheme has been devastating. Shortly after Valeant's relationship with Philidor was exposed in October 2015, the three largest pharmacy benefit managers in the U.S. announced that they were dropping Philidor from their networks. Almost immediately thereafter, Valeant was forced to announce the termination of its relationship with Philidor.

12.     The revelation of pervasive misconduct at Valeant has also forced the departure of most of the senior executives and directors responsible for the wrongdoing. Valeant has

specifically attributed its fictitious accounting to the "improper conduct" of Howard Schiller, its former CFO, and Tanya Carro, its former Corporate Controller, as well as the unethical "tone at the top" set by senior management, including Pearson, its former CEO. These Valeant executives have now been terminated and replaced. In addition, Valeant has announced the replacement of the majority of its Audit Committee, who reviewed and approved the accounting for Philidor and conducted due diligence of the Philidor Purchase Option Agreement.

13. Valeant has also withdrawn its financial statements and acknowledged them to be false, restated its revenue for fiscal year 2014, drastically reduced its revenue and profitability guidance for 2015 and 2016, and admitted that the Company's disclosure controls and internal controls over financial reporting had been inadequate. Currently, Valeant is the focus of numerous government investigations, including by the SEC, the State of Texas, the State of North Carolina, and both houses of Congress, as well as a criminal probe by the U.S. Department of Justice. In November and December 2016, a former senior executive at Valeant, Gary Tanner ("Tanner"), and the former CEO at Philidor, Andrew Davenport ("Davenport"), were arrested on four counts of fraud and conspiracy in connection with the massive scheme to fraudulently peddle Valeant pharmaceuticals. On January 27, 2017, they were named as defendants in an indictment filed in the Southern District of New York. On May 22, 2018, a jury convicted Davenport and Tanner of all charges, including wire fraud and conspiracy to commit money laundering.

14. Defendants' fraudulent scheme had a devastating impact on investors. As the market learned the truth about Valeant, Valeant's stock price plummeted from a high of over $262 per share on August 5, 2015 to less than $15 on August 19, 2016, a decline of more than 90%. The value of its debt securities similarly collapsed as investors became concerned about the long-term

viability of the business. The enterprise's reach was so widespread and devastating that commentators have dubbed it the "Pharmaceutical Enron."

## II.    JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

16.    Venue is properly in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391. The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

17.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## III.    PARTIES

### A.    Plaintiff

18.    Plaintiff, Delaware Public Employees' Retirement System ("Plaintiff" or "DPERS"), was established in 1970 and manages public pension funds for nearly all Delaware state employees.

19.    Plaintiff purchased Valeant common stock between January 4, 2013 and June 6, 2016 at prices that were materially inflated as a result of the misrepresentations, omissions, and other unlawful conduct alleged herein, and suffered massive economic losses when the market prices of those securities collapsed following the revelation of the illegal scheme alleged herein.

### B.    Defendants

20.    Defendant Valeant is a Canadian corporation, which has its U.S. headquarters, nerve center, and principal place of business, at 400 Somerset Corporate Boulevard,

Bridgewater, New Jersey. Valeant is a pharmaceutical and medical device company that markets a broad range of branded, generic and branded generic pharmaceuticals, over-the-counter products, and medical devices, directly or indirectly, in over 100 countries. Valeant is one of the largest pharmaceutical companies in the United States. Until July 13, 2018, shares of Valeant stock traded on the New York Stock Exchange ("NYSE") and the Toronto Stock Exchange ("TSX") under the ticker symbol "VRX." Effective July 13, 2018, Valeant changed its corporate name to "Bausch Health Companies Inc." and on July 16, 2018, began trading under a new ticker symbol "BHC" on the NYSE and the TSX. In addition, Valeant issued numerous debt securities that traded during the relevant period.

21.     Defendant Pearson served as Valeant's CEO and a member of Valeant's Board of Directors from February 2008 until May 3, 2016, except during January and February 2016, during which time Pearson took a medical leave of absence. From March 2011 through January 2016, Pearson served as the Chairman of Valeant's Board of Directors. On March 21, 2016, Valeant announced that Pearson had been terminated. During his tenure at Valeant, Pearson's compensation, including cash and stock awards, was $7 million in 2013, $10.3 million in 2014, and $14.3 million in 2015. Moreover, between 2013 and 2015, Pearson held Valeant stock and/or stock awards valued at over $2 billion.

22.     Defendant Schiller served as Valeant's CFO and an EVP of the Company from December 2011 until June 30, 2015, when he resigned from both positions. Schiller also served as a member of Valeant's Board of Directors from September 2012 until June 14, 2016. On March 21, 2016, Valeant announced that Schiller had engaged in "improper conduct" that "contributed to the misstatement of [financial] results" and led to Valeant's restatement of its historic financial statements for fiscal 2014 and the first quarter of 2015. In 2013 and 2014,

Schiller's compensation, including cash and stock awards, was $4 million and $27 million, respectively.

23.     Defendant Rosiello served as Valeant's CFO and EVP from July 2015 until December 31, 2016. Rosiello briefly served as a member of the three-person "Office of the Chief Executive Officer," along with Chief General Counsel Robert Chai-Onn and Group Chairman Ari Kellen, in January and February 2016 in Pearson's absence. Rosiello worked with Pearson at McKinsey & Company prior to joining Valeant.

24.     Defendant Carro served as Valeant's Corporate Controller and in that capacity oversaw the preparation of Valeant's financial reports and audits, and participated in investor conference calls. On March 21, 2016, Valeant announced Carro had been placed on administrative leave after committing "improper conduct" related to Valeant's restatement.

25.     Defendants Pearson, Schiller, Rosiello, and Carro are referred to herein as the "Individual Defendants" and, with Valeant, as the "Defendants."

## IV.    THE ENTERPRISE

26.     The unlawful scheme described herein was devised and executed by an illegal enterprise (the "Enterprise") consisting of various legally distinct but associated-in-fact pharmaceutical companies, specialty pharmacies, individuals, and others who associated together for the purpose of carrying out the pattern of racketeering activity alleged herein, including, but not limited to, using the mails and wires to defraud investors, engage in market manipulation, obtain illegal kickbacks, transport and transmit misappropriated funds and property through interstate commerce, and conspiring to do the same. The Enterprise was comprised of, among others, the following members:

### A.     The Valeant Enterprise Members

#### 1.     Valeant

27.     Beginning in 2008, under the direction of its new CEO, Pearson, Valeant identified a new revenue growth strategy. Instead of investing significant portions of its revenues into R&D to develop or improve pharmaceutical products, which had a low rate of return, Valeant set out to acquire pharmaceutical companies with already-established products to sell, allowing Valeant to cut R&D costs. Between 2008 and 2015, Valeant purchased more than 100 pharmaceutical companies and drug portfolios, including Medicis Pharmaceutical Corp. ("Medicis") (for $2.6 billion), Bausch & Lomb Holdings Inc. (for $8.7 billion), Salix Pharmaceuticals, Ltd. (for $14.5 billion), Sprout Pharmaceuticals, Inc. (for $1 billion), and Marathon's drugs Isuprel and Nitropress (for $350 million) which all now fall under the aegis of Valeant.

28.     Through these acquisitions, Valeant acquired a portfolio of pharmaceutical products that were vulnerable to massive price increases. To do so, Valeant applied a critical new sales strategy known internally as alternative fulfillment ("AF") by which Valeant, through the creation of a secret network of pharmacies, implemented unconventional, deceptive, and illegal practices to reduce barriers to sales of, and reimbursement for, drugs sold at prices that a transparent market would not tolerate. As a result of its AF strategy, Valeant's drug prices increased on average by 66%—five times the average price increase implemented by comparable pharmaceutical manufacturers—and well over 5,000% in the case of some drugs.

29.     Unknown to investors, Valeant's organic growth was fueled primarily by these price-hikes and improper sales tactics and not by increased sales volume, as Defendants misleadingly stated publicly. Investors were further unaware that Valeant was only able to

charge these high prices by the use of a distribution channel that used captive pharmacies and other improper practices. Valeant's public financial statements concealed this reality by, *inter alia*, failing to disclose any information about Valeant's control over Philidor and other captive pharmacies in violation of GAAP and the securities laws.

### 2. Pearson

30.     Pearson, a New Jersey resident and former head of McKinsey's global healthcare consultancy, became the CEO of Valeant in February 2008. According to Valeant's board of directors, "Pearson *was* Valeant," and it was "always the Michael Pearson show at [Valeant's] Madison executive offices." Pearson's compensation was tied to aggressive shareholder-return goals, and thus he faced an "inordinate amount of pressure" to drive up Valeant's stock price.

31.     Pearson led the implementation of "tough tactics" at Valeant, including its "roll-up" strategy of acquisition and price gouging. He "hire[d] cronies like his former McKinsey partner Robert Rosiello," his brother-in-law, and the children of former clients. Pearson personally insisted on astronomical price increases, over and above the guidance of his business unit, in order to meet "seemingly impossible shareholder-return goals."

32.     As set forth in detail herein, in addition to implementing Valeant's acquisition and price gouging strategy, Pearson orchestrated the Enterprise's concealment of the true drivers of Valeant's revenue growth and its corresponding artificial inflation of the price of Valeant securities. For example, Pearson consistently touted the purportedly successful volume-based revenue growth strategy on which Valeant's claims of sustainability and justifications for the value of the Company's securities were based, including during public earnings calls and investor conferences.

33.     Pearson also coordinated closely with other members of the Enterprise including Valeant's CFO (Schiller), Controller (Carro), and the Director of Valeant's Access Solution team (Tanner). As Valeant's CEO, Pearson communicated and attended numerous meetings with key members of the Enterprise, and he was privy to confidential, proprietary, and non-public information concerning every aspect of Valeant's operations, finances, and business prospects and those of Valeant's acquisition targets, including Philidor. Moreover, Pearson signed all of Valeant's quarterly and annual financial statements, including the Sarbanes-Oxley ("SOX") certifications that attested to the accuracy of Valeant's financials and effectiveness of the Company's internal controls.

### 3.     Schiller

34.     As Valeant's CFO between December 2011 and June 30, 2015, Schiller, working alongside Pearson, "religiously track[ed] each deal on a quarterly basis," and "track[ed] every [Valeant] product around the world." Like Pearson, Schiller coordinated closely with senior Valeant and Philidor executives and was intimately involved in the planning, approval, direction, and monitoring of every aspect of the fraudulent scheme, including directly authorizing the implementation of illegal practices in Valeant's AF program.

35.     Moreover, Schiller was responsible for Valeant's financial accounting and reporting, and signed all of Valeant's quarterly and annual financial statements and accompanying SOX certifications during his tenure as CFO. Thus, Schiller, along with Pearson, and others working in concert with them, facilitated the artificial inflation of the price of the Valeant securities by, among other things, concealing the relationship between Valeant and Philidor by failing to disclose Philidor as a variable interest entity ("VIE") in Valeant's year-end financial statements. In addition, as the Company's CFO, Schiller enabled the Company to

11

inflate its reported revenue and net income by improperly consolidating Philidor's sales with Valeant's financial results.

36.     As direct evidence of Schiller's material role in the Enterprise, in March 2016, Valeant admitted that Schiller had engaged in "improper conduct" that "contributed to the misstatement of [financial] results" and led to Valeant's restatement of its historic financial statements for fiscal 2014 and the first quarter of 2015.

### 4.     Rosiello

37.     Rosiello served as Valeant's CFO and EVP from July 2015 to December 31, 2016. A former colleague of Pearson's from McKinsey, Rosiello operated and managed Valeant's role and participation in the Enterprise by, among other things, orchestrating Valeant's growth-by-acquisition, price gouging, and AF strategies, personally overseeing the preparation of Valeant's false and misleading financial statements, and repeatedly misrepresenting to investors Valeant's relationship with Philidor and the degree to which Valeant relied on price, rather than volume, to drive revenue growth.

### 5.     Carro

38.     Carro had operational and managerial control over Valeant and participated in the illegal scheme by among other things: (i) directly authorizing the implementation of Philidor's illegal and unsustainable practices in the AF program; (ii) orchestrating massive price increases of, among others, the drug Cuprimine by nearly 6,000%; and (iii) overseeing the preparation of Valeant's false and misleading financial statements.

### 6.     Tanner

39.     Prior to working at Valeant, Gary Tanner was employed by Medicis, where he directed the AF program for pharmaceuticals that experienced low rates of insurance coverage

because of their cost and the availability of generic substitutes. Medicis' AF program directed patients to bring their prescriptions for such Medicis drugs to certain specialty pharmacies that would assist patients and doctors in obtaining insurance coverage for those drugs or would provide other incentives for patients to purchase Medicis-branded drugs instead of generic substitutes.

40.     Following its December 2012 acquisition of Medicis, Valeant tapped Tanner, and others who worked under Tanner in running Medicis' AF program, to develop an AF program at Valeant. Internal Valeant documents describe Tanner as "key organization talent" acquired from Medicis. By April 2013, Valeant had appointed Tanner to Senior Director for the "Access Solutions Team," and Tanner was later promoted to VP responsible for Access Solutions.

41.     In that role, Tanner worked with other members of the Enterprise to create Philidor, and developed the proposal for Valeant to partner with Philidor as a way of supporting Valeant's AF program and facilitated the funding for Philidor. Specifically, by email dated January 3, 2013, Tanner sought approval from Valeant executives for the Philidor project, and a commitment to advance $2 million in funds to Philidor after fulfillment of certain milestones, and to provide expertise and other support to the new pharmacy. In connection with Tanner's request, Tanner submitted a standard Valeant contract approval form ("CAF") that listed Tanner as the "Initiator" of the contract with Philidor and described him as the "Valeant Employee Primarily Responsible For Administration And Performance of Contract. Eight Valeant executives, including Pearson, signed the CAF in the summer of 2013.

42.     Notwithstanding Tanner's responsibility for Valeant's AF program, beginning in January 2013, Tanner focused primarily on developing Philidor and solidifying its relationship with Valeant. Indeed, Tanner spent so much time in Philidor's Pennsylvania offices that Tanner

13

was assigned his own office there. Tanner was supervised by Laizer Kornwasser ("Kornwasser"). Kornwasser, who reported directly to Pearson, served as Valeant's EVP and Chairman from February 2013 through July 2015. Pearson handpicked Kornwasser to serve as a liaison between Valeant and Philidor due to his understanding of specialty pharmacies and his expertise in exploiting the lack of transparency within the labyrinthine structure of specialty pharmacy distribution chains.

43.     Tanner was involved in all aspects of Philidor's operations, including the implementation of Philidor's illegal and unsustainable practices. In addition, Tanner personally directed Philidor employees to resubmit denied claims for reimbursement to end payors using different prices until Philidor received payment at the highest possible amount. To conceal Tanner's direct involvement in Philidor's operations while an employee of Valeant, Tanner communicated with Philidor employees under the alias "Brian Wilson."

44.     Beginning in or around August 2014, Tanner facilitated Valeant's purchase of Philidor, which was consummated on December 15, 2014, when Valeant and Philidor executed a Purchase Option Agreement whereby Valeant paid $100 million for a ten-year option to purchase Philidor for $0 (the "Philidor Option"). Unlike other contracts entered into by Valeant, a request for proposal process was not undertaken for the Philidor contract.

45.     In August 2015, Valeant terminated Tanner. Immediately following his termination, Tanner was hired by Philidor. Notwithstanding his retention by Philidor, beginning in September 2015, Tanner negotiated a consulting agreement with Valeant to continue to perform services for Valeant while simultaneously serving as a Philidor employee.

46.     Like Pearson, Schiller, Rosiello, and Carro, Tanner had a financial motive to participate in the Enterprise. In addition to the millions of dollars in compensation that Tanner

reaped from Valeant's price gouging and AF strategies, a four-count indictment filed against Tanner on November 16, 2016 by the U.S. Attorney for the Southern District of New York and the Federal Bureau of Investigation ("FBI"), charging Tanner with fraud and conspiracy, reveals Tanner's involvement in an elaborate kickback scheme, whereby he was compensated $10 million for facilitating the Philidor Option and was promised many millions more if Philidor reached certain sales milestones for Valeant products. On May 22, 2018, a jury convicted Tanner of all charges, including wire fraud and conspiracy to commit money laundering.

### 7.    Other Valeant Employees

47.    Other Valeant employees directed and coordinated the Enterprise's activities, including but not limited to:

(a)    Bijal Patel – a former Medicis employee who worked under Tanner, Patel joined Valeant in January 2013 following Valeant's acquisition of Medicis. Patel was instrumental in the creation of Philidor and coordinated closely with Tanner and Davenport in developing Philidor's "back door" practices for reimbursement and routinely provided proprietary information to Philidor, including information concerning the most popular drugs and which physicians were prescribing them, to facilitate Philidor's sales and reimbursement.

(b)    Ari Kellen – served as Valeant's EVP, Company Group Chairman from January 1, 2014 to December 31, 2016. Between March and December 2016, Kellen served as the head of Valeant's U.S. dermatology business. Like Rosiello, Kellen was a colleague of Pearson's from McKinsey. Kellen operated and managed Valeant's role and participation in the Enterprise by, among other things, orchestrating Valeant's growth-by-acquisition, price gouging, and personally overseeing the implementation of Valeant's AF model.

B.      **The Philidor Enterprise Members**

1.      **Philidor**

48.     Philidor was created on January 2, 2013 by Valeant executive Gary Tanner, and the principal of a Pennsylvania pharmaceutical industry communication and marketing firm, Andrew Davenport. Philidor's sole purpose was to serve as a shill through which Valeant could facilitate sales of its massively inflated branded pharmaceuticals. Indeed, Valeant was Philidor's only customer and Valeant employees were instrumental in the formation and staffing of Philidor with several eventually joining Philidor full time. By the time Valeant acquired an option to purchase Philidor in December 2014, Philidor had grown to a company with approximately 450 employees with tens of millions of dollars in revenue, which was nearly all derived from its relationship with Valeant and the sale of Valeant products.

49.     Philidor falsely portrayed itself as a specialty pharmacy. However, while true specialty pharmacies focus on self-administration of highly differentiated brand-name drugs for patients undergoing intensive therapies for chronic, complex illnesses such as cancer and HIV, Philidor was principally devoted to dispensing Valeant's undifferentiated traditional drugs, most of which had low-cost generic substitutes. Through Philidor, Valeant insulated itself from generic competition, by among other things, flouting statutory or contractual mandates for substitution of generic equivalents for Valeant-branded drugs, submitting false claims, making claims for refills that patients never requested, and implementing fraudulent and illegal patient co-pay assistance programs. Through these improper and illegal tactics, Philidor enabled Valeant to massively increase the prices of its drugs and inflate the number of claims paid on prescriptions for those drugs.

50.     As set forth herein, to conceal the relationship between Philidor and Valeant, the Enterprise created a host of shell companies tied to Philidor, which they used to acquire interests in smaller retail pharmacies all over the United States and secretly extend their captive pharmacy network.

### 2.     Andrew Davenport

51.     Andrew Davenport was the principal of BQ6 Media, a communications and media firm, which caters to the pharmaceutical industry, and held himself out as Philidor's CEO. Davenport met Tanner when BQ6 Media performed services in connection with the development of Medicis' AF program. Following Valeant's acquisition of Medicis, Andrew Davenport worked with Tanner and others to create Philidor. Davenport owned approximately 40% of Philidor personally and through his wholly owned shell company, End Game, LP. The remaining equity interest in Philidor was held by Davenport's colleagues, former business and personal associates, and entities associated with those individuals.

52.     As set forth herein, Davenport coordinated closely with Tanner and others at Valeant to facilitate the sale and reimbursement of Valeant's drugs through Philidor, including the development of "backdoor" policies. Moreover, as set forth herein, Davenport coordinated closely with Tanner to solidify the relationship between Valeant and Philidor through the execution of the Philidor Option in December 2014, from which Davenport personally profited in the amount of $40 million. As a result of Davenport's involvement in the fraudulent scheme, and his payment of a kickback to Tanner in the amount of $10 million for Tanner's role in facilitating the Philidor Option, in December 2016, Davenport was arrested and charged with four counts of fraud and conspiracy and released from jail on $2 million bail.

### 3. Matthew Davenport

53.     Matthew Davenport, Andrew Davenport's brother, was a principal of Philidor and, at times, held himself out to be Philidor's CEO. As set forth herein, Matthew Davenport participated in, and coordinated the Enterprise's fraudulent scheme, through his certification of Philidor's fraudulent applications for pharmacy licenses in various states to extend Philidor's captive pharmacy network and conceal its relationship with Valeant and its deceptive and illegal business practices.

### C.    Valeant Board Members And Audit Committee

54.     Norma Provencio, Katherine B. Stevenson, and Theo Melas-Kyriazi were the members of Valeant's Board of Directors who served on Valeant's Audit Committee during the relevant time period. The Company's Board of Directors also included Robert A. Ingram, Ronald H. Farmer, Colleen Goggins, Anders Lönner, and Robert N. Power during this timeframe.

55.     Valeant's Board Members and Audit Committee facilitated and participated in the Enterprise's illegal scheme by, among other things, approving the $100 million Philidor Option and concealing this information from investors and regulators by failing to identify Philidor as a VIE in the Company's financial reporting. Indeed, the Valeant Board and Audit Committee toured Philidor's Pennsylvania facilities prior to approving the purchase agreement and were provided further access to Philidor's operations and business practices.

56.     During an October 26, 2015 conference call, CFO Rosiello conceded that Valeant's "Finance and Transaction Committee, Audit and Risk Committee and the Full Board all reviewed the [Philidor] transaction [and] [t]he appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

18

### D.      Other Enterprise Members

57.      The Enterprise also includes other members known and unknown who participated in and facilitated the scheme, including but not limited to:

(a)      Isolani LLC – shell company created by Philidor and used to purchase R&O Pharmacy;

(b)      Lucena Holdings – shell company created by Philidor and used to purchase a stake in West Wiltshire Pharmacy in California after California denied Philidor a license;

(c)      Back Rank, LLC – shell company created by Philidor and used to purchase a stake in Orbit Pharmacy, Inc. in Houston, Texas;

(d)      KGA Fulfillment Services, Inc. – wholly-owned Valeant subsidiary used to lend money to Philidor's owners and the vehicle through which Valeant held the Philidor Option;

(e)      Fifty Moves, LLC; ELO Pharmacy LLC; C-K Pharmacies LLC; Tarrasch Pharmacy Holdings, LLC; NC3 Pharmacy LLC; and Lasker Pharmacies, LLC – Philidor-created shell companies created to extend the captive pharmacy network; and

(f)      SafeRx Pharmacy; D&A Pharmacy; Prescription Shoppe; Heritage Compounding Pharmacy; Parkwest Pharmacy – additional specialty pharmacies through which Philidor distributed Valeant's price-gouged drugs.

58.      Although these entities and persons are distinct and independent of each other, and free and incentivized to act in and advance their own interests independently, they have associated in fact with a common purpose, identifiable relationships, and sufficient longevity to pursue their common purpose. Specifically, beginning no later than January 2013 and continuing

until the illegal scheme was revealed, they have been engaged in a mutually understood, agreed-upon, and coordinated campaign of racketeering activity for financial gain, resulting in the enrichment of the Enterprise members, and artificial inflation of the price of Valeant's securities, all at the expense of Valeant's investors. These wrongful acts have resulted in the loss of tens of billions of dollars in investor value.

## V.   THE CRIMINAL SCHEME

### A.   Valeant's Deceptive Business Model

#### 1.   Growth By Acquisition

59.   In February 2008, Valeant appointed Pearson to serve as its CEO. While Pearson lacked any experience in developing and manufacturing drugs through internal R&D, Valeant chose Pearson for his business acumen and his cut-throat tactics to realize even greater profits. And Pearson did just that. He ran Valeant like a hedge fund, and was compensated with aggressive stock-based compensation uncommon in the pharmaceutical industry. At the peak of the Enterprise's operation, Pearson's stock compensation was valued at over $2 billion.

60.   Pearson's first move as Valeant's CEO was to gut the Company's R&D department, which Pearson viewed to be low-return since it did not often yield marketable drugs. While traditional pharmaceutical companies devote 15–20% of revenue to R&D, under Pearson's leadership, Valeant slashed its R&D budget down to only 3%. Rather, Valeant focused on acquiring companies with already established products, surreptitiously manipulating a labyrinthine healthcare system, and exploiting the price of long-developed and off-patent drugs that had been low-cost staples of treatment for some of America's most vulnerable patients for decades.

61.     To maintain its growth-by-acquisition strategy, Valeant purchased more than 100 pharmaceutical companies or drug portfolios between 2008 and 2014, including Medicis, Bausch & Lomb, Salix, Sprout, and Isuprel and Nitropress. Valeant borrowed heavily to finance its acquisitions, and by 2015, Valeant was carrying $31 billion dollars in debt with correspondingly enormous debt payments.

62.     Valeant targeted for acquisition "orphan drugs," which treat rare medical conditions. Due to the small population that these drugs service, orphan drugs face little to no competition despite being past the point of protection from generic equivalents, providing the manufacturer with monopoly pricing power. Likewise, "orphan drugs" have patients who depend on them, sometimes to survive, and are effectively captive to their prescriptions, which further solidified Valeant's pricing power over its newly-acquired drugs.

63.     In addition, Valeant's acquisition strategy focused on healthcare sectors where there was no significant competition from other major pharmaceutical manufacturers, including, among others, the dermatology, neurology, and ophthalmology sectors.

### 2.      Price Gouging

64.     Valeant's acquisition strategy left it under immense pressure to create the revenue necessary to carry its heavy debt load. At year-end 2014, Valeant had $15.2 billion in debt and only $323 million in cash. By September 2015, Valeant's debt ballooned to $30.7 billion.

65.     So long as Valeant's revenues continued to grow and its stock price remained high, its acquisition model appeared to be working, but if either metric slipped, Valeant risked being overwhelmed by its debt. Thus, Valeant had to demonstrate to investors and lenders that it was generating sufficient cash flow from its acquisitions. Valeant did so by massively inflating the prices of its newly acquired drugs.

66.     A report by the U.S. Senate details how, in late 2012, Valeant was facing declining revenue in its Neurological and Other division. To combat this decline, the Company's top executives, including Pearson, developed and approved a plan, called the "Orphan Drug Pricing Strategy" that refocused the division on using steep and repeated price increases to make up for the decline in revenue. Once the plan was adopted, Pearson and other top executives personally determined how much to raise drug prices.

67.     For example, following Valeant's acquisition of Cuprimine, a drug used since 1965 to treat Wilson's disease, a rare condition that prevents the body from processing copper, Valeant senior executives, including Pearson, Rosiello, and Carro, decided to raise the price of Cuprimine by nearly 5,800% to allow Valeant to recoup its investment prior to the approval of general competition. Valeant employed similar price gouging tactics with respect to Syprine, raising the price 3,200%.

68.     Once it was successful, Valeant applied this price gouging strategy across the board. Valeant's execution of the price gouging strategy on Isuprel and Nitropress—drugs used to treat acute heart conditions—is a case in point. On December 3, 2014, Andrew Davis, Valeant's SVP for Business Development, sent an e-mail to Kornwasser, stating that he had identified another opportunity in the drug manufacturer, Marathon, whose "value is largely derived from 2 hospital products [Isuprel and Nitropress] . . . which have no IP [i.e., protection from generic competition]." Steve Sembler, Valeant's General Manager of Neurology, responded that the purchase "would also have to be a price play (if we determine there is upside to take price)[.]"

69.     Thereafter, Valeant worked with consultants at Marketing Medical Economics and McKinsey to determine the pricing potential for Isuprel and Nitropress. The consultants

advised that Marathon had increased the price of Nitropress from $47 to $214, and Isuprel from $48 to over $200, but noted that "most patients treated [with Nitropress, for example] are in critical condition," and thus advised Valeant that there was still "upward potential for pricing" of these drugs. McKinsey, Pearson's former employer, similarly advised Pearson by e-mail dated December 29, 2014 that these drugs had "material pricing potential" because "[s]maller/older products (*e.g.*, Isuprel and Nitropress) are not reviewed on formulary [and] [Isuprel and Nitropress] have been in the system for so long that reviews are practically rubber stamped." Moreover, Valeant projected that Isuprel and Nitropress would not face generic competition until 2017 at the earliest.

70.     Two days after acquiring the rights to Nitropress and Isuprel from Marathon, Valeant massively increased the prices of the drugs by 212% and 525%, respectively. Valeant employed similar tactics with dozens of other drugs.

71.     Though Valeant is a large drug manufacturer, with many product lines and hundreds of individual drugs, the price increases applied to newly-acquired drugs like Isuprel and Nitropress provided disproportionate short-term gains. For example, Valeant recorded $150 million in revenues on Isuprel and Nitropress in 2014, and, after dramatically raising prices on both drugs, over half a billion dollars in revenues in 2015. Valeant's total revenues for 2015 were $10.4 billion. Thus, price-gouging strategies applied to only two newly-acquired drugs, provided over 5% of Valeant's revenues in 2015.

72.     Reports indicate that in 2015, Valeant raised its brand name drug prices by 66% on average—five times more than any other pharmaceutical company in the industry. Other examples of dramatic price increases include: (a) inflating the price of Carac Cream, a treatment for precancerous lesions, by more than 1,100%, from $230 per tube to over $2,800;

(b) increasing the price of Glumetza, a drug used to control blood sugar for people with type 2 diabetes, by more than 1,000%, from $900 per 90 tablets to over $10,000; (c) gouging the price of Targetin, a treatment for skin problems associated with T-cell lymphoma, by over 1,600%, from $1,800 per tube to over $30,000; (d) raising the price of Wellbutrin XL, an anti-depressant drug, by $1,400 per one month's supply while the generic alternative sells for $30; and (e) raising the price of Addyi, a libido enhancing drug for women, by 100% immediately after Valeant acquired the drug from Sprout.

73.     Although Valeant's price increases appeared to boost its profitability in the near term, the manner in which they were achieved was in fact unsustainable and exposed Valeant to numerous risks, including, among others, that patients, insurers, and other payors would refuse to pay such drastically increased prices or would substitute generic or alternate-brand products for Valeant branded drugs. Valeant also risked regulatory scrutiny, and relationship and/or brand damage in response to the price increases. These short-term gains misled investors as to Valeant's true financial performance and prospects.

### 3.     The Enterprise Inflates Sales Through A Secret Network Of Captive Pharmacies

74.     Valeant's price gouging strategy required it to raise the price of its drugs beyond what other market participants would normally accept. Typically, pharmacy benefit managers ("PBM"), intermediaries between pharmaceutical manufacturers and patients and other payors, prevent unreasonable price gouging and reduce instances of fraud. These intermediaries negotiate drug prices and reimbursement rates with drug manufacturers, and often encourage the automatic substitution of cheaper products for high-priced, brand-name drugs. A key component of the Enterprise's scheme was to avoid this cost control mechanism altogether.

75.     Realizing that Valeant could not execute its drug pricing strategy through traditional pharmaceutical channels, the Enterprise set about creating its own, secret, drug distribution network of captive pharmacies, made up of entities named after chess players and strategies. At the center of this clandestine pharmacy network was Philidor, which Valeant helped form in January 2013—immediately after adopting the Orphan Drug Pricing Strategy—under the direction of Tanner and Andrew Davenport. Valeant provided financing, staffing, and other resources to develop Philidor.

76.     Valeant immediately tested its new AF scheme in its newly acquired Arizona-based Medicis dermatology unit. Valeant, through Medicis, retained Philidor to dispense its products, communicate with patients and other actors in the prescription drug distribution chain, manage the prior authorization process, handle delivery of Valeant products, and manage Valeant prescription refills. Through this arrangement, Valeant increased its formal control over Philidor, obtaining the right to inspect Philidor, audit Philidor's compliance with the parties' arrangement, and to "assess and evaluate the operation of the program."

77.     To conceal the close ties between Valeant and Philidor, Tanner, and many other Valeant employees conducting work on behalf of Philidor, used aliases, including "Brian Wilson" and "Peter Parker" used by Tanner and Bijal Patel, respectively. With these aliases, Valeant employees provided Philidor with proprietary, non-public prescription and referral information so that Philidor could facilitate the sale and reimbursement of Valeant drugs and avoid automatic substitution of generic equivalents.

78.     Senior Valeant executives were aware of, and indeed directed and facilitated Philidor's operations. For example, in or around November 2013, Valeant executive Kornwasser, Tanner's direct supervisor who reported directly to Pearson, toured Philidor's Philadelphia

facility along with another Valeant executive, Deborah Jorn ("Jorn"). During that tour, Kornwasser witnessed first-hand Valeant's extensive control over Philidor, including that a Valeant employee, Tanner, was assigned an office at Philidor, had access to all aspects of Philidor's offices, and exercised managerial control over Philidor's operations and employees. As a result of that visit, according to his testimony in the trial of Davenport and Tanner, Kornwasser was so concerned about what he saw from an "independence perspective" and a "compliance perspective" that he went "straight back to Valeant" to "make sure [he] told the proper executives."

79.    After his first visit, Kornwasser twice returned to Philidor—once with Valeant's comptroller and head of compliance. Indeed, Kornwasser was so troubled about Valeant's relationship with Philidor—and his role in that relationship—that he began documenting his concerns in secretly recorded conversations with Pearson. For example, on or around September 2014, Kornwasser expressed concern to Pearson that Valeant was stuffing the Philidor channel with drugs to meet sales goals. Pearson reacted by questioning Kornwasser's concern about the practice, stating that it seemed to be "out of character for you, if you know what I mean." Kornwasser responded, "Yeah. I'll be aggressive on stuff. This is one where like, for example, like this buy, where Philidor's going to take 22 pallets, their inventory room doesn't have room for three pallets. And so it's one of those things where if it were ever to be exposed, it just doesn't feel—it just doesn't feel right."

80.    Notwithstanding Kornwasser's direct knowledge that Valeant exercised direct control over Philidor through Tanner—which Kornwasser reported to his supervisors, including Pearson—Valeant did not terminate Tanner's role at Philidor, but rather continued to capitalize on Tanner's role at Philidor as an instrumentality to solidify Valeant's control over Philidor.

81.     Likewise, when Valeant's Chief Compliance Officer, Seana Carson, raised questions internally as to whether Tanner held an undisclosed equity interest in Philidor, Valeant executives, including Pearson, Schiller, and others, turned a blind eye to these concerns. Valeant took no disciplinary action against Tanner, permitted him to keep operating in his dual role at Valeant and Philidor, and concealed Tanner's misconduct because Philidor was vital to the Enterprise's price gouging strategy.

82.     Valeant's executives were well aware of the Company's reliance on Philidor, and planned to rely on it from its inception. In a 2013 email to Kornwasser and Keller, Tanner updated the Company on his efforts to pursue "alternative arrangements" with, among others, Bluegrass Pharmacy, Cardinal Health Pharmacy, Bergen Medical Pharmacy Inc., and Carepoint Rx Pharmacy "in the event Philidor cannot be scaled quickly enough" to achieve Valeant's "financial goals." In response, the Valeant supervisors supported and encouraged Tanner's efforts to implement Valeant's price gouging and AF strategies.

### 4.     The Enterprise Ensures Sales Of Price-Gouged Drugs By Manipulating Patient Assistant Programs And A Specially Designed Public Relations Campaign

83.     Valeant's scheme to ensure sales of its price-gouged drugs depended on manipulating patient assistance programs such as patient copays. The purpose of this manipulation was to avoid the scrutiny of regulators, media attention, and resistance from patients and payors.

84.     Typically, patient co-pays, which require the patient to pay a portion of the cost of the treatment they are prescribed, encourage patients to resist high-priced treatment options or to substitute generic alternatives for high-priced drugs. However, Valeant waived and eliminated patient co-pays, increasing their patient assistance program costs by over 1,100%, from $53

million in 2012 to $600 million in 2015, to ensure sales of its price-gouged drugs—a practice which violates criminal anti-kickback laws when perpetrated on government payors like Medicaid. In addition, these practices breached contracts, and angered doctors, payors, and PBMs, and presented serious business risks, including that if Valeant's tactics were discovered, PBMs and payors would refuse to pay Valeant's high prices, resulting in massive reductions in sales volume. Valeant projected it would spend more than $1 billion on its patient assistance programs in 2016. Despite the ballooning costs of these measures—which were critical to keep up sales of Valeant's price-gouged drugs—Valeant's revenues were not keeping pace, rising by only 300% between 2012 and 2015, from $3.5 billion to $10.4 billion during that time period.

85.     While proper patient assistance programs are designed to ensure patients can afford necessary medical treatment, Valeant manipulated its patient assistance program to manipulate payors and patients and ensure sales of its price-gouged drugs. Indeed, in testimony before Congress during its investigation into Valeant's pricing and business practices, Mark Merritt, the President and CEO of the Pharmaceutical Care Management Association, which represents PBMs, stated that Valeant had forced "employer's unions and others to pay hundreds of thousands more for the most expensive brands on the formulary," practices that constitute illegal kickbacks when perpetrated on government payors.

86.     Internal Valeant presentations reflect that its patient assistance programs were part of the deceptive sales practices used to maintain Valeant's price gouging strategy. For example, one such presentation explained that the increases in patient assistance would be "funded through planned price increases" and "[i]nvolve[d] a combination of alternative/restricted distribution model, advocacy support and patient assistance programs." To ensure sales of Valeant's price-gouged drugs, the presentation urged employees to use patient assistance programs to entice

patients to accept Valeant's branded drugs over lower priced alternatives or to offer free goods "as a last resort." Valeant knew the institutional risks these tactics presented, and the presentation noted that "[s]ubstantial price actions could attract undue negative publicity from patients, HCP's [health care providers], payors, and/or government agencies," so it implemented a "PR Mitigation" plan and "[p]rivately address[ed] concerns from patients, insurance companies or managed care providers to prevent public displays of negative sentiment [and] [m]inimize[d] media coverage of [] pricing increase[s]."

87.   The same presentation provided Valeant employees with a "PR Draft Communications Plan [for] Orphan Drug Rate Increases," stating that orphan drugs can "command a substantial premium in the market—to offer pharmaceutical companies a greater return on investment." However, it cautioned, "[w]hile the high cost of orphan drugs has been largely tolerated by the medical community because the overall impact of these pharmaceuticals on health budgets has been relatively small, there has recently been a renewed focus on the cost of these drugs [and the] press has also picked up on these trends." The presentation further warned that Valeant's plan to increase Cuprimine and Syprine, the Wilson's disease treatments, "needs to be managed carefully."

88.   To prepare Valeant employees for questions about price gouging, including whether "Valeant [was] just trying to make insurers and managed care providers pay as much as possible for these drugs," Valeant employees were instructed to lie by providing answers such as, "No. These rate increases are essential to ensure that Valeant is able to continue to offer these important pharmaceuticals to our patients who are afflicted with [for example] Wilson's disease while also remaining commercially viable." For example, when Berna Heyman, who suffered from Wilson's disease, wrote to Pearson to express her outrage at the steep price increases on

29

Syprine, Valeant falsely responded: "there are many challenges associated with *developing* treatments for rare conditions such as Wilson's disease, the *investments* we make to develop and distribute novel medicines are only viable if there is a reasonable return on the company's investment and if our business is sustainable." In reality, Valeant does not develop new drugs, nor does it invest in the development of novel medicines except the paltry 3% of revenues that Valeant purported to spend on R&D.

89.     The price gouging strategy described herein was critical to the Enterprise's scheme, as it allowed Valeant to drive massive short-term revenues, providing an excellent selling point to new investors in Valeant. The Enterprise touted these short-term gains to mislead investors to believe that Valeant had hit upon a sustainable and legitimate business model that would continue to produce such performance into the future.

### 5.     Through Philidor, The Enterprise Creates A National Network Of Captive Pharmacies

90.     In addition to manipulating patient assistance programs, the Enterprise created a web of shell companies—which were all assigned names related to chess players or strategies— through which Philidor purchased ownership stakes in pharmaceutical companies all around the country. This ownership structure enabled the Enterprise to sell their price-gouged drugs in every market across the nation without revealing that those sales were in fact directed and controlled by Valeant. The purpose of creating this network was to obscure Valeant's role in the aggressive pharmacy-led promotion and sale of its price-gouged drugs, and to create the appearance that ostensibly independent pharmacies across the country were promoting and selling Valeant products of their own volition and based on the merits of those products. Moreover, as described herein, the network also allowed Valeant to implement deceptive practices designed to trick payors into reimbursing Valeant for drugs.

91.     In furtherance of this objective, Philidor attempted to obtain a pharmacy license in California. However, in May 2014, the California State Board of Pharmacy denied Philidor's application upon learning it contained false representations made to conceal the true ownership of Philidor and the close relationship between Valeant and Philidor.

92.     To circumvent the denial and enable it to conduct business in California, Philidor created Isolani LLC ("Isolani"), a wholly-owned shell company with the sole purpose of acquiring a licensed California pharmacy, R&O Pharmacy ("R&O"). In fact, Philidor began using R&O's unique national provider identifier ("NPI") before the sale agreement between R&O and Isolani was even completed, both within California and outside of California. Upon discovering Philidor's improper use of the its NPI, R&O's principal, Russell Reitz ("Reitz"), confronted Philidor, which, through Andrew Davenport, falsely assured Reitz that Philidor had discontinued its improper use of R&O's NPI.

93.     As Reitz discovered other fraudulent and improper practices in Philidor's sales of Valeant products through Philidor, he stopped remitting checks to Philidor, and instead began depositing them in an R&O account. After arguing with Philidor for several months, Reitz received a letter from Robert Chai-Onn, Valeant's General Counsel, demanding "immediate payment" of more than $69 million and warning that any delay in payment would result in "further damage to Valeant and other parties." Reitz found this suspicious, because up until this time, Philidor had not disclosed that it had any relationship with Valeant, and R&O had no direct commercial relationship with Valeant. Undeterred, R&O filed a complaint against Valeant in October 2015, which stated that R&O had no relationship with Valeant, and that either R&O and Valeant were both the target of a fraudulent scheme or Valeant was attempting to defraud R&O.

31

94.     The R&O lawsuit provided the first glimpse into Valeant's ties to Philidor and the means and instrumentalities through which Philidor exploited its relationship with R&O, including: (i) Philidor's sales of large volumes of Valeant drugs using R&O's NPI in states where R&O was not licensed, using R&O's NPI for drugs R&O had never dispensed, and filling prescriptions under the R&O NPI by pharmacies unaffiliated with R&O; (ii) Eric Rice, Philidor employee and sole member of Philidor shell company, Isolani, signed an R&O audit that R&O's CEO Reitz refused to sign; and (iii) Philidor refused to apply for, or provide R&O with proof of application for, pharmacy licenses in states where Philidor operated under the R&O name.

95.     In view of this misconduct, R&O's general counsel wrote to a senior director at Philidor, Eric Rice, on July 22, 2015 informing Philidor that it "appear[ed] to be engaging in a widespread fraud." By August 31, 2015, R&O had terminated its engagement with Isolani, and sent Isolani a letter stating that "[i]t is now crystal clear that Isolani/Philidor fraudulently induced Mr. Reitz to [engage with Philidor/Isolani] in order to allow Isolani/Philidor to engage in a massive fraud." R&O noted that "Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, [and] various payer networks," and accused Philidor of "creat[ing] Isolani as the instrumentality to improperly use R&O's National Council for Prescription Drug Programs ("NCPDP") and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O."

96.     Philidor likewise created Lucena Holdings ("Lucena"), another shell company, with the sole purpose of purchasing a stake in West Wilshire Pharmacy ("West Wiltshire"). Filings with the California State Board of Pharmacy show that: (i) Sherri Leon, Philidor's Director of Pharmacy Operations, was Lucena's CEO; (ii) Gregory Blaszczynski, a Philidor

owner, was listed as an owner of Lucena; and (iii) Jamie Fleming, Philidor's Controller, was a director of Lucena. Philidor concealed these individuals' affiliations with Philidor, and falsely stated that they were not associated with any entity that had previously been denied a pharmacy license in California.

97.     Isolani and Lucena are not the only shell companies with chess-themed names that the Enterprise created to carry out its fraudulent scheme. For example, in 2015 Philidor created the shell company Back Rank which had extensive connections with Philidor: Back Rank used an e-mail address at the "philidorrxservices.com" domain name; used as its address Philidor's Hatboro, Pennsylvania address; Gretchen S. Wisehart ("Wisehart"), Philidor's general counsel, served as Back Rank's general counsel; and Philidor's Controller, Fleming, was Back Rank's president. The Enterprise in turn used Back Rank to buy a controlling stake in Orbit Pharmacy, Inc. ("Orbit"), a pharmacy based in Houston, Texas. Orbit then changed its address to the Horsham, Pennsylvania address shared by BQ6, Philidor, and an untold number of Philidor's shell companies. The Enterprise falsely reported to the Texas State Board of Pharmacy that none of its owners or partners had ever been the subject of a professional disciplinary action or been denied a license, despite Philidor's prior license denial in California.

98.     The Enterprise used this nationwide network of shell companies and captive pharmacies to implement Philidor's range of deceptive and illegal sales practices. Specifically, Philidor created a separate "adjudication" department within Philidor to receive prescriptions from doctors and ship drugs to patients before health insurance coverage was secured. Philidor's adjudication department followed an "Adjudication Reference Binder," Philidor's training manual, which instructed employees on specific deceptive and fraudulent practices, including: (i) application of "back door" approaches so that insurers who would not be willing to pay

Philidor directly were tricked into paying Philidor indirectly; (ii) filling prescriptions through Philidor in states where neither Philidor nor the pharmacies in its secret network of captive pharmacies had a pharmacy license; and (iii) altering doctors' prescriptions without authorization to include a "dispense as written" instruction to prevent a pharmacy from substituting cheaper generic equivalents for the prescribed medication.

99.     The Enterprise created the false impression that Philidor and its nationwide network of captive pharmacies were independent from Valeant so that patients, other end payors, and PBMs would not view these pharmacies' allegiance to Valeant products with heightened scrutiny or refuse to pay for or reimburse the price-gouged drugs. Concealing the Valeant-Philidor relationship was critical to the Enterprise's scheme because, among other reasons, the tactics described herein violated numerous provisions of PBM agreements governing their relationships with pharmacies. As evidence that these practices violated PBM agreements, in 2015, OptumRx sent cease and desist letters to, and ceased doing business with, R&O and West Wilshire pharmacies upon discovery that Philidor was surreptitiously operating through those entities. And, as discussed below, when Valeant's relationship to Philidor was exposed, several major third party payors terminated their contracts, leading to a massive decline in revenue for many of Valeant's most important drugs.

### 6.     Valeant Formalizes Its Control Over Philidor Through Execution Of An Undisclosed Purchase Option Agreement

100.     To solidify its control over Philidor, on December 15, 2014, Valeant purchased for $100 million a ten-year option to buy Philidor for $0 (the "Philidor Option"). The deal came with supplemental payments in increments of $25 or $33 million dollars upon certain Philidor performance benchmarks, which, of course, were also rigged because Tanner worked both sides

of the fence and ensured that Valeant sent enough business to Philidor that it would reach each benchmark set by the terms of the Philidor Option.

101.   As discussed herein, the Philidor Option was the subject of further malfeasance by Tanner and Philidor's CEO, Andrew Davenport, who exploited the Valeant-Philidor relationship and the Philidor Option deal to operate a side kickback and money laundering scheme that yielded the pair nearly $50 million and eventually landed them under federal criminal indictment for violation of a host of federal laws. Valeant's top executive team did nothing to prevent or disclose their illegal conduct because Tanner and Davenport were the grease allowing the Enterprise's Valeant-Philidor gears to turn.

102.   The Philidor Option was structured to conceal the Valeant-Philidor relationship, and this structure was approved at the highest level. Indeed, in connection with the Congressional probes, Philidor was asked why Valeant did not simply purchase Philidor outright rather than acquire the option to purchase it for $0. Philidor's counsel, in a written response, said that "Philidor concluded that Valeant's conduct was consistent with a concern about the economic impacts of any PBM response if Valeant had purchased Philidor." Thus, Philidor confirmed that Valeant knew PBMs would refuse to reimburse Philidor prescriptions if PBMs knew of the controlling relationship. Indeed, senior Valeant executives were aware of the payor risk Valeant's scheme subjected it to—as Kornwasser put it, Valeant had "all their eggs in one basket." In other words, if and when Philidor had trouble with the PBMs, it would impact Valeant as a whole—a concern Kornwasser raised to Pearson and other executives.

103.   To add an additional layer of secrecy, the Philidor Option was routed through Valeant's wholly owned subsidiary KGA Fulfillment Services, Inc. (which stands for "King's

Gambit Accepted," yet another chess-themed entity created solely to conceal the Enterprise's fraudulent scheme).

104.     This secret network of captive pharmacies, and its host of deceptive and illegal sales practices, was part of the value that Valeant sought when it purchased the Philidor Option. Indeed, the purchasing agreement required Valeant to enter into subsequent agreements with Philidor shell companies, such as Lucena and Isolani.

### B.     Defendant's Accounting Violations

#### 1.     Valeant's GAAP Responsibilities

105.     Under the federal securities laws and the regulations and guidance promulgated by the U.S. Securities and Exchange Commission ("SEC") pursuant to those laws, companies whose stock is publicly traded in the U.S.—such as Valeant—have important reporting and disclosure obligations.

106.     Public companies are required to file with the SEC certain disclosure documents containing comprehensive information about their business operations and their financial condition. Investors, including Plaintiff, rely on the accuracy and transparency of these disclosures when determining whether to invest.

107.     As a publicly traded corporation with significant operations in the U.S., Valeant is required to prepare its financial statements in accordance with GAAP. GAAP is a set of rules and standards that is designed to ensure uniform financial reporting. Failing to prepare financial statements in accordance with GAAP renders them misleading and inaccurate.

108.     Among those standards is ASB Accounting Standards Codification Topic 810, Consolidation ("ASC 810"). Among other things, ASC 810 sets forth rules governing the disclosure by public companies in their financial statements of "variable interest entities" or

"VIEs." Loosely defined, a VIE is an entity in which the reporting company has a controlling interest. If the reporting company is the "primary beneficiary" of a VIE, it must consolidate the VIE in its financial statements. ASC 810 also requires that certain information about any VIE, whether consolidated or not, be disclosed in a reporting company's financial statements.

109.    In addition to complying with GAAP, the SEC developed standards governing what information public companies must disclose in financial statements and other public filings. For example, with respect to assessing materiality in preparing financial statements, the SEC has released Staff Accounting Bulletin No. 99 ("SAB 99"), which emphasizes the importance of qualitative factors in determining materiality. In SAB 99, the SEC stated that while it had no objection to using a numerical threshold of 5% as a starting point in assessing materiality, "quantifying, in percentage terms, the magnitude of a misstatement is only the beginning of an analysis of materiality; it cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Thus, for example, a quantitative misstatement of revenue under 5% might be deemed material if "the misstatement hides a failure to meet analysts' consensus expectations."

110.    Topic 13 of the SEC Staff Accounting Bulletin Series ("SAB Topic 13") sets forth the rules on revenue recognition. Under SAB Topic 13, "revenue should not be recognized until it is realized or realizable and earned." Generally, revenue is realized or realizable and earned when "[p]ersuasive evidence of an arrangement exists"; "[d]elivery has occurred or services have been rendered"; "[t]he seller's price to the buyer is fixed or determinable"; and "[c]ollectibility is reasonably assured."

111.    Certain SEC filings—such as the issuer's annual report—are required to contain a section titled "Management's Discussion and Analysis of Financial Condition and Results of

Operations" (the "MD&A"). Its underlying purpose is to give investors an opportunity to see the issuer's past results and future prospects through the eyes of management. *See* 17 C.F.R.§ 229.303.

112. SAB Topic 13 further provides that the types of revenue transactions or events that should be disclosed in the MD&A include, among other things, "[c]hanging trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales returns."

113. SAB Topic 13 also requires disclosure of "unusual or infrequent transactions, known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue." Clearly, the Philidor transactions were unusual. But, these transactions also materially affected reported income because of the high product pricing and attendant profitability. In this situation, SAB Topic 13 describes the required disclosure as including "changes in revenue," which "should not be evaluated solely in terms of volume and price changes, but should also include an analysis of the reasons and factors contributing to the increase or decrease."

114. SAB Topic 13's examples further confirm that Valeant should have disclosed its transactions with Philidor. One such example is "An increasing trend toward sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users. Also, increasing service revenue that has a higher profit margin than product sales." While the example highlights a reseller with lower profit margins, the corollary is also required. This circumstance exactly describes Valeant's sales to Philidor.

115.    Public companies such as Valeant are also required to maintain effective internal controls. An issuer's top-ranking executives must personally guarantee the effectiveness of the company's internal controls.

116.    The Committee of Sponsoring Organizations of the Treadway Commission's *Internal Control–Integrated Framework* (which Valeant purported to follow) defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting and compliance."

117.    Section 404 of the Sarbanes-Oxley Act of 2002 ("SOX") requires public companies to publish information in their annual reports concerning the scope and adequacy of their internal control structure and procedures for financial reporting, and also to assess the effectiveness of such internal controls and procedures. In its interpretative guidance issued for the rules promulgated to implement Section 404, the SEC instructed that "management should evaluate whether it has implemented controls that adequately address the risk that a material misstatement of the financial statements would not be prevented or detected in a timely manner. [This involves] a top-down, risk-based approach . . ., including the role of entity-level controls in assessing financial reporting risks and the adequacy of controls." Commission Guidance Regarding Management's Report on Internal Control Over Financial Reporting Under Section 13(a) or 15(d) of the Securities Exchange Act of 1934, Exchange Act Release No. 55929, § I (June 20, 2007). When management identifies a control deficiency, it cannot claim that its internal controls are effective if the control deficiency is deemed to be a material weakness.

118.    Section 302 of SOX requires a public company's CEO and CFO to provide certifications concerning their review of, and disclosure of information about, the company's

39

internal controls. *See* Certification of Disclosure in Companies' Quarterly and Annual Reports, Exchange Act Release No. 46427, § II.A (Aug. 28, 2002) (footnotes omitted).

### 2.    Valeant's Violations of GAAP

119.    Throughout the relevant period, Valeant represented to investors, including Plaintiff, that Valeant's accounting and SEC filings complied with the applicable public reporting obligations by timely disclosing truthful material facts about Valeant's business, accurately reporting its financial results, and maintaining effective internal controls. However, unbeknownst to the market, Valeant omitted to disclose material information and made misrepresentations about its illicit use of a secret network of pharmacies, its recorded revenue, its reliance on Philidor, and its growth, which—when the truth was slowly revealed to the outside world—caused a precipitous decline in the value of Valeant securities. Indeed, Valeant has since admitted that its accounting violated GAAP and that it had inadequate internal controls during the relevant period, leading to the resignation of Defendants Schiller and Carro, and a restatement of Valeant's revenue—an admission that its GAAP violations were material to reasonable investors and needed to be corrected.

120.    Valeant's financial statements violated GAAP in several ways. First, Valeant failed to disclose Philidor despite the fact that Philidor should have been considered a material VIE during the period, that Philidor was a material change in the sales channel, and the fact that the Philidor Option was a material acquisition. Second, Valeant improperly double-booked revenue for sales to Philidor in the fourth quarter of 2014. Third, Valeant's executives falsely certified that Valeant maintained adequate internal controls over financial reporting throughout the relevant period, statements that Valeant later admitted were untrue.

121.    Valeant later justified hiding Philidor from investors by claiming in an October 26, 2015 investor conference call that Philidor was not quantitatively material, as it fell below a "pre-established internal threshold." Yet, Philidor was clearly significant to Valeant's business as defined by ASC 250-10-S99. As an initial matter, Valeant had agreed to pay up to $233 million to acquire Philidor. Indeed, Valeant had disclosed two smaller transactions, specialty pharmacy Natur Produkt International, JSC ($149.9 million) and Gerot Lannach ($164 million), in its 2014 10-K (Valeant 2014 Annual Report on Form 10-K, at F-21 and F-25). Philidor would account for over 7% of Valeant's 2015 sales. In addition, Valeant's sales through Philidor involved products priced significantly above average, and were thus integral to Valeant's profitability. For 2014, Valeant originally attributed a total of $111 million in sales to Philidor, but $58 million of that sum was later determined not to comply with GAAP, an overstatement of 109%.

122.    In addition, Valeant's treatment of Philidor strongly suggests that Valeant believed Philidor to be material. For example, Philidor was explicitly included in Valeant's SOX testing of internal control over financial reporting. PCAOB Standard AS 5 states that locations with a reasonable possibility of *material* misstatements should be tested. AS 5.B11. Similarly, Valeant's restatement of Philidor-related revenue itself constitutes an admission of materiality, as restatements are required when a misstatement is material.

123.    When Valeant finally disclosed its relationship with Philidor in October 2015, analysts considered these transactions to be significant. For example, Morgan Stanley estimated that Philidor contributed over 50% of Valeant 2015 U.S. organic growth (Morgan Stanley Research, October 30, 2015). BMO Capital Markets concluded that Valeant should have disclosed the structure of its relationship with Philidor and the fact that consolidation was

occurring, especially considering that the secret pharmacy channel represented about 10% of Valeant's revenue (BMO Capital Markets, October 23, 2015).

124.    Indeed, the Enterprise suppressed information about Philidor, falsely attributed Valeant's growth to volume increases, and misstated its revenues *because* this information was material to investors. The Enterprise sought to convince investors that Valeant's acquisition strategy could form the basis for sustainable, volume-based growth. To do that, Valeant needed to continually meet revenue expectations, especially in relation to newly-acquired drugs. To meet these expectations, Valeant relied on Philidor and its network of secret pharmacies to obtain reimbursement for its high-priced drugs. If investors understood how much Valeant's growth relied on conning third party payors, they would not have valued it as highly—as demonstrated by the massive devaluation of Valeant's securities as the truth emerged.

### C.    The Enterprise's Material Misrepresentations And Omissions

125.    An essential component of the scheme was the Enterprise members' efforts to conceal their price-based business model and deceptive sales tactics by making prolific false and misleading representations about Valeant's business model. Without the cover of its campaign of misrepresentations, the Enterprise would have been unable to retain investors, sell new securities at inflated prices, or sustain its short-term business model of reaping profits by gouging prices. Each of the Enterprise's intentional misrepresentations constitutes a violation of Section 10(b) of the Exchange Act and gives rise to a separate claim of securities, mail, and wire fraud, and, as such, each constitutes a separate predicate act of racketeering under the New Jersey Racketeering Influenced Corrupt Organizations Act ("NJ RICO").

126.    During the relevant period, the Enterprise made numerous material misrepresentations and omissions of material fact concerning Valeant's business, including:

(a) statements indicating that volume played a larger role in Valeant's rapid revenue growth than it actually did; (b) statements obscuring and omitting to disclose Valeant's ties to Philidor and use of a network of secret pharmacies and deceptive business practices to unsustainably and artificially inflate sales and prop up prices; (c) representations that Valeant's reported financials for the third and fourth quarters and full year of 2014, and the first nine months of 2015 complied with GAAP, and that the Company's financial guidance for 2016 had a reasonable basis in fact; and (d) general representations by Defendants and certifications by Valeant's executives that the Company had adequate internal controls.

127.    Among other consequences, the Enterprise's material misstatements and omissions caused Valeant securities to trade at artificially inflated prices during the relevant period. As discussed herein, these statements and omissions were materially false and misleading because:

(a)    from 2013 to 2015, Valeant pursued a deliberate strategy—devised at the highest levels of the company, but hidden from investors—that relied on steep and repeated price hikes rather than sustainable volume increases to drive revenue growth;

(b)    Valeant helped create Philidor in 2013 solely to benefit Valeant, controlled the pharmacy by staffing it with Valeant employees, and through Philidor and its network of secret captive pharmacies, implemented deceptive business practices to drive sales of Valeant drugs by ensuring that therapeutically identical generic drugs were not substituted for Valeant's expensive branded drugs;

(c)    Valeant employed deceptive practices that included: (i) implementing enormous undisclosed price increases that Defendants knew were unsustainable but allowed Valeant to meet financial targets; (ii) using Valeant's sales force to route patients into Valeant's

43

network of secret and captive pharmacies that presented themselves as independent; (iii) using the so-called "patient assistance" program and public relations strategies to minimize patient complaints and deflect scrutiny into the Company's improper practices; and (iv) concealing these practices from payors and physicians in order to obtain reimbursement for drugs that would not otherwise be reimbursed if these practices were known to private payors, physicians, and PBMs.

(d)     Valeant's reported revenues, earnings per share ("EPS"), profitability, growth, and future business prospects were dependent on the Company's continued ability to conceal and rely on these deceptive business practices and thus did not accurately portray Valeant's business prospects and financial performance;

(e)     Valeant's control and use of Philidor and its network of secret pharmacies, and the Company's deceptive business practices, posed material regulatory and reimbursement risks to Valeant's business prospects, including government investigations, regulatory sanctions, criminal charges, reputational harm, contractual violations, and decreased sales and revenues;

(f)     Valeant's growth and ability to service its debt were dependent on maintaining a cycle of acquiring companies and drug portfolios and then generating revenue by putting the newly acquired drugs through its program of massive price increases coupled with the deceptive practices described above. By relying on deceptive practices to support its debt-fueled acquisition strategy, the Defendants exponentially magnified business risks to the Company in the event that discovery forced the Company to stop its secret strategy;

(g)     Valeant failed to disclose Philidor as a material VIE, as required by GAAP;

(h)     Valeant improperly recognized Philidor revenue, in violation of GAAP, causing revenues, net income, and EPS to be materially misstated and inflated;

44

(i)     Valeant's financial predictions for 2016 did not have a reasonable basis in fact and were issued to artificially inflate Valeant's securities in the face of new revelations about its business model; and

(j)     Valeant did not have adequate internal controls and, in fact, Valeant has admitted that certain Valeant executives cultivated an "improper tone at that top of the organization" and a "performance-based environment" where employees prioritized stock price and their own compensation over building a sustainable business and complying with applicable laws, regulations, and contracts.

1.     **The Enterprise Falsely Attributed Valeant's Rapid Revenue Increases to Organic Volume Growth and Obscured Valeant's Reliance on Price Increases**

128.     Throughout the relevant period, the Enterprise repeatedly misrepresented the amount of Valeant's revenue growth that was driven by organic growth in volume, rather than price increases. These statements were materially false and misleading because they failed to disclose how dependent Valeant was on price increases, supported by a network of captive pharmacies, to drive revenue. Because investors associate volume-based revenue growth with more sustainable long-term cash flows, and consider price increases to be a short-term boost, these representations were material to investors' decisions to buy Valeant securities. Valeant could only sustain this model as long as it could rely on a secret network of pharmacies to hide the reimbursement practices it needed to sustain its price increases. As the details of its deceptive practices were revealed, Valeant lost its ability to receive reimbursement for its high-priced drugs and its profits plunged.

129.     On January 4, 2013, Pearson and Schiller hosted a conference call with investors and analysts to discuss Valeant's 2013 financial guidance. On the call, Pearson and Schiller

made several statements concerning Valeant's business model and financial prospects. Regarding Valeant's organic growth, Pearson stated:

> 2012 was another very strong year for Valeant. From a top line perspective we added over $1 billion in revenue in 2012 . . . . On the bottom line, **we delivered cash EPS growth of greater than 50% as compared to 2011, demonstrating once again the sustainability of our business model.**
>
> **Our businesses continued to deliver strong organic growth**, and we expect full year 2012 to have same-store sales, organic growth of approximately 8%, and pro forma organic growth of approximately 10%.

130.   Later in the call, in response to an analyst's question about projected organic growth, Pearson stated, "Really the only two big changes, Gary, are **Neuro, which we expect as we mentioned previously, to have positive organic growth this year**, and dermatology, which will probably fall more in line with what we've experienced as a Company."

131.   On February 28, 2013, the Pearson and Schiller hosted a conference call to discuss financial results for the fourth quarter of 2012. During opening remarks, Pearson stated, "Organic growth continued to be strong for both the quarter and the year. **We are particularly pleased to report a return to positive growth for our Neuro and Other business after six quarters of decline**. As we mentioned earlier this year, we expect U.S. Neuro and Other business to continue to grow throughout 2013."

132.   The statements in ¶¶ 129-31, that Valeant's "organic growth" demonstrated the "sustainability" of Valeant's business model, and that Valeant expected the Neurology and Other unit to have positive organic growth were false and misleading when made because Defendants omitted to tell investors that Pearson and Valeant's executives and senior managers had adopted a strategy of boosting flagging revenues with dramatic price increases, rather than more sustainable volume growth. For example, as discussed above at ¶¶ 66–72 and detailed in the

Senate Drug Pricing Report, in late 2012 Valeant executives adopted a plan to aggressively raise prices in Valeant's Neurology and Other unit to compensate for declining revenue and turn it into the most profitable unit within Valeant in 2013, a plan the Company subsequently put into practice. *See* Drug Pricing Report, at 50–55. Valeant's price-hike strategy was not confined to a single business unit—during his testimony before the U.S. Senate on April 27, 2016, Pearson admitted that for each quarter (except one) between January 1, 2013 and September 30, 2015, "***pricing has driven more growth than volume***."

133.    On October 31, 2013, the Company issued a release reporting its 2013 third quarter ("3Q13") financial results. The release again emphasized Valeant's rapid growth, stating that "Valeant's Developed Markets revenue was $1.14 billion, up 77% as compared to the third quarter of 2012" and that "***[t]he growth in the Developed Markets was driven by continued improvement in many of our Dermatology prescription brands***, ***our aesthetics and oral health portfolios, our orphan drug products and CeraVe***."

134.    On January 7, 2014, Pearson and Schiller hosted a conference call with investors and analysts. During the call, Pearson again highlighted Valeant's purportedly strong organic growth:

> If we compare Valeant's performance in 2013 to the company's average performance from 2009 through 2012, you can see a continuing track record of consistent strong performance in terms of growth in revenues, earnings, and most important, returns to all of you, our shareholders. ***This is a result of achieving strong organic growth in a fiscally responsible manner for the products that we already own, coupled with a consistent track record of buying durable assets in a very disciplined manner and over-achieving in terms of improving growth rates and extracting cost synergies***.

135.    The statements in ¶¶ 133-34 were materially false and misleading when made because Valeant's revenue growth was not driven by "improving growth rates," or "strong

organic growth," nor was Valeant's business model sustainable. Rather, Valeant executives had adopted a strategy of relying on repeated and dramatic price increases to drive revenues, as discussed in ¶¶ 127 and 132 above.

136.    On February 28, 2014, the Company filed its annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"). The 2013 10-K was signed by Pearson and Schiller. The 2013 10-K included statements attributing the Company's growth to a purportedly legitimate low-risk business model. For example, the 2013 10-K stated:

> The growth of our business is further augmented through our lower risk research and development model. ***This model allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense*** . . . This is achieved primarily as follows: ***focusing our efforts on niche therapeutic areas*** . . . and ***acquiring dossiers and registrations for branded generic products***, which require limited manufacturing start-up and development activities.

137.    The statements in ¶ 136 were materially false and misleading because Valeant's purported "low risk research model" could not, in fact, sustainably "drive future commercial growth." Rather, in both the "niche therapeutic areas" [orphan drugs in its Neurology and Other unit] and "branded generic products," Valeant was relying on steep price increases, as well as the improper business practices described in ¶ 127, to drive revenue growth throughout the relevant period.

138.    On April 22, 2014, Valeant issued a press release stating that it had submitted an unsolicited merger proposal to Allergan's Board of Directors. In total, the offer to acquire Allergan, a drug manufacturer, was valued at approximately $46 billion.

139.    On May 8, 2014, the Company issued a press release announcing Valeant's first quarter 2014 ("1Q14") financial results. The release discussed Valeant's continued trend of extraordinary growth, including revenue growth which represented "an increase of 77% over the

prior year," which "[e]xceed[ed] our expectations," along with "*[p]ositive organic growth in the U.S. . . .*" The release quoted Pearson as stating, in part, "*[o]ur first quarter results demonstrate the strong, durable nature of our diversified business model.*"

140.    On May 9, 2014, Valeant filed its quarterly report on Form 10-Q for the first quarter ended March 31, 2014 ("1Q14 10-Q"). The 1Q14 10-Q was signed by Pearson and Schiller. In the report, the Company again attributed its commercial growth to a low risk model, stating: "*The growth of our business is further augmented through our lower risk research and development model, which allows us to advance certain development programs to drive future commercial growth, while minimizing our research and development expense . . . .*"

141.    The statements in ¶¶ 138–40 were false and misleading when made for the reasons discussed in ¶¶ 127 and 132, above.

142.    On May 12, 2014, Allergan issued a press release rejecting Valeant's unsolicited bid, stating its Board of Directors "believes that the Valeant business model is not sustainable." During a conference call on the same day, Allergan's Chairman and CEO referred to "the unsustainability of Valeant's business model," emphasized Valeant's lack of organic growth, and cautioned investors to "very carefully" check the results "actually achieved" by Valeant's new product launches and "dig in what are the price increases behind those very low [organic growth] numbers because there are some eye-popping increases of price."

143.    In response to Allergan's criticism, Defendants falsely insisted that Valeant's business model was sustainable, and that the Company's revenue growth was based on organic volume growth, not price increases and deceptive and unsustainable business practices. Indeed, Defendants claimed multiple times that the Company's managed care contracts prevented it from raising prices more than single-digit percentages each year.

144.    For example, on May 28, 2014, Valeant held an investor meeting and conference call to respond to Allergan's accusations. During the call, Pearson stated that they would provide "*a much deeper understanding of our operating model and why we believe it is sustainable for many years to come*" and show that "*when we buy a platform asset, we have either maintained the growth or in most cases, we have accelerated the growth* . . . ." During the question and answer session, Pearson was asked to reconcile industry data showing 15% price increases with slides used during the presentation showing a 1% increase. Pearson replied, in part, "*We are limited. For example in the U.S. with our managed care contracts, I think the maximum price increase we can take a year is 9% across dermatology, across ophthalmology, etc. So that is what limits*. *It is managed care in the United States.*" Pearson concluded the presentation by claiming Valeant "*has delivered strong organic growth since I have been here*" and "*[w]e are very transparent*" and "*our basic underlying growth rate is about 8%*[.]"

145.    Also on May 28, 2014, Pearson participated in the Sanford C. Bernstein Strategic Decisions Conference on behalf of Valeant. In response to numerous questions about Valeant's business model, Pearson again insisted that Valeant's business was sustainable, based on organic volume growth, and that the Company could not rely on price increases for revenue growth:

> The only country in the world that you can really sustainably increase pricing is the United States. *And in the United States, you're governed by managed care contracts. And the managed care contract—the highest price increase we could take under any managed care contract we have in the US is 9% a year*.

> So, we have a lot of constraints, just like other pharma companies do, in terms of pricing. *So, we focus on volume growth, and the vast majority of our growth on a global basis—and we went through some of that this morning—is volume*.

146.    During the same conference, Pearson also justified Valeant's refusal to provide more detailed disclosures about product sales, stating, "*We're more like a generics company in*

*terms of the amount of revenue we get per product*," and that "[it] just makes no sense" to make such disclosures.

147.     And again, during a June 17, 2014 conference call hosted by Pearson and Schiller "to refute recent misleading assertions made by Allergan," Pearson emphasized that Valeant's business was "strong" and "sustainable," stating:

> I am pleased to update all of you that our business is continuing to perform well. I find it very odd that Allergan continues to suggest that our Q2 and in particular our Q3 results will demonstrate weakness. . . . *In short, our business is strong and I can assure you our operating model is both durable and sustainable*.
>
> In Allergan's investor presentation dated June 10, 2014, they asserted that Valeant has experienced volume decreases in 11 of its top 15 worldwide pharmaceutical products.
>
> First, the products listed in the presentation are not Valeant's top 15 products by revenue. Only 6 of the products listed are in Valeant's top 15 products. *The presentation also claimed that most of our products are not growing, when in fact, 13 of our top 15 products are growing and 9 of the top 15 are growing by volume, not just price*.

148.     Later in the call, Pearson continued to insist that Valeant's growth was based on increasing volume, stating that when, at some unspecified time, Valeant does break down sales into volume and price, "it will be surprising to people because I think *volume is a much larger piece of our organic growth than most people would assume it is*."

149.     Pearson further stated during the June 17, 2014 conference call that "[o]ur sales force in dermatology now has been stable for a few quarters and . . . *all our promoted products in dermatology are growing*."

150.     The statements in ¶¶ 144–49 that Valeant's business model was "strong" and "sustainable," that the "majority" of the Company's growth was "volume," that Valeant was "focused" on increasing volume growth rather than price, and that "volume is a much larger

piece of our organic growth than most people would assume" were materially false and misleading when made for the reasons stated in ¶¶ 127 and 132. In addition, Pearson's claims that Valeant was "limited" to price increases of "9%" was materially false and misleading when made because Valeant implemented price increases far beyond 9% in multiple drugs, across several business units. For example, in 2013 and 2014, Valeant increased the price of Cuprimine by 224% and 158%, respectively. These practices were widespread—the Senate Report concluded that Valeant pursued this price strategy "companywide," and Pearson admitted in Senate testimony that price drove revenue growth more than volume in every quarter except one between January 1, 2013 and September 30, 2015.

151.    On July 31, 2014, the Company issued a press release announcing its second quarter 2014 ("2Q14") financial results. The release reported "2014 Second Quarter Total Revenue [of] $2.0 billion; an increase of 86% over the prior year." It quoted Pearson stating "*Valeant once again delivered strong quarterly results and, as expected, organic growth has accelerated from the first quarter*. As we look across the entire business, I have never been more confident about the growth trajectory across the entire company."

152.    On August 1, 2014, the Company filed its quarterly report on Form 10-Q for 2Q14 ("2Q14 10-Q"), signed by Pearson and Schiller. The 2Q14 10-Q included a statement regarding the commercial growth achieved through the Company's purportedly lower risk business strategy, stating: "The growth of our business is further augmented through our lower risk research and development model, *which allows us to advance certain development programs to drive future commercial growth*, while minimizing our research and development expense."

52

153.    On September 11, 2014, the Company filed with the SEC a letter sent by Pearson to Valeant's employees, which included reference to Allergan's "attack[s] on our business" and "*our business model and our track record of organic growth*." In the letter, Pearson responded that "[h]ighlights across Valeant's businesses include . . . *continued tremendous growth in our U.S. Neuro & Other and OraPharma businesses.*"

154.    On October 20, 2014, in response to further criticism by Allergan, Valeant filed a document titled "October 20th rebuttal items." In the document, Valeant disputed Allergan's claim that "price is a large drive[r] of growth for select Valeant U.S. pharmaceutical businesses" by stating, in part, that: "*Overall price/volume for the Valeant business was ~50% volume and ~50% price*"; "Like all PhRMA [Pharmaceutical Research and Manufacturers of America] companies, including Allergan, *our managed care contracts restrict our price increases each year, and many of our managed care contracts restrict price increases to less than 10% net price increase per year*"; and "*Gross price increases could be seen as higher but do not contribute to our reported net sales growth*."

155.    The statements in ¶¶ 151–54 about the "sustainability" of Valeant's business model, Valeant's organic volume growth, and the ability of Valeant's purportedly "low risk research model" to drive "commercial growth" were materially false and misleading for the reasons discussed in ¶¶ 127 and 132 above. In addition, the statements in ¶ 154 claiming that Valeant was constrained to price increases of "less than 10%" were materially false and misleading because at the time Valeant was relying on triple-digit price percentage increases to drive revenue growth, as discussed in ¶ 150, above.

156.    On February 23, 2015, Pearson and Schiller hosted a conference call to discuss Valeant's 4Q14 and full year 2014 financial results. During the call, Schiller highlighted

Valeant's sources of growth, including that "[r]evenues for our dermatology business were very strong and increased 70% year-over-year" and:

> **The outstanding work of our sales teams, implementation of innovative marketing approaches, great leadership, a portfolio of great products, and our four new launch products** have contributed to the turnaround and the outstanding results in our dermatology business in Q4 and 2014.
>
> Core products such as Zyclara, Elidel, and the RAM franchise continued their strong growth. And Solodyn grew in Q4 and grew 5% for all of 2014, after a tough year in 2013.
>
> Jublia continues its rapid growth trajectory and reported more than 20,000 weekly scripts for the last reported weekly sales report. This yields an annualized run rate of greater than $250 million for the product.

157. On February 25, 2015, Valeant filed with the SEC its annual report on Form 10-K for the year ended December 31, 2014 ("2014 10-K"). The 2014 10-K was signed by Defendants Pearson and Schiller, and the relevant third parties. The 2014 10-K:

(a)    attributed the source of Valeant's growth to "**our lower risk, output-focused research and development model, which allows us to advance certain development programs to drive future commercial growth**, while minimizing our research and development expense"; and

(b)    claimed "[t]o successfully compete for business with managed care and pharmacy benefits management organizations, **we must often demonstrate that our products offer** not only medical benefits but also **cost advantages as compared with other forms of care**[.]"

158. The statements in ¶¶ 156–57, that Valeant's organic was attributable to an "outstanding sales team," "portfolio of great products," and other factors that did not include dramatic price increases, that Valeant's "lower risk" research model could "drive future

commercial growth," and that Valeant must demonstrate "cost advantages," were false and misleading when made for the reasons discussed in ¶¶ 127 and 132, above.

159.    On March 16, 2015, Valeant announced a $1.45 billion public offering of 7.3 million shares of common stock at a price of $199 per share, the proceeds of which were used to fund the acquisition of Salix and related costs (*see* ¶ 183 below). The March 2015 Stock Offering was conducted pursuant to the March 2015 Stock Offering Materials, including the Registration Statement and Prospectus Supplement.

160.    The March 2015 Stock Offering Materials represented that:

(a)    A "key element" of Valeant's business strategy, which allowed it to "***improve both the growth rate and profitability of the Company***" and "enhance shareholder value," was its "***low-risk research and development ('R&D') model***"; and

(b)    Valeant's dermatology segment and other segments were "attractive markets" in which Valeant operated because they were "high-growth businesses" with "***sustainable organic growth***" where the "healthcare professional or patient is still the primary decision maker," and similarly stated that Valeant's business strategy operated "to ensure decisions are made close to the customer" and that there was "significant opportunity to create value through application of the Valeant model."

161.    On April 29, 2015, the Company issued a press release announcing its financial results for the first quarter 2015 ("1Q15"), as well as increased guidance for full year 2015. The release reported: "Same Store Sales Organic Growth was 15%, driven by," among other things, "Growth from launch brands, including BioTrue Multipurpose Solution, BioTrue ONEday Contact Lens, Jublia, Luzu, and Ultra Contact Lens," and "***Double digit growth in U.S.***

*businesses such as Contact Lens, Dermatology, Neurology and Other, Obagi, and Oral Health*."

162.    On April 29, 2015, Pearson, Schiller and Kellen hosted a conference call to discuss Valeant's 1Q15 financial results with investors and analysts. During the call Pearson stated, in part: "Our US dermatology business had an outstanding quarter. Dermatology revenue grew 38% year on year and script growth grew 37% year on year. Jublia scripts grew 87% in Q1 versus Q4 of last year."

163.    An analyst asked "if you could quantify a little bit how much was price versus volume that contributed to growth in 1Q [2015]? And what do you factor in your full-year guidance price versus volume?" Pearson responded that, "In terms of price volume, *actually volume was greater than price in terms of our growth*. Outside the United States it's all volume. . . . *And in the US it's shifting more to volume than price*, and we expect that to continue with our launch brands. *A lot of our prices for most of our products are negotiated with managed care. And there's only a limited amount of price that we can take.*"

164.    On May 21, 2015, Pearson attended an RBC Investor Meeting on behalf of the Company and made numerous statements about the Company's pricing, source of growth, and accounting practices, including:

(a)    when asked to discuss pricing in the U.S., Pearson said that due to managed care contracts, Valeant was "*contractually*" not allowed to raise prices beyond an average of *"5%,"* including in its Dermatology business;

(b)    in discussing pricing, Pearson said of the Neurology and Other business segment "that's where we have the most ability to raise price[s]" and raising prices "is I believe not, at least from your [an investor's] standpoint a bad thing." Pearson said Valeant's base plan

was around 5% price increases adding that Valeant had raised prices more in certain areas but that "*we don't plan for them, but again if we can take advantage of – during times we've had significant price increases in acquisitions*";

        (c)    Pearson said they raised the prices of Isuprel and Nitropress because Marathon left money "on the table" and claimed the drugs were priced much lower than competitive products, stating they raised prices "because the drugs were mispriced vs. comparative products" and adding "that can create lot of value[] for shareholders"; and

        (d)    Pearson added that "we've been [accused] of our growth being price and not [volume]" but claimed that "*organic growth is more volume than price and will continue to be.*"

    165.    On July 23, 2015, the Company hosted a conference call to discuss its 2Q15 financial results. During the call, Pearson was asked about the price increase on Glumetza and the "extent to which you envision more pricing power . . . broadly speaking, in the U.S.?" In response, Pearson stated:

> I think most pharma companies that I'm aware of, as the product gets into the last stages of their life, like Glumetza -- we're going to lose Glumetza within six months—***often price increases are taken at the end. So that was just consistent with what most companies do***.
>
> Our view on pricing—***across most of our portfolio, we do not take prices.*** Outside the US, there's like zero price. I think, David, as we get more and more into segments like contact lenses and consumer products and other devices, we're not able to take price. ***So we're opportunistic when it comes to price. But our base strategy is, how do we grow organically through volume, which is—I think this quarter, we once again exhibited our ability to do so***.

    166.    On July 28, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for its 2Q15, ended June 30, 2015 ("2Q15 10-Q"). The 2Q15 10-Q was signed by Pearson

and Rosiello. The 2Q15 10-Q reported the Company's revenues for the six months ended June 30, 2015 of $4.923 billion. The 2Q15 10-Q included a statement regarding the Company's purportedly lower risk business strategy, stating: "The growth of our business is further augmented through our **lower risk, output-focused research and development model**, which allows us to advance certain development programs to **drive future commercial growth**, while minimizing our research and development expense."

167.    The statements in ¶¶ 160–66 touting Valeant's volume increases, downplaying the role that price increases played in Valeant's growth, that contractually Valeant could not raise prices more than 5%, and that the Company does not plan for price increases were materially false and misleading when made, as detailed in ¶¶ 127, 132, and 150. And the statements about the "sustainability" of Valeant's business model, Valeant's organic volume growth, and the ability of Valeant's purportedly "low risk research model" to drive "commercial growth" were materially false and misleading for the reasons discussed in ¶¶ 127 and 132 above. As discussed above, Valeant relied on double- and triple-digit percentage price increases throughout the relevant period. Indeed, in response to Pearson's public statement to investors in ¶ 164 that "organic growth is more volume than price," Schiller sent him an email on May 21, 2015, with the subject "price/volume," in which he corrected Pearson: "Last night, one of the investors asked about price [versus] volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." Despite Schiller's email, Pearson did not retract his misleading statements about price and volume, and the statements had their intended effect. On May 26, 2015, an RBC Capital Markets, LLC ("RBC Capital Markets") analyst reported that one of the key takeaways from the meetings with Valeant management and Pearson, was "volume not price is fueling organic growth."

### 2.      Misrepresentations Concerning Philidor

168.     Defendants created Philidor and a network of secret pharmacies to maintain Valeant's inflated prices by ensuring that patients received Valeant prescriptions rather than the equivalent generics, to bypass other cost-controlling systems employed by PBMs and third party payors. In order to continue its fraudulent program however, the Enterprise had to conceal Philidor's ties to Valeant. In order to do so, Defendants issued numerous false and misleading statements during the relevant period and violated relevant accounting rules in their public filings.

### (a)      Defendants' incomplete and misleading descriptions of the Alternate Fulfillment Program

169.     Valeant's so-called AF Program was not designed to help patients. Rather, it served as little more than the cover for the fraudulent scheme the Enterprise was running through Philidor and the network of Valeant-controlled pharmacies. Throughout the relevant period, however, Defendants chose to speak about the operations and purported benefits of the AF Program without disclosing that the way Valeant used Philidor to ensure patients were prescribed Valeant products could subject Valeant to serious regulatory and reimbursement risks.

170.     On February 28, 2013, the Company issued a release and hosted a conference call regarding Valeant's 2012 financial results. During the call, Pearson and Schiller highlighted the purported benefits of their AF strategy but did not disclose the associated improper practices and risks. In response to a question about the AF strategy, Pearson represented that "***The program is working actually quite well. We are going to be rolling out a couple new generations of the program but we're not going to talk about it on this call***." When pressed for details on the "Medicis alternate fulfillment channel" and "how that sort of contributes to the growth," Pearson emphasized that it had increased sales volumes but similarly refused to disclose the improper

practices and risks, stating: "We have never given details. Medicis never gave details. And that was probably a smart practice. We are not going to give details in terms of what's flowing through full alternate fulfillment and what's not. *What we can reiterate is that all of our key brands in dermatology since our sales force meeting are now growing*."

171.    On June 11, 2013, Schiller presented at the Goldman Sachs Healthcare Conference. When asked about the Company's "alternative fulfillment program" by a Goldman Sachs analyst, Schiller responded that the program was increasing profits and that AF was a trend in "the whole pharmaceutical industry":

> Alternative fulfillment, I think a couple things. *One is, to me, the alternative fulfillments was an example of what the whole pharmaceutical industry*—certainly what Mike and I believe is the trend, and that is the focus on the profitable scripts. There was a day when you could call on anybody, and almost any script was profitable. Those days are gone. So segmenting your customer base and really focusing on profitability has got to be the future. And that's—alternative fulfillment was the beginning of that journey, but not the endpoint.
>
> So I probably think under Medicis, alternative fulfillment was held out a little bit too much as the Holy Grail. I really think it's - it's actually the starting points, and in some ways, it was quite a clumsy starting point. It wasn't that different, but it's a process where we have generation two and generation three. *But it's all trying to focus on profitable scripts, and stay away from those scripts that are unprofitable, and more judicious use of copay cards and the rest, and making sure when a customer, a patient is covered, you get reimbursed for it.* . . . Yes, I think—I'm hoping—we've got generation two and generation three, which I'm hoping sort of turn it into a pure defense, into more of an offensive tool to allow us to grow profits. And that's really the focus, is growing profits.

172.    On July 23, 2015, the Company also hosted a conference call to discuss its 2Q15 financial results. During the question and answer portion of the call, a Jefferies LLC analyst questioned whether the number of prescriptions for Jublia going through specialty pharmacy

channels had improved. In response, Kellen, Valeant's Company Group Chairman, concealed Valeant's control over the Philidor network, and stated: "***Yes, the adoption through multiple specialty pharmacies continues.*** I think last time we said Jublia was around 50%. That trend continues. For derm[atology] overall, it varies by product, but it's around 40%."

173.    The statements in ¶¶ 170–72 were false and misleading when made because Defendants, having chosen to speak, failed to disclose that the AF Program was not a "multi-stage" program, nor did it involve "multiple specialty pharmacies," or simply "focus[ing] on profitable scripts." Nor did Valeant's program resemble what the "whole pharmaceutical industry" was implementing. Rather, it consisted almost entirely of routing prescriptions through a Valeant-controlled pharmacy, Philidor, which used a network of secret pharmacies and improper and illegal practices to obtain reimbursement for drugs that otherwise would have been rejected by independent pharmacies or third party payors. These practices inflated Valeant's sales figures while posing extreme and undisclosed business, regulatory, and reimbursement risks—risks that in fact came to pass when Valeant's control of Philidor was exposed.

### (b)    Defendants' misrepresentations and omissions regarding Philidor prior to the December 2014 purchase option agreement

174.    As discussed above at ¶¶ 74–82, Valeant formed Philidor in January 2013 to serve as a channel for Valeant to push its high-priced branded drugs on patients by avoiding, sometimes fraudulently, efforts to switch patients to identical generics. As part of Defendants' scheme to conceal Valeant's creation of and control over Philidor, Defendants failed to disclose to investors and otherwise obscured Valeant's relationship with Philidor.

175.    On May 3, 2013, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2013 ("1Q13 10-Q"). The 1Q13 10-Q represented that "***pricing and***

*sales volume of certain of our products* . . . *are distributed by third parties, over which we have no or limited control.*" Valeant included identical statements in its financial filings, signed by Valeant's top executives, until Valeant's control of Philidor was exposed in October 2015. This statement also appeared in later SEC filings, including Valeant's: (1) August 7, 2013 quarterly report on Form 10-Q for the second quarter ended June 30, 2013 ("2Q13 10-Q"), signed by Pearson and Schiller; (2) November 1, 2013 quarterly report on Form 10-Q for its 3Q13 ended September 30, 2013 ("3Q13 10-Q"), signed by Pearson and Schiller; (3) February 28, 2014 annual report on Form 10-K for the year ended December 31, 2013 ("2013 10-K"), signed by Pearson and Schiller; (4) May 9, 2014 quarterly report on Form 10-Q for the first quarter ended March 31, 2014 ("1Q14 10-Q"), signed by Pearson and Schiller; (5) August 1, 2014 quarterly report on Form 10-Q for the second quarter ended June 30, 2014 ("2Q14 10-Q"), signed by Pearson and Schiller; and (6) October 24, 2014 quarterly report on Form 10-Q for the third quarter ended September 30, 2014 ("3Q14 10-Q"), signed by Pearson and Schiller.

176.    The statements in ¶ 175 that Valeant had "no or limited control" over the pricing and sales volume of drugs in the hands of third parties were materially false and misleading, because Valeant had created a network of secret captive pharmacies for the express purpose of being able to control the pricing of its drugs. As discussed above, Valeant had created Philidor, Valeant was Philidor's only client, and multiple Valeant employees worked on site at Philidor and saw Philidor and Valeant as the same organization.

177.    Furthermore, each of the SEC filings discussed in ¶ 175 contained an MD&A section. Valeant failed to disclose Philidor as a distinct sales channel in any of those reports. The MD&A in each of each of these reports, which caused Valeant securities to trade at artificially inflated prices, was materially misleading and incomplete because, under SAB Topic 13, Valeant

had an obligation to disclose Philidor as a distinct sales channel in its MD&A. Specifically, Valeant was required to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could be expected to have a significant effect on future sales or sale returns." By the third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of Valeant's revenues, and likely more given the substantial decline in Valeant's revenue following Philidor's closure. Thus, Valeant was required to disclose Philidor as a changing trend in a sales channel that was expected to have a significant effect on Valeant's sales.

178.    In addition, the 2013 10-K was signed by Pearson and Schiller. In the 2013 10-K, Valeant, Pearson and Schiller represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles." In Note 2 to its Consolidated Financial Statements—entitled "Significant Accounting Policies"—Valeant, Pearson, and Schiller represented that, "*[t]here were no material arrangements determined to be variable interest entities*."

179.    The statements above in ¶ 178, which caused Valeant securities to trade at artificially inflated prices, were materially false, misleading, and incomplete because Valeant was Philidor's only client and operated Philidor to its benefit and effectively as a division of the Company. Thus, even before the purchase option agreement, Philidor was a material unconsolidated VIE and Defendants should have disclosed it as such. In addition, Defendants were required to disclose certain information about Philidor pursuant to ASC 810. Specifically, Valeant was required to disclose, among other things: (a) quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size, and activities" of Philidor, and how Philidor was financed; and (b) Valeant's methodology for concluding that it was not required to consolidate Philidor's financial statements with its own, including disclosure of key

factors, assumptions, and significant judgments used in making the determination. *See* ASC 810-10-50-5A. Moreover, Valeant was required to disclose information concerning: (a) significant judgments and assumptions made in determining whether it needed to consolidate Philidor and/or disclose information about its involvement with Philidor; (b) the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor; and (c) how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows." *See* ASC 810-10-50-8.

180.    The 2013 10-K was also materially false and misleading because Valeant failed to consolidate Philidor in its financial statements. Under ASC 810, Valeant was required to consolidate any VIE for which it was the primary beneficiary. As Philidor's only client, Valeant was the primary beneficiary of Philidor even prior to entering into the purchase option agreement. Accordingly, Valeant should have consolidated Philidor in its financial statements prior to 2014, and its failure to do so rendered its 2013 financial reports materially false and misleading.

### (c)    Defendants' omissions and misstatements regarding Philidor after the December 2014 purchase option agreement

181.    In December 2014, Valeant entered into the purchase option agreement with Philidor, which required Valeant to consolidate Philidor's financials. However, Valeant still failed to disclose Philidor as a material consolidated VIE prior to October 2015.

182.    Specifically, on February 25, 2015, Valeant filed its 2014 10-K. The 2014 10-K was signed by Pearson and Schiller. Valeant, Pearson, and Schiller again represented that the audited financial statements included therein were "prepared in accordance with U.S. generally accepted accounting principles." In Note 2 to its Consolidated Financial Statements—titled "Significant Accounting Policies"—Valeant, Pearson, and Schiller represented that, "[t]he

consolidated financial statements include the accounts of the Company and those of its subsidiaries and any variable interest entities ("VIEs") for which the Company is the primary beneficiary." In Note 3 to its Consolidated Financial Statements—titled "Business Combinations"—Valeant, Pearson, and Schiller represented that, "[d]uring the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which are not material individually or in the aggregate." The 2014 10-K contained no references to Philidor.

183.   On March 16, 2015, Valeant announced a $1.45 billion public offering of 7.3 million shares of common stock at a price of $199 per share, the proceeds of which were used to fund the acquisition of Salix and related costs. The offering materials discussed, among other things, the Company's "Other Recent Acquisitions," but again failed to mention that Valeant agreed to pay between $100 and $300 million for the option to acquire Philidor just three months prior to the March 2015 Stock Offering, and claimed that the Company was "*not currently a party to any significant transactions, other than the [Salix merger]*."

184.   On April 30, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2014 (the "1Q2015 10-Q"), which was signed by Pearson and Schiller. Valeant represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. generally accepted accounting principles ('U.S. GAAP') for interim financial reporting." However, those financial statements again contained no mention of Philidor as a material consolidated VIE. Additionally, the 1Q2015 10-Q included the same untrue statement related to Valeant's "Business Combinations" as in the Company's 2014 10-K, discussed above at ¶ 182.

185.    On July 28, 2015, Valeant filed its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2015 (the "2Q2015 10-Q"). Valeant again represented that the financial statements reported therein had been prepared in U.S. dollars and in accordance with GAAP for interim financial reporting. However, those financial statements contained no mention of Philidor as a material consolidated VIE.

186.    The statements above in ¶¶ 182–85 were materially false, misleading and incomplete because Defendants had already determined that Philidor was a material consolidated VIE, a fact that required Defendants to disclose certain information about Philidor pursuant to ASC 810. Specifically, Valeant was required to disclose, among other things, quantitative and qualitative information about Valeant's ties to Philidor, including the "nature, purpose, size and activities" of Philidor, and how Philidor was financed. *See* ASC 810-10-50-5A. Additionally, Valeant was required under GAAP to disclose the factors that resulted in the consolidation of Philidor—*i.e.*, the purchase option agreement with Philidor. *See id.* Moreover, Valeant was required to disclose information concerning: (a) significant judgments and assumptions made in determining whether it needed to consolidate Philidor and/or disclose information about its involvement with Philidor; (b) the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor; and (c) how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows." *See* ASC 810-10-50-8.

187.    Furthermore, each of Valeant's 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q contained an MD&A section. However, Valeant failed to disclose Philidor as a distinct sales channel in any of those reports. The MD&A in each of Valeant's 2014 10-K, 1Q2015 10-Q, and 2Q2015 10-Q reports was materially misleading and incomplete because, under SAB Topic 13, Valeant had an obligation to disclose Philidor as a distinct sales channel in its MD&A.

Specifically, Valeant was required to disclose Philidor as a "[c]hanging trend[] in shipments into . . . a sales channel . . . that could be expected to have a significant effect on future sales or sale returns." SAB Topic 13.B. By the third quarter of 2015, sales through Philidor were accounting for at least approximately 7% of Valeant's revenues and likely far more given the substantial declines in Valeant's revenues following Philidor's closure. Thus, Valeant was required to disclose its use of Philidor as a changing trend in a sales channel that was expected to have a significant effect on Valeant's sales.

### 3. Misrepresentations Related to the Manipulation of Revenue Recognition

#### (a) Valeant Materially Overstates Its Reported Revenue

188.   In 2014 and 2015, Valeant reported the following revenues:

| SEC Filing | Financial Period | Reported Revenue |
|---|---|---|
| 3Q2014 10-Q | 3 months ended September 30, 2014 | $2,022.9 million |
| 2014 10-K | 3 months ended December 31, 2014 | $2,235.5 million |
| 2014 10-K | Year ended December 31, 2014 | $8,263.5 million |
| 1Q2015 10-Q | 3 months ended March 31, 2015 | $2,146.9 million |
| 2Q2015 10-Q | 6 months ended June 30, 2015 | $4,841.9 million |
| 3Q2015 10-Q | 9 months ended September 30, 2015 | $7,590.1 million |

189.   Valeant's revenue results were widely communicated to investors, including in the presentations accompanying each of the Company's earnings calls.

190.   Valeant later admitted that these reported revenues were materially overstated. Specifically, Valeant executed transactions with Philidor outside the normal course of business. Valeant's ability to actually collect revenue from these transactions was not reasonably assured at the time the revenue was recognized, and therefore the revenue was improperly recognized. *See* SAB Topic 13. According to Valeant's 2015 annual report, such transactions included

"fulfillment of unusually large orders with extended payment terms and increased pricing, an emphasis on delivering product prior to the execution of the purchase option agreement and seeking and filling a substitute order of equivalent value for an unavailable product." These transactions were undertaken to artificially increase revenue before consolidation of Philidor, after which Valeant would be prohibited from recognizing revenue on any deliveries of product to Philidor. The prospects of consolidating Philidor, which would have delayed the recognition of revenues and profits earned through the Philidor transactions, were undesirable to management. That Valeant was preparing to acquire Salix by incurring massive amounts of debt made it all the more undesirable to delay revenue recognition. To compound the error, after the purchase option agreement was executed, Philidor recorded revenue from the sales of these products when it shipped them to patients, even though Valeant had already recognized the revenue when it transferred the medication to Philidor. Because, at that point, Philidor's financials were consolidated with Valeant's, Valeant double-booked revenue on these transactions.

191.    Valeant admitted the overstatement in a March 21, 2016 Form 8-K filed with the SEC. In the disclosure, the Company admitted that it had improperly booked revenue leading up to the purchase option agreement, and double booked revenue for some sales:

> Prior to consolidation, revenue on sales to Philidor was recognized by the Company on a sell-in basis (*i.e.*, recorded when the Company delivered product to Philidor). In connection with the work of the Ad Hoc Committee, the Company has determined that certain sales transactions for deliveries to Philidor in 2014 leading up to the option agreement were not executed in the normal course of business and included actions taken by the Company in contemplation of the option agreement. As a result of these actions, revenue for certain transactions should have been recognized on a sell-through basis (i.e., record revenue when Philidor dispensed the products to patients) prior to entry into the option agreement rather

68

than incorrectly recognized on the sell-in basis utilized by the Company.

\* \* \*

The revenue that is being eliminated from 2014 does not result in an increase to revenue in 2015 as a result of the Company having previously also recognized that revenue in 2015. . . . Now that the Company has determined that certain sales transactions for deliveries to Philidor, leading up to the option agreement, were not executed in the normal course of business and included actions taken by the Company in contemplation of the option agreement, the revenue recorded in 2014, prior to the option agreement, is now being reversed. However, because that revenue was also recorded by Philidor subsequent to consolidation, upon dispensing of products to patients, the elimination of the revenue in 2014, prior to consolidation, does not result in additional revenue being recorded in 2015.

192.    As described above, Valeant previously recognized revenue from the Philidor transactions on a "sell-in" basis. This basis of accounting enabled Valeant to recognize revenue and related profit on these transactions at the same time the product was purportedly sold to Philidor. This accounting violated ASC 605-15-25 (Revenue Recognition – Products). This standard required, among other things, that the price charged to Valeant was fixed or determinable, as well as that those fees were probable of collection. ASC 605-15-25-1.

193.    Further, GAAP specifically identifies these types of transactions as problematic. That is, GAAP does not allow revenue to be recognized on a sell-in basis if the following condition exists: "The buyer acquiring the product for resale has economic substance apart from that provided by the seller. This condition relates primarily to buyers that exist on paper, that is, buyers that have little or no physical facilities or employees. It prevents entities from recognizing sales revenue on transactions with parties that the sellers have established primarily for the purpose of recognizing such sales revenue." ASC 605-15-25-1.d.

194.    Valeant, however, clearly failed to meet these criteria. As a result, GAAP required Valeant to defer revenue and related profit until Philidor subsequently sold the product to an actual customer.

195.    The reported revenues were materially overstated as follows:

| Financial Period | Reported Revenue Overstated By: |
|---|---|
| 3 months ended September 30, 2014 | $12.9 million |
| 3 months ended December 31, 2014 | $44.6 million |
| Year ended December 31, 2014 | $57.5 million |
| 3 months ended March 31, 2015 | $20.8 million |
| 6 months ended June 30, 2015 | $20.8 million |
| 9 months ended September 30, 2015 | $20.8 million |

196.    The significance to Valeant's growth and business model of the revenue and profits generated through Philidor cannot be overstated. On October 30, 2015, Morgan Stanley estimated that Philidor accounted 55% of Valeant's U.S. year-over-year organic growth, and contributed 15 percentage points of Valeant's 27% U.S. year-over-year organic growth (Morgan Stanley Research, October 30, 2015). In particular, though Valeant could expect to transfer some of the prescriptions filled through Philidor to other, non-captive pharmacies, it could not be expected to make these sales at the same unduly high price afforded by control over the pharmacy.

197.    Moreover, Valeant would not have beaten analysts' estimates for the fourth quarter of 2014 had it not improperly recognized revenue. Analysts polled by Thomson Reuters estimated earnings of $2.55 per share that quarter. Valeant reported cash earnings per share as $2.58, just beating analysts' projections. The $2.58 cash earnings-per-share figure was based on

adjusted net income of $880.7 million divided by 341.9 million shares. If Valeant had not improperly recognized revenue in the fourth quarter of 2014, it would have missed analysts' estimates. Valeant presented this metric as important; in the fourth quarter 2014 earnings call, and the accompanying presentation, the Company explicitly focused on beating its guidance, which was in line with analyst estimates.

198.    In addition, Morningstar commented that "a significant portion of this revenue will evaporate as CVS and Express Scripts slash these specialty pharmacies from their networks" (Morningstar Equity Research, October 30, 2015). Morningstar added that it planned on reducing these sales, causing "a material, but not major, shift in [Morningstar's] cash flow projections" *Id.* Morningstar added that "the lack of aggressive specialty pharmacy fulfillment practices will slow growth even more than [its] initial estimates," which it already considered "conservative." *Id.* As a result, Morningstar expected Valeant to only "maintain an organic growth rate in the low single digits over the next 5 years." *Id.* If Valeant had reported the Philidor transactions in accordance with GAAP, these lower growth expectations would have emerged in earlier periods.

199.    Valeant's revenues and profits generated through Philidor should be viewed in the context of the very significant debt on Valeant's balance sheet and its prospects to generate sufficient cash flows to service it. Valeant's acquisition-based business model under Pearson was fueled by this debt, causing Valeant to become very heavily leveraged. As of September 2015, exacerbated by its acquisition of Salix in early 2015, Valeant's balance sheet was weighed down by $30.7 billion in debt against only $1.4 billion in cash and a net debt to EBITDA (earnings before interest, taxes, depreciation, and amortization) ratio "in the mid-5s." As of year-end 2014, Valeant's debt totaled $15.2 billion against only $323 million of cash (Morningstar Corporate Credit Research, October 30, 2015). As a result, the successful generation of cash flow from its

acquisitions was paramount to Valeant's financial health. Morningstar reported that Valeant was targeting a reduction in net debt to EBITDA to below 4, but that the "leverage target may be difficult to achieve" given the loss of its specialty pharmacy sales. *Id.* Morningstar concluded that concerns over wrongdoing and weak internal controls resulting from Valeant's relationship with Philidor, when combined with its high debt level, "have placed the company under severe pressure." *Id.*

200. The disclosures also caused Morningstar to place "[its] credit rating for Valeant under review with negative implications" and to consider a "multinotch downgrade." *Id.* Morningstar also noted that Valeant's "cost of capital has clearly shifted due to the company's rapid turn in market perception over internal controls and lingering specialty pharmacy concern," and as result, it was raising the discount rate it used to value the company. *Id.* This change negatively impacted Morningstar's newly established target price initiated at that time.

201. Investors would have drawn these conclusions had Valeant disclosed the characteristics of its sales through Philidor and its control of the captive pharmacy before or at year-end 2014.

### 4. Valeant's Compliance With GAAP

202. Throughout the relevant period, Defendants represented in public statements and in filings with the SEC that Valeant's financial statements and public filings had been prepared in accordance with GAAP.

203. In the 1Q2013 10-Q, Defendants represented that the financial statements reported therein "have been prepared by the Company in United States ('U.S.') dollars and in accordance with U.S. GAAP for interim financial reporting." Defendants made identical

representations in the 2Q2013, 3Q2013, 2013 10-K, 1Q2014, 2Q2014, 3Q2014 10-Q, and the 2014 10-K's.

204.     On May 21, 2015, Pearson attended an RBC Investor Meeting on behalf of the Company. During the presentation Pearson reassured Valeant investors that "*our accounting practices are fine*" and added "*[w]e get audited all the time, by the SEC . . . and we have absolutely no issue from a government standpoint*" and that "*we never had financial irregularities.*"

205.     On October 26, 2015, Valeant's executives and directors hosted a conference call to address the allegations surrounding Philidor. In his opening remarks, Pearson stated that, "*We operate our business based on the highest standards of ethics and we are committed to transparency. We follow the law, and we comply with accounting and disclosure rules. These values are the core of our business model, and if I find examples of violations, I will not hesitate to take action.*"

206.     Following Pearson's statements, Bob Ingram, a member of the Board of Directors stated on behalf of the Board that, "*the Company stands by its accounting completely. The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment.*"

207.     In that same call, Rosiello stated in reference to Valeant's relationship with Philidor that, "*The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee.*"

208.   On October 26, 2015, Valeant filed its 3Q15 10-Q. In that filing, the Company repeated that "*its Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.*"

209.   The statements in ¶¶ 203–08 were materially false and misleading when made because Valeant committed multiple GAAP violations during the relevant period, including: (a) failing to report Philidor as a VIE entity both before and after the purchase option agreement; (b) failing to disclose Philidor in Valeant's MD&A section; and (c) by booking revenues twice: first, when it sold to Philidor (*i.e.*, itself), and then again when Philidor sold the same product.

### 5.   Valeant's Certifications Of Internal Controls

210.   In Valeant's filings with the SEC, Defendants Pearson, Schiller, and Rosiello attested to the effectiveness of Valeant's internal controls and that the filings did not contain any untrue statement of material fact or omit to state a material fact. These statements were false and misleading because Valeant lacked adequate internal controls and compliance and training programs, and the Company's SEC filings contained numerous untrue statements of material facts and omitted many material facts. These inadequacies in reporting and misleading filings were the direct result of an "improper tone at the top" of the organization that created a corporate culture of prioritizing short term revenue growth over compliance with applicable laws, regulations, and contracts.

211.   On May 3, 2013, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2013 ("1Q13 10-Q"). The 1Q13 10-Q was signed by Pearson and Schiller and represented that management's disclosure controls and procedures were effective: "Our management, with the participation of our CEO and Chief Financial Officer ('CFO'), has

evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of March 31, 2013" (hereafter, "Internal Controls Statement").

212.    The 1Q13 10-Q included Sarbanes Oxley Certifications signed by both Pearson and Schiller pursuant to Rules 13a-14(a) of the Exchange Act, which stated, among other things, that the 1Q13 10-Q did not contain any untrue statement of material fact or omit to state a material fact (hereafter, the "SOX Certifications"). Specifically, the SOX Certifications stated:

- that the filing "*does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading* with respect to the period covered by this report;"

- that "*the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report*;" and

- that the certifying officers and Pearson had "[e]valuated the effectiveness of the Company's disclosure controls and procedures" and had presented "our conclusions about the effectiveness of the disclosure controls and procedures" in the filing.

213.    The 2013 10-K also stated that, "Based on our evaluation, our management, including the CEO and Chief Financial Officer ("CFO"), has concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934) as of December 31, 2013 are effective."

214.    The same Internal Controls Statement and SOX Certifications set forth at ¶¶ 211-12 appeared in the 2Q13 10-Q, signed by Pearson and Schiller; the 3Q13 10-Q, signed by Pearson and Schiller; the 1Q14 10-Q, signed by Pearson and Schiller; the 2Q14 10-Q, signed by Pearson and Schiller; the 3Q14 10-Q, signed by Pearson and Schiller; the 2014 10-K, signed by

Pearson and Schiller; the 1Q15 10-Q, signed by Pearson and Schiller; the 2Q15 10-Q, signed by Rosiello and Pearson; and the 3Q15 10-Q, signed by Rosiello and Pearson.

215.    The 3Q13 10-Q also stated that: "Our management, with the participation of our CEO and Chief Financial Officer ("CFO"), has evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2013. Based on this evaluation, our CEO and CFO concluded that our disclosure controls and procedures were effective as of September 30, 2013." The Company made similar statements in the 10-Qs issued from 1Q13 through 3Q15.

216.    Pearson's, Schiller's, and Rosiello's representations in the foregoing certifications that Valeant's filings with the SEC were free from material misrepresentations were themselves materially false and misleading when made because, as set forth above, each of those filings contained material misrepresentations.

217.    Further, these Defendants' certifications and representations that Valeant's internal controls were effective were false and misleading when made. After the establishment of an Ad Hoc Committee to review Valeant's internal controls, the new management team represented in the 2015 10-K that, based on that review:

> the Company's Chief Executive Officer and the Company's Chief Financial Officer have concluded that as of December 31, 2015, due to the existence of the material weaknesses in the Company's internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective to provide reasonable assurance that the information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management as appropriate to allow timely decisions regarding required disclosure.

218.    Similarly, as part of the AHC's review of Valeant's internal controls, the Company officially determined that the internal controls were not effective as of March 31, 2015, June 30, 2015, September 30, 2015, and December 31, 2014. The 2015 10-K also stated:

> As a result of the restatement described above, management, with the participation of the Company's Chief Executive Officer and the Company's current Chief Financial Officer, has reassessed the effectiveness of the Company's disclosure controls and procedures as of December 31, 2014, March 31, 2015, June 30, 2015 and September 30, 2015 and, due to the existence of the material weaknesses in internal control over financial reporting described above (which had not been identified prior to the Ad Hoc Committee's review), the Chief Executive Officer and the current Chief Financial Officer have determined that such disclosure controls and procedures were not effective as of such dates. Similarly, as a result of the restatement, management, with the participation of the Company's Chief Executive Officer and the Company's current Chief Financial Officer, has reassessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2014 and, due to the existence of the material weaknesses in internal control over financial reporting described above, management has determined that internal control over financial reporting was not effective as of such date.

### 6.    Defendants' Continued Misstatements and Omissions as the Enterprise's Criminal Scheme Begins to Unravel

219.    Beginning in the fall of 2015, the truth about Valeant's business emerged in a series of disclosures. As the truth leaked out, even as Defendants were forced to shut down Philidor and discontinue some of Valeant's most egregious practices, Defendants continued to mislead investors with a series of misstatements and half-truths designed to conceal the true state of Valeant's business and maintain the Company's inflated securities prices. Eventually, however, investors learned just how much Valeant's appearance of growth and profitability relied on price hikes, Philidor, and improper and unsustainable business practices.

220.    **September 28, 2015.** The first hint that something was amiss at Valeant emerged on September 28, 2015, when *Bloomberg* reported that members of Congress were calling for an

investigation of Valeant's price gouging. *Bloomberg* reported that all Democratic members of the House Committee had directed Chairman Jason Chaffetz to subpoena Valeant for documents related to massive price increases for two heart medications, and that, according to the House Committee members, Valeant had failed to "adequately answer" questions and provide documents requested by House Committee staff members regarding the Company's basis for such "skyrocketing prices." Also on September 29, 2015, numerous additional news reports were released detailing that Valeant was being targeted by Congress for the Company's practice of purchasing older drugs and then dramatically raising their prices.

221.    In response to this partial disclosure regarding the Company's reliance on, and the associated risks of, price gouging, the price of Valeant stock dropped more than 16%, from a close of $199 per share on Friday, September 25, 2015, to a closing price of $166 per share on Monday, September 28, 2015, on unusually high trading volume, a decline of over 16%, or $32 per share.

222.    Defendants immediately denied the truth of these criticisms. On September 28, 2015, Valeant filed a Form 8-K with the SEC that attached a letter from Pearson to the Company's employees to respond to the "two main issues worrying investors," that Valeant's "***business model and strategy is dependent upon large price increases in our U.S. pharmaceutical business***" and "***[c]oncern around our exposure to U.S. government drug price reimbursement***." In his letter:

(a)    Pearson referred to these concerns as a "***bear thesis***," claimed they were "incorrect on both accounts," and dismissed the dependency on price increases, stating, "***Valeant is well-positioned for strong organic growth, even assuming little to no price increases. As we have stated many times, Valeant's core operating principles include a focus on volume growth***

*and a concentration on private and cash pay markets that avoid government reimbursement in the U.S.*" and "*the majority of our portfolio will continue to deliver strong volume-based organic growth and is not dependent on price increases*";

(b)   Pearson went on to "lay out the facts," noting, in part, that: (i) growth in dermatology, ophthalmology, Rx, and dentistry was based on having "delivered over 30% script growth year to date," and (ii) they expected "*double-digit script growth and corresponding revenue growth trends to continue*" in the "Salix business"; and

(c)   Pearson added: "we expect double-digit organic growth in 2016 and beyond as we prepare for the launch of Addyi and anticipate other potential product approvals[.]"

223.   The statements in ¶ 222 that criticisms of Valeant were inaccurate and a "bear thesis," that the "majority of [Valeant's] portfolio" was "not dependent on price increases," and the financial guidance issued to allay investor concerns were false and misleading when made for the reasons discussed in ¶¶ 127 and 132.

224.   **October 4, 2015.** On Sunday, October 4, 2015, however, additional details regarding Valeant's reliance on price gouging were revealed when *The New York Times* published a highly critical article concerning Pearson's September 28, 2015 letter to employees and his claim that Valeant was well-positioned for growth even without any price increases. The article reported that extraordinary price increases on eight Valeant drugs accounted for approximately 7% of the Company's revenue and 13% of its earnings before taxes and interest in the second quarter, and that Valeant raised the prices on its branded drugs nearly five times as much as its closest competitor. On this news, the price of Valeant securities fell. Valeant's stock

declined by more than 10%, falling from a close of $182 per share on Friday, October 2, 2015 to a close of $163 per share on Monday, October 5, 2015, on unusually high trading volume.

225.   **October 14, 2015.** After the market closed on October 14, 2015, concerns about the legality of the Company's financial assistance programs were revealed when Valeant issued a press release disclosing that it had received subpoenas from the U.S. Attorney's Offices for the District of Massachusetts and the Southern District of New York requesting documents related to, among other things, Valeant's PAPs, financial support provided by Valeant for patients, distribution of Valeant's products, and pricing decisions. Even as Valeant disclosed the investigation, it sought to reassure investors, stating that, "***All of us at Valeant firmly believe in maintaining strong regulatory and financial controls and believe we have operated our business in a fully compliant manner***." The press release also noted that the Company was beginning to reach out to hospitals impacted by above average price increases in response to Congressional inquiries. On October 15, 2015, additional information was revealed to the market as news reports detailed Valeant's failure to be responsive to or transparent with Congress's investigation, and that despite being served with a federal subpoena, Valeant was still refusing to provide adequate answers regarding its price gouging and improper practices. On this news, the price of Valeant stock dropped by 4.75%, from a close of $177 per share on October 14, 2015, to a close of $168 per share on October 15, 2015, on elevated trading volume.

226.   **October 19, 2015.** Further information about Valeant's true business practices continued to emerge. On October 19, 2015, the market learned more about Valeant's dependence on price increases, its controlling interest in Philidor, and a related secret network of specialty pharmacies, when the Company reported its third quarter 2015 ("3Q15") financial results and hosted an earnings conference call (which started before the market opened). During the

conference call, the Company revealed its direct relationship with and reliance on certain specialty pharmacies to increase the price of Valeant's drugs and volume of Valeant's sales, including Philidor, and Valeant's option to purchase Philidor. In addition, the Company disclosed that pricing accounted for approximately 60% of its growth in 2014 and 2015, that it would be making drug pricing a smaller part of growth going forward, and that R&D would become an increased area of focus. After the market closed on October 19, 2015, *The New York Times* published an article that described Philidor as not a "typical" specialty pharmacy, noted that Philidor's application for a license in California had been rejected for submitting false statements, and stated that Valeant was using Philidor as a tool to keep its drug prices high.

227.   On this news, the price of Valeant stock declined by nearly 8%, falling from a close of $177 per share on Friday, October 16, 2015 to a close of $163 per share on Monday, October 19, 2015, on elevated trading volume. The following day, Valeant shares fell an additional 10% to close at $146 per share on October 20, 2015, also on unusually high trading volume. The total stock price decline over this two-day period was over 17%, or $30 per share.

228.   During a conference call on October 19, 2015, hosted by Pearson, Rosiello, and Kellen, Defendants continued to mislead investors about Valeant's business. In reference to media and government scrutiny of Valeant's pricing practices, Pearson claimed that such criticism was an industry-wide problem and told investors that Valeant's forecast was appropriately discounted for such scrutiny, claiming, "it's clear that the pharmaceutical industry is being aggressively attacked for past pricing actions. And that's not just Valeant, but I think it's all companies. I do think given that environment, *the pricing that pharmaceutical companies will take in the future will be more modest, and we built that into our forecast for next year*."

229.    In the slide deck presentation accompanying the earnings conference call, Valeant included a list of anticipated "Questions from Investors," inspired by a report revealing Valeant's ties to Philidor published by the Southern Investigative Reporting Foundation ("SIRF"). One of the "anticipated" questions was "How does Valeant work with specialty pharmacies and what is Valeant's relationship with Philidor," to which the presentation noted:

- We have viewed our relationship with Philidor and our other specialty pharmacies as proprietary and as one of our competitive advantages

- ***Similar to many pharmaceutical companies in the U.S., an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies***

- We find specialty pharmacies improve patients' access to medicines at an affordable price and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients

                        *       *       *

- We understand that Philidor:

    - Provides services under our programs for commercially insured and cash-paying claims only. Any claim that would be reimbursed in whole or in part by government insurance is not eligible for our co-pay subsidy programs

    - ***Does not restrict prescriptions it fills to any particular manufacturers (including Valeant)***[2]

    - ***Dispenses generic products as specified in patient's prescription or as requested by patient***

230.    During the conference call, Pearson repeated some of the same claims, saying that the relationship with Philidor had not been disclosed previously for "***competitive reasons***" and suggesting Valeant's use of specialty pharmacies was similar to its competitors' and resulted in more affordable prices, stating, in part:

---

[2] As Defendants knew, and as Philidor admitted on November 25, 2015, Valeant was Philidor's only customer.

The topic of specialty pharmacies has not been a focus of ours on past calls because we believe this was a competitive advantage that we did not want to disclose to our competitors. But given all the incorrect assertions by some, we will provide an update to this call.

**Similar to many pharmaceutical companies in the US**, an increasing percentage of our revenue is coming from products dispensed through multiple specialty pharmacies. We find specialty pharmacies improve patients' access to medicines at an affordable price, and help ensure physicians are able to prescribe the medications they believe most appropriate for their patients. In almost all cases, our inventory with specialty pharmacies in this channel and the title to our medicine only transfers to the pharmacy when the actual prescription is filled.

231.    Pearson also claimed that "***[s]ince we do not recognize the revenue of our products [sold through Philidor] until the prescriptions are filled***, this consolidation has the impact of delaying revenue recognition as compared to products that are sold through traditional distribution channels."

232.    With regard to a lawsuit that had been filed by one of the pharmacies in the Philidor network, R&O, which had claimed fraudulent practices were being employed, Pearson reassured investors that the business practices of Valeant and Philidor were proper by claiming:

**R&O is one of the specialty pharmacies in our network**, and Valeant has shipped approximately $69 million at wholesale prices to them. This represents approximately $25 million at net prices. Any products R&O dispensed to patients were recognized as our revenues, and are reflected in our receivables. Any products still held by R&O are reflected in our inventory. R&O is currently improperly holding significant amounts it receives from payers. We will refrain from comment on active litigation, and look forward to showing in court that we are owed the money.

233.    Also during the conference call, Rosiello discussed the increased guidance the Company released that day, and added that "[w]e expect our gross margins to approach 80% in the fourth quarter, driven by continued growth in our dermatology and Salix businesses, the

launch of Addyi, and decreased sales of Xenazine." His statements were accompanied by the following chart in the slide presentation:

| | Previous Q4 2015 | New Q42015 | Previous full year | New full year |
|---|---|---|---|---|
| Revenues | $3.2–$3.4B | $3.25–$3.45B | $10.7–$11.1B | $11.0–$11.2B |
| Cash EPS | $3.98–$4.18 per share | $4.00–$4.20 per share | $11.50–$11.80 per share | $11.67–$11.87 per share |
| Adj. Cash Flow From Operations | NA | NA | >$3.2B | >$3.35B |

234.    To further alleviate investor concern, and buoy the price of Valeant's securities, the slide presentation also revealed that Valeant was "reaffirming our expectations to exceed $7.5 [billion] EBITDA in 2016." When Pearson was asked during the conference call whether Valeant could still meet its EBITDA guidance in 2016 without "the benefit of price increases," he said, "*In terms of our EBITDA for 2016, I think we're only going to say today that we feel very comfortable with the $7.5 billion and we expect our guidance next year will exceed that*."

235.    The statements in ¶¶ 228–34, that Valeant was run in a "compliant manner," that Valeant's use of specialty pharmacies resembled that of other pharmaceutical companies, about Valeant's relationship with Philidor, and that Philidor does "not restrict prescriptions it fills to any particular manufacturer," were materially false and misleading when made because, as described above, Valeant had created Philidor to exclusively serve Valeant and to circumvent cost controls put in place by payors, and had used Philidor and its network of secret pharmacies in ways that posed undisclosed regulatory and reimbursement risks.

236.    **October 21 and 22, 2015.** On October 21 and 22, 2015, the market learned of additional problems regarding Valeant's secret relationships with specialty and "affiliate"

pharmacies, including Philidor and R&O, and related issues regarding Valeant's accounting practices. On that day, Citron published a research report questioning the relationship between Valeant and Philidor and Valeant's attendant accounting practices, and suggesting that Valeant had created a network of "phantom" specialty pharmacies for the purpose of inflating the Company's revenues. The Citron report also provided further details of the lawsuit between R&O and Valeant, where R&O accused Valeant of "conspiring . . . to perpetuate a massive fraud." After Citron's report was published, trading in Valeant shares was temporarily halted because of the rapid decline in the price of Valeant shares. Specifically, as a result of the information provided to the market on October 21, the price of Valeant stock dropped more than 19%, from a close of $146 per share on October 20, 2015, to a close of $118 per share on October 21, 2015, on extraordinary trading volume.

237.    Moreover, after the market closed, Philidor issued a press release disclosing its contractual relationship with "affiliated pharmacies," including R&O, and that it had a right to acquire such pharmacies now or in the future subject to regulatory approval. The following day, analysts reacted to the troubling disclosures. For example, before the market opened on October 22, 2015, BMO issued a report downgrading its rating of Valeant and concluding that Valeant's arrangements with Philidor were "not just aggressive, but questionable."

238.    As analysts reacted to the disclosures and the market continued to digest the negative news, the price of Valeant stock continued to decline on October 22, falling an additional 7%, to close at $109 per share on unusually high trading volume. The total stock price decline over this two-day period was over 25%, or $36 per share.

239.    Despite these revelations, Defendants continued to insist that there was nothing wrong with Valeant's accounting related to Philidor, and in an October 21, 2015 press release

85

again claimed, falsely, that "*sales are recorded only when the product is dispensed to the patient*."

240.    **October 25 and 26, 2015.** On October 25 and October 26, 2015, the market learned of additional issues concerning Valeant's improper relationship with and reliance on specialty pharmacies to increase the prices of Valeant products and to boost the volume of Valeant sales, and that the Company might be forced to terminate these clandestine relationships. On Sunday, October 25, 2015, *The Wall Street Journal* reported that former Philidor employees had revealed that Valeant employees worked directly at Philidor and were using fictitious names in order to conceal the companies' relationship "so it didn't appear Valeant was using the pharmacy to steer patients" to Valeant products. Before the market opened on October 26, 2015, Valeant filed its 3Q15 10-Q, which acknowledged that the Company had the "power to direct" Philidor's activities, and that the Company was conducting an investigation, through an ad hoc Board committee, into its relationship with Philidor.

241.    Despite being forced to admit that Valeant could "direct Philidor's activities," Defendants still did not fully disclose the state of Valeant's business and its relationship with Philidor, and Defendants continued to provide misinformation to the market. Though the 3Q15 10-Q disclosed for the first time that Valeant had the "power to direct Philidor's activities," it also stated that Valeant's entire board of directors had reviewed Valeant's accounting for Philidor and had confirmed its appropriateness. Specifically, the 3Q15 10-Q stated:

> During the year ended December 31, 2014, the Company completed other smaller acquisitions, including the consolidation of variable interest entities, which were not material individually or in the aggregate. These acquisitions are included in the aggregated amounts presented below. Beginning in December 2014, the Company has consolidated Philidor Rx Services, LLC ("Philidor") pharmacy network, which includes R&O Pharmacy, LLC. The Company determined that based on its rights, including its option

to acquire Philidor, Philidor is a variable interest entity for which the Company is the primary beneficiary, given its power to direct Philidor's activities and its obligation to absorb their losses and rights to receive their benefits. As a result, since December 2014, the Company has included the assets and liabilities and results of operations of Philidor in its consolidated financial statements. Net sales recognized through Philidor represent approximately 7% and 6% of the Company's total consolidated net revenue for the three-month and nine-month periods ended September 30, 2015, respectively, and the total assets of Philidor represent less than 1% of the Company's total consolidated assets as of September 30, 2015. The impact of Philidor as a consolidated entity on the Company's net revenues for 2014 was nominal.

*       *       *

*On October 26, 2015, the Company also announced that its Audit and Risk Committee and the full Board of Directors have reviewed the Company's accounting for its Philidor arrangement and have confirmed the appropriateness of the Company's related revenue recognition and accounting treatment.*

*       *       *

As is customary in the pharmaceutical industry, our gross product sales are subject to a variety of deductions in arriving at reported net product sales. Provisions for these deductions are recorded concurrently with the recognition of gross product sales revenue and include cash discounts and allowances, chargebacks, and distribution fees, which are paid to direct customers, as well as rebates and returns, which can be paid to both direct and indirect customers. . . . *Gross product sales for products dispensed through Philidor Rx Services, LLC ("Philidor") pharmacy network (which is consolidated as a variable interest entity within our consolidated financial statements) are recognized when a prescription is dispensed to a patient.* Net sales recognized through the Philidor pharmacy network represents 7% and 6% of our total consolidated net revenue for the three months and nine months ended September 30, 2015, respectively.

242.    Also on October 26, 2015, the Company hosted a conference call with investors with an accompanying presentation. Pearson, Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen attended on behalf of the Company.

243.    The presentation disclosed that "[o]ur specialty pharmacy strategy originated from the Medicis Alternate Fulfillment Program." Among other things, the presentation also stated that:

(a)    "Prescriptions *through Philidor are less profitable than traditional channels due to lower copay rates, lower cash pay rates and more cash pay scripts in Philidor than in retail and other channels*";

(b)    "*We do not own or control Philidor . . .*" and "*Philidor employees do not report to Valeant . . .*";

(c)    "*Philidor is independent . . .*"; and

(d)    "*Unless and until Valeant exercises the option to acquire Philidor, Philidor remains independent and Valeant has no rights to remove CEO or management.*"

244.    Pearson assured investors there was no improper practices involving Philidor, stating:

(a)    "*[T]he sensational claims made by the short seller Andrew Left, through his entity Citron, are completely untrue*. His motivation is the same as someone who runs into a crowded theater to falsely yell fire. He wanted people to run";

(b)    "after we saw the false report from Citron, we promptly coordinated with our outside regulatory counsel from Cahill to make a request that the SEC investigate Mr. Left and Citron";

(c)    "We still believe that the strategy of working with specialty pharmacies is sound and it's good for patients and physicians. *There have been no issues with regards to the accounting or revenue recognition of the business*"; and

(d)    "*We have been working with outside counsel and we have found no evidence of illegal activity* whatsoever *at Philidor*."

245.    Ingram, Valeant's lead independent director, speaking on behalf of the entire board of directors, reaffirmed these statements saying:

> Thank you, Mike [Pearson]. As Mike stated, *the Company stands by its accounting completely. The audit committee of the Board and the full Board have reviewed the Company's accounting, the Philidor relationship, and have confirmed the appropriateness of the Company's revenue recognition and accounting treatment*.

246.    Rosiello reinforced the statements by Pearson and Ingram adding:

(a)    "Valeant consolidates financials with Philidor and the Philidor network, ensuring that revenue recognition and financial statement presentation is appropriate";

(b)    "*Valeant recognizes revenue only when products are dispensed to patients, and Valeant records this at net realized price*";

(c)    "*There is simply no way to stuff the channel of consolidated variable interest entities, or VIEs, since all inventory remains on Valeant's consolidated balance sheet until dispensed to patients*"; and

(d)    "*Philidor was considered a VIE prior to the purchase option agreement, but since Valeant was not determined to be the primary beneficiary, consolidation was not appropriate.* A purchase option agreement for Philidor was executed in December 2014. The finance and transactions committee, audit and risk committee, and full Board, all reviewed the transaction. The appropriate accounting treatment was determined by management and reviewed with the Audit and Risk Committee."

247.    Valeant's corporate controller, Carro, also defended Valeant's accounting and lack of prior disclosure regarding Philidor. Specifically:

(a)     Carro claimed that, as of year-end 2014, "*Philidor is not considered to be material to Valeant's business for reporting purposes*" because the "GAAP requirement for disclosing sales to large customers is 10% of revenue" and in December 2014 Philidor's year-to-date net sales were $111 million; and

(b)     Carro claimed that for the first two quarters of 2015 "*Philidor was not specifically mentioned in our disclosures because it had not been material to the consolidated financial statements*," because "*[i]t represented 1% or less of total assets and 7% or less of consolidated net revenues since the fourth quarter of 2014*."

248.     Schiller reassured investors that there was no evidence of wrongdoing by Pearson, stating "*if I had any concerns whatsoever about Valeant or Mike, I would not have stayed on the Board*. It's as simple as that. When we announced that I was leaving, and Mike and I had a bit of our lovefest, I don't want to repeat all the words but I meant them in terms of Mike is professional, his ethics, his work ethic, his commitment to doing the right thing."

249.     To mitigate the impact of the negative news, Pearson reaffirmed Valeant's recently increased 2015 guidance, stating: "Given the continued healthy growth in dermatology, Salix, eye health, and the recent Addyi launch, we expect to meet or exceed our fourth-quarter projections, excluding the one-time expenses associated with recent events." He added, "*we continue to be very comfortable with our 2016 EBITDA expectation of greater than $7.5 billion.*"

250.     The statements in ¶¶ 241–48 about Philidor's compliance with laws, about the timing of revenue recognition, about Philidor's status as a VIE, and about Philidor's independence from Valeant were materially false and misleading when made. Indeed, as discussed above, Valeant created and controlled Philidor solely for Valeant's benefit, as

demonstrated by Valeant's announcement, just a few days later that Philidor would be closing after Valeant cut ties. And as discussed further below, Valeant's statements that it had properly recorded revenues were false when made, as demonstrated when Valeant was forced to restate its finances in March 2015 and to admit that it had been double-booking revenue on sales through Philidor. The statements in ¶ 249 about Valeant's ability to still hit the Company's guidance targets were false and misleading when made, as the Valeant Defendants were aware that Valeant relied heavily on Philidor and price gouging to drive revenues across its product portfolio, as discussed at ¶¶ 64-82.

251.    Later that day, *Bloomberg* reported that the remarks on the call "left investors skeptical, failing to answer critical questions on Valeant's continuing relationship with Philidor." As a result of this news, the price of Valeant stock dropped more than 5%, from a close of $116 per share on Friday, October 23, 2015, to a close of $110 per share on Monday, October 26, 2015, on unusually high trading volume.

252.    **October 28 and 29, 2015.** Still, information continued to leak out. On October 28 and 29, 2015, further information was revealed to the market regarding Valeant's secret relationship with and reliance on specialty pharmacies, including Philidor, to increase the prices of Valeant products and boost the volume of Valeant's sales. On that day, *Bloomberg* reported that Philidor used "back door" tactics to increase payments and "instructed employees to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim— to essentially shop around for one that would be accepted." Then, on October 29, 2015, *Bloomberg Businessweek* reported on additional improper business practices at Philidor, including that Philidor was falsifying prescriptions to boost Valeant sal*es, based on* the accounts of former Philidor employees and internal company documents. Additionally, during market

hours on October 29, 2015, reports surfaced that CVS Caremark had terminated its relationship with Philidor following an audit of Philidor's practices.

253.    On this news, the price of Valeant shares declined $5.50 a share, or 4.7%, from a close of $117 per share on October 28, 2015 to a close 111.50 per share on October 29, 2015.

254.    After the market closed on October 29, 2015, the nation's other largest PBMs, Express Scripts and OptumRx, announced that they too had terminated their relationships with Philidor—highlighting to investors for the first time the payor risk posed by Valeant's Philidor strategy, a risk that the Valeant Defendants knew of (or recklessly disregarded), but concealed, from the very beginning. Before the market opened on October 30, 2015, the Company issued a press release stating that it would be terminating its relationship with Philidor, which would be ceasing operations as soon as possible.

255.    On this news, Valeant shares fell by nearly 16%, from a close of $111 per share on October 29, 2015, to a close of $93 per share on October 30, 2015, on unusually high trading volume.

256.    **November 4, 2015.** On November 4, 2015, before the market opened, the Senate Special Committee on Aging announced that it had formally launched a probe and requested documents and information from Valeant regarding its skyrocketing drug prices. That same day, also before the market opened, *Bloomberg* reported that just weeks prior to the Company's announcement that it was cutting ties with Philidor, Valeant had planned to expand its use of Philidor, which further called into question the viability of the Company's recently issued financial guidance. After the market closed on November 4, 2015, *The Wall Street Journal* reported that Valeant's largest shareholder, Pershing Square, was considering liquidating its

entire $3.8 billion stake in the Company and had demanded that Valeant management "come clean" about Philidor.

257.    On this news, the price of Valeant stock dropped by approximately 6%, from a close of $97 per share on November 3, 2015, to a close of $91 per share on November 4, 2015, on elevated trading volume. Valeant shares continued to decline the following day, falling by more than 14%, to close at $78 per share on November 5, 2015, on extraordinary trading volume. The total stock price decline over this two-day period was 19.5%, or $19 per share.

258.    **November 10, 2015.** On November 10, 2015, before the market opened, Pearson, Rosiello, Carro, and Kellen hosted a business update call and disclosed the "significant" negative financial impact that Philidor's closing and the Government's spiraling probes into its pricing practices were having on the Company, including with respect to its financial guidance. In particular, Valeant disclosed that there would be a significant short-term disruption to the Company's dermatology division, including its top-selling drugs, Jublia and Solodyn, that the Company was seeing short-term pressure in its neurology business, and that the Company was "working to quantify the potential short-term impact" on 4Q15 of the termination of its relationship with Philidor. The Company also acknowledged that filling prescriptions for free would "obviously" have an impact on the rest of the quarter and that if Valeant's pricing is "viewed as aggressive, we are going to have to listen to that."

259.    Undoubtedly this disruption to the dermatology division was related to Valeant's inability to continue employing the Philidor strategy to obtain reimbursement for Jublia and Solodyn.

260.    During the call, Pearson still attempted to portray Valeant's relationship with Philidor as legitimate. Pearson stated, in relevant part:

> *We began working with Philidor because we believed a strong relationship with one specialty pharmacy would deliver better, faster customer service for doctors and patients.* We were also looking for a pharmacy which would be willing to process prescriptions before adjudicating the claims, which would allow us, rather than the patient, to assume the risk if the commercial payer denied the claim.

261.    In a question to Pearson, an analyst noted that there were "two kind[s] of major accusations aimed at the . . . Company," one regarding pricing and the other regarding Philidor, and noted that Valeant "decided to limit your pricing going forward" and "cut operations with Philidor." With regard to Philidor, Pearson responded in part:

> Well Philidor was very specific. First, there was the Citron report which claimed financial fraud and other things. *They quickly came out and there was no financial fraud in terms of Valeant had to do.* But then other allegations were made in terms of the practices of Philidor. And we felt, both management and the Board felt that given these allegations, given what was happening to our stock price and given what many of our major shareholders were asking us to do that the best thing to do was to sever.

262.    The statements in ¶¶ 260–61 that Valeant worked with Philidor because Valeant believed it would help patients and doctors, that there was no financial fraud in its dealings with Philidor, and that Philidor was not mentioned because it was "not material" were materially false and misleading when made. As described in detail above, Valeant hid Philidor from investors because secrecy was central to the Enterprise's scheme to artificially inflate prices and sales through Valeant's secret pharmacy channel, a scheme which was designed to benefit Defendants, without regard for the consequences to patients or investors. On this news, Valeant stock dropped 2%, from a close of $85 per share on November 9, 2015, to a close of $83 per share on November 10, 2015, on unusually high trading volume.

263.    **November 11, 2015.** After the market closed on November 10, 2015, it was reported that the Sequoia Fund, Valeant's biggest shareholder, had paid and was offering to pay

former Philidor employees in order to obtain information regarding Valeant's practices. The next day, before the market opened, *Bloomberg* reported that Valeant's creditors were "[s]pooked" by a possible "[r]evenue [s]queeze" and concern was "growing that disruption to Valeant's cash flow could heighten the risk of the company violating lender limits on its debt burden." During market hours on November 11, 2015, analysts at Nomura cut their Valeant price target. On this news, the price of Valeant stock continued to decline, falling by over 5%, to close at $78 per share on November 11, 2015.

264.   **November 12, 2015.** On November 12, 2015, before the market opened, *Bloomberg* published another article regarding Valeant's relationship with Philidor, and multiple media outlets reported that analysts at several firms had lowered their price targets for Valeant. On this news, Valeant's stock price dropped an additional 6.5%, to close at $73 per share. The total stock price decline from November 10 through November 12, 2015 was over 11%, or $9.91 per share.

265.   **November 16, 2015.** On November 16, 2015, during market hours, *Bloomberg* reported that Congressman Elijah Cummings wrote Pearson requesting that he make certain Valeant employees available for interviews. After the market closed that day, *The Washington Post* reported that the House Oversight Committee announced it would hold a hearing in early 2016 on prescription drug pricing, and that it had contacted Valeant to gather information. The article also disclosed that members of the House Oversight Committee were urging Valeant's executives to testify at the hearing and for Valeant to be subpoenaed. On this news, the price of Valeant stock dropped by nearly 3%, from a close of $75 per share on November 13, 2015, to a close of $73 per share on November 16, 2015, on unusually high volume. The price of Valeant

stock continued to decline on November 17, 2015, dropping an additional 4% to close at $70 on high trading volume.

266.    Despite Defendants' insistence that Valeant was well-positioned for growth without price increases, and their reaffirmance of guidance for 2016, Valeant admitted in December 2015 that its earlier projections were inflated. On December 16, 2015, its analyst day, Valeant issued a release formally withdrawing the inflated guidance it issued and defended on October 19, 2015. In an attempt to offset the disappointing revised 2016 guidance and notwithstanding the financial impact of its lost sales through Philidor and increased scrutiny by PBMs and private payors for its products, Valeant's December 16, 2015 release projected robust 2016 growth with revenue of $12.5–$12.7 billion, Cash EPS of $13.25–$13.75, and EBITDA of $6.9–$7.1 billion.

267.    On that same day, the Company hosted a conference call. Pearson, Rosiello, Jorn, and Kellen participated on behalf of the Company. Rosiello repeated the 2016 guidance and Pearson stated the guidance was conservative, noting: "I feel very comfortable [with the] guidance. But each little pieces [sic], I feel little less comfortable this year just given—*so we put an extra dose of conservatism in*."

268.    The statement in ¶ 267, that the new guidance had an "extra dose of conservatism," was false and misleading when made. At the time they issued increased guidance, Defendants were aware that the disclosure of Valeant's relationship with Philidor and investigations into Valeant and Philidor's price-based business model would result in decreased sales, revenue, and earnings. Defendants therefore had no reasonable basis to believe and, in fact did not believe, that Valeant could achieve the financial forecasts that Defendants issued in October 2015, or the revised forecasts they issued in December 2015.

96

269.     **December 17, 2015.** On December 17, 2015, before the market opened, Mizuho cut its rating on Valeant stock to "neutral" from "buy." The Mizuho analyst cited a lack of clarity regarding Valeant's agreement with Walgreens, and stated that Valeant management had "not done a good job in articulating the details" and that "[w]e still don't understand how this partnership will improve filled prescriptions if payer restrictions persist." During market hours that day, *Bloomberg* published an article reporting on the Mizuho downgrade. On this news, the price of Valeant stock declined nearly 6%, falling $7 from a closing price of $118 on December 16, 2015 to close at $111 on December 17, 2015.

270.     **February 19, 2016.** On February 19, 2016, media outlets reported on a Wells Fargo analyst report issued the prior day that included an in-depth analysis on Valeant and questioned whether the Company had been truthful about Philidor. In particular, the report questioned whether the Company had been truthful regarding Philidor and Valeant's relationship, including the adverse consequences to Valeant of terminating that relationship, management's credibility, and irregularities with the Company's accounting. The analysis noted that Valeant's "new guidance is not compatible with the data presented by Valeant" and "the reduction in guidance does not match the impact [of Philidor], as described by Valeant." The report stressed that "the slide in Valeant's shares is directly related to decisions that the board and management have made" including "the board review and approval of a relationship with Philidor." The report further noted that Valeant's accounting was misaligned with its purported performance, and suggested that the dramatic rise in Valeant's accounts receivables could be an indication of Valeant's "improperly timed recognition of revenue." On this news, the price of Valeant stock dropped by nearly 10%, falling from a close of $94 per share on February 18, 2016 to a close of $84 per share on February 19, 2016, on elevated trading volume.

271.   **February 22, 2016.** On February 22, 2016, a Wells Fargo analyst released an updated note regarding Valeant that included two additional valuation models and a $62 price target. Also on February 22, 2016, CVS announced it would restrict the use of Jublia, one of Philidor's most heavily distributed drugs, by requiring patients to first try a less expensive generic drug. After the market closed on February 22, 2016, *The Wall Street Journal* reported that Valeant was likely to restate its 2014 and 2015 earnings following an internal review of its financials. Later that evening, the Company confirmed in a release that it would be restating its 2014 earnings by at least $58 million, which would reduce 2014 GAAP EPS by approximately $0.10. The Company disclosed that, contrary to Defendants earlier explicit representations, it had been improperly recognizing revenue upon the delivery of products to Philidor, instead of when the products were dispensed to patients. The Company also announced it would delay filing its 2015 10-K pending completion of related accounting matters. Schiller commented that the Company would be "improving reporting procedures, internal controls and transparency for our investors." On this news, the price of Valeant stock dropped by over 10%, from a close of $84 per share on February 19, 2016 to a close of $75 per share on February 22, 2016, the next trading day, on unusually high trading volume. Valeant shares continued falling in after-hours trading on February 22, 2016 as news of the impending restatement hit the market, dropping as low as $68 per share.

272.   On Sunday, February 28, 2016, Valeant issued a press release announcing Pearson's immediate return as CEO, Ingram's appointment as Chairman of the Board, and the cancellation of a conference call set for February 29, 2016 concerning preliminary 4Q15 financial results and updated guidance for 2016. The press release also disclosed that the Company was withdrawing its prior financial guidance, and confirmed that it would delay filing

its 2015 10-K pending completion of the review of accounting matters by the ad hoc committee "and the Company's ongoing assessment of the impact on financial reporting and internal controls." Numerous media outlets reported on these disclosures prior to the market's opening on February 29, 2016. Also during market hours, Moody's placed Valeant ratings on review for potential downgrade on concerns that the Company's operating performance was weaker than expectations, potentially impeding deleveraging plans. As the day progressed, additional reports surfaced, and the Company ultimately confirmed that Valeant was under investigation by the SEC and had received a subpoena during 4Q15.

273.    On this news, the price of Valeant stock dropped by more than 18%, from a close of $80 per share on February 26, 2016 to a close of $65 per share on February 29, 2016, the next trading day, on unusually high trading volume.

274.    **March 15, 2016.** On March 15, 2016, before the market opened, Valeant issued its preliminary unaudited 4Q15 financial results and held a much anticipated conference call. The Company revealed that it was reducing its financial guidance for 2016, and provided certain unaudited financial information concerning its 4Q15 performance. In particular, the Company slashed its 2016 revenue guidance from $12.5–12.7 billion to $11–11.2 billion; reduced its Cash EPS guidance from $13.25–13.75 to $9.50–10.50; and cut its EBITDA guidance from $6.7–$7.1 billion to $5.6–$5.8 billion. The Company cited as reasons for these substantial downward revisions "reduced revenue assumptions for certain businesses, new managed care contracts and increased investment in key functions, such as financial reporting, public and government relations and compliance, as well as the impact of the weak first quarter of 2016." The Company also reported $51.3 million in "wind down costs" for Philidor, including "write-downs of fixed assets and bad debt expenses," and a $79 million impairment charge related to Philidor. As to

price increases, Pearson stated that all increases going forward "will be more modest and in line with industry practices and managed-care contracts." During the conference call, Defendants disclosed that even the Company's release from earlier that morning was inaccurate because its reporting forecasted adjusted EBITDA for the next four quarters of $6.2 to $6.6 billion, when the figure should have been only $6.0 billion. That same day, Moody's further downgraded Valeant's credit ratings, as well as those of its subsidiaries.

275.    On this news, the price of Valeant stock plummeted by more than 50%, from a close of $69 per share on March 14, 2016 to a close of $33 per share on March 15, 2016, on extremely high trading volume.

276.    **March 28, 2016.** During trading hours on March 28, 2016, news sources reported that Valeant CEO Pearson was called to testify in front of a senate panel investigating the cost of prescription drugs. On this news, the price of Valeant common stock fell 7.17%, or $2.23 a share, from a close of $31.09 on Friday, March 25, 2016 to a close of $28.86 on March 28, 2016, on high trading volume.

277.    **April 27–29, 2016**.   After the markets closed on April 27, 2016, news sources reported that Valeant expected to name four new directors and five board members were stepping down. During trading hours on April 28, 2016, Defendant Pearson testified before the Senate Special Committee on Aging. Before the markets closed on April 29, 2016, Valeant filed its Form 10-K for the year ended December 31, 2015, and included restated statements.

278.    On this news, Valeant's common stock dropped $1.89 a share, or 5.36%, from a close of $35.25 on April 28, 2016 to a close of $33.36 on April 29, 2016, on heavy trading volume.

279.     In the following months, more facts about Valeant's use of Philidor and the source of revenue growth were publicly disclosed. On June 7, 2016, Valeant issued a press release and hosted a conference call regarding the Company's long-delayed 1Q16 financial results. The Company reported a GAAP loss per share of $1.08 and significantly lowered its 2016 guidance, and revealed that the poor financial results and outlook were caused, in large part, by the loss of Philidor. For example, Rosiello stated that sales volume declines were "exacerbated by the loss of refills following the shutdown at the end of January of our previous specialty pharmacy relationship."

280.     Joseph Papa ("Papa"), the Company's new CEO, added that with respect to dermatology, "a significant portion of our Walgreens prescriptions have profitability significantly below our internal projections and meaningfully below non-Walgreen prescriptions" and that "[i]n some instances, these prescriptions actually have a negative average selling price."

## VI.     THE SCHEME'S CONNECTIONS TO NEW JERSEY

281.     As set forth herein, the Enterprise's scheme had substantial contacts with the state of New Jersey, where Valeant's U.S. headquarters is located.

282.     Numerous Defendants and Enterprise members were employed by or regularly conducted business out of Valeant's offices in New Jersey.

283.     Substantial elements of the illegal scheme, including deliberation and implementation of growth-by-acquisition model, price gouging strategies, and Valeant's AF program, were orchestrated from Valeant's New Jersey offices where many of Valeant's senior executives were located.

284.    Moreover, conduct undertaken to conceal the fraudulent scheme, including preparation of false and misleading financial statements and other misrepresentations on investor and earnings calls, originated from Valeant's New Jersey offices.

285.    Finally, the scheme had numerous, significant, foreseeable, and intended adverse effects in New Jersey.

## VII.   SUMMARY OF DEFENDANTS' SCIENTER

286.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

287.    The Individual Defendants acted with scienter with respect to the materially false and misleading statements and omissions of material fact set forth above because they knew, or at the very least recklessly disregarded, that those statements were materially false or misleading when made. As senior executives of Valeant during the relevant time period, their scienter is imputable to Valeant.

288.    As discussed above, the Enterprise engaged in a multi-year scheme to defraud investors by issuing false and misleading statements about Valeant's business strategy, practices, and prospects while secretly pursuing a wrongful course of business to artificially inflate sales that required defrauding PBMs and payors in the prescription drug market. The Individual Defendants were personally aware of, designed, implemented, and/or approved the deceptive practices detailed in this Complaint. Because of their de facto control over Philidor, their right to review its records and policies, and their close monitoring of the pharmacy, the Individual Defendants were personally aware of, or were severely reckless in disregarding, Philidor's improper and deceptive practices.

A.     **The Individual Defendants' Role in Valeant's Unsustainable Business Model**

289.     Pearson first developed Valeant's non-traditional business strategy as a consultant at McKinsey, and brought that template to Valeant—acquire companies, slash R&D, and jack up prices—and he hand-picked executives who would help him pursue that strategy. Together, the Individual Defendants orchestrated Valeant's many acquisitions and dramatic price increases and other deceptive practices. Pearson and the Individual Defendants understood the role that price increases played in Valeant's growth from their design and close monitoring of budgets within each business unit—Pearson even personally set and approved the price increases of individual drugs to meet budget targets.

290.     Pearson's presence at Valeant loomed large. His intimate knowledge of Valeant's operations flowed from a reported practice of "micromanaging" the business, an attention to detail that was expected of all of the Individual Defendants. Former employees told *Bloomberg Businessweek* that Pearson "had his fingers in everything, from operations to making decisions about the salaries of individual employees." Other former employees told *Forbes* that he "micromanaged things he deemed important." Pearson himself confirmed during a hearing before the Senate that was involved in minute details of Valeant's drug price program, even reading individual reports of patient complaints related to drug pricing, stating that "we do track every patient that calls and make sure that it's run to ground," and "I read the reports."

291.     But Pearson also worked closely with the other Individual Defendants. Pearson held weekly calls with the leaders of Valeant's business groups on Tuesdays at 11:00 am, during which Valeant senior management would assess the business, address developing issues, and ensure that there were no surprises facing the Company at each quarter end. A *Forbes* article also described the executives around Pearson as "cronies," and according to a former Valeant

103

executive, Pearson "wanted to win at all costs and surrounded himself with people who would basically do whatever he told them to do." These close associates included his former McKinsey partner Robert Rosiello, his brother-in-law Robert Brabandt, and Ryan Weldon, the son of Pearson's former client, Johnson & Johnson CEO Bill Weldon.

292.   Valeant documents uncovered by news reports and a Senate investigation confirm that Pearson and the Individual Defendants were directly involved in the Company's strategy to grow through price increases. The Senate Report on Drug Pricing details how, when Valeant's Neurology and Other business unit was not meeting budget targets, Valeant's senior leadership determined to implement an "Orphan Drug Pricing Strategy" to turn the business around. The plan, which leadership began developing in late 2012, called for transforming the unit into Valeant's number one revenue generator by implementing steep price increases. The Senate Report includes documents from an April 20, 2013 presentation to Pearson and Schiller outlining this approach. Pearson admitted in a deposition that a slide from the presentation "captures the unit's plan of making up for declining revenue by implementing major price increases." The documents also show that Pearson drove this transformation. The Senate Report also details how the plan was reviewed by Kornwasser and other executives, and how, as the unit implemented repeated and steep price increases, the unit's leadership presented new forecasts reflecting these changes to Pearson, Schiller, and Kornwasser. An April 25, 2013 email from Jeff Strauss to Kornwasser presented an orphan pricing model intended to "get to the projected number this year that Mike [Pearson] had in his head." According to the Senate Report, the attached model proposed a series of price hikes in the second half of 2013 that would cumulatively raise the price of Syprine 500% and Cuprimine 100%. Pearson and the Individual Defendants went further: In a July 2015 meeting, Pearson met with Rosiello, Carro, and others and decided to

raise the price of Cuprimine by 400%, from approximately $6,500 for 100 capsules to over $26,000.

293.    Similarly, the Senate Report provides details, based on internal Valeant documents and testimony from Valeant's executives, about how, in late 2014, the acquisition of Isuprel and Nitropress was internally justified by Valeant's ability to raise the drugs' prices dramatically. This price-focused acquisition model for Marathon was developed by Pearson, Schiller, Davis, and other executives, and was presented to Valeant's auditors at Deloitte. Indeed, the *Wall Street Journal* reported that at a meeting to discuss pricing attended by Pearson, Schiller, Kornwasser, Andrew Davis, Steve Sembler, and Sandeep Lalilt, the group recommended smaller price increases over time, but Pearson pushed to dramatically increase price. At the Senate hearing, Schiller confirmed that "Mr. Pearson made a decision to go with the higher price." Thus, while Pearson and the Individual Defendants publicly insisted that Valeant's growth was based on volume, not price, that Valeant did not "plan" for price increases; that Valeant had a sustainable business model, and that contractually, Valeant could not raise prices more than single-digit percentages, they were intimately involved in a price-based business strategy that was contrary to everything they had represented to investors.

294.    Further, throughout the relevant period, the Individual Defendants held themselves out to investors as the persons most knowledgeable about Valeant's business, operating model, strategies, acquisitions, organic growth, internal controls, compliance programs, and the sales volume, pricing, and performance of Valeant's products. For example, with regards to Valeant's many acquisitions, Schiller stated in a May 2014 conference call with investors that he and Pearson "religiously track each deal on a quarterly basis. Our Board of Directors get a report every quarter on each deal. We go back every quarter and ask how are we

doing, we are our own biggest critics." Later that day, at a Sanford C. Bernstein Strategic Decisions Conference, Pearson stated, "we're tracking every product around the world."

295.    Further confirming these statements and examples, the Individual Defendants' roles at Valeant and the nature of the fraud itself also support a strong inference of scienter. As described in part above, as senior executive officers during the relevant period, the Individual Defendants were privy to confidential and proprietary, non-public information concerning Valeant's operations, finances, financial condition, and present and future business prospects. And the ongoing fraud required not only the interplay of management and individual business units, but also acquisitions of and relationships with other business entities—including decisions requiring board-level approval, such as approving budgets and budget-based compensation targets and entering the purchase option agreement with Philidor. This complex, carefully designed fraud could not have been perpetrated without the knowledge or recklessness and complicity of employees at the highest levels of Valeant, including the Individual Defendants.

296.    Indeed, Kornwasser refused to execute the Philidor Option for the following reasons: (i) concern over the relationship between Tanner and Philidor; (ii) concern there was information related to the Philidor Option that he was not made aware of; (iii) and concerns of the payor risks that the Philidor Option created for Valeant. When Kornwasser raised these concerns with Pearson, Pearson was unhappy with Kornwasser, removed him from his role overseeing Philidor and Tanner, and pushed the deal through without him. Following Kornwasser's refusal, Pearson personally oversaw Valeant's relationship with Philidor.

297.    Moreover, Pearson, Schiller, and Rosiello undertook the affirmative obligation to obtain the requisite knowledge to ensure the Company's disclosures to the market were true by executing SOX certifications. Pearson, Schiller, Rosiello, and Carro participated in the drafting,

preparation, and/or approval of the various SEC filings, releases, and other public statements that appear herein and because of their positions had control over the information that was disclosed.

### B.      Individual Defendants' Control of Philidor

298.    The Individual Defendants were personally aware of Valeant's use of and control over Philidor and its network of pharmacies, from Valeant's creation of Philidor in 2013 through the Individual Defendants' decision to cut ties with the pharmacy in October 2015. The Individual Defendants were involved in the acquisition of Medicis, and chose to adopt Medicis' AF strategy and hire former Medicis employee Tanner to join Valeant for the sole purpose of running the AF program, which entailed creating Philidor on January 2, 2013. The next day Valeant announced that it had hired Kornwasser, who would supervise Tanner and report directly to Pearson. Kornwasser's position and compensation—$8.8 million total in 2013—demonstrate Philidor's importance to Valeant.

299.    Pearson, Schiller, Rosiello and senior management signed Valeant's agreements with Philidor, and Pearson and other executive officers often touted Valeant's new "alternative fulfillment program." The Individual Defendants knew that several Valeant employees helped to create Philidor, and that many worked at Philidor as Valeant employees before being transferred there to oversee Valeant's plan to use deceptive practices to artificially boost sales of Valeant's overpriced drugs. Two high-level Valeant employees—Tanner and Kornwasser—were intimately aware of Philidor's operations, and other Valeant employees, such as Bijal Patel and Alison Pritchett, helped to set up and run Philidor.

300.    Pearson and the Individual Defendants received regular updates on Valeant's business with Philidor, including, but not limited to, weekly meetings to discuss Philidor that began in 2013, and were attended by Kornwasser, Schiller, Tanner, and Pearson. For example,

Gary Tanner sent an email to Ari Kellen and Laizer Kornwasser on January 17, 2014, discussing alternative arrangements he was pursuing in case "Philidor could not be scaled quickly enough," to which Kellen replied, "Fully understand and agree[.]" The close monitoring continued throughout the relevant period. For instance, on March 9, 2015, Kellen sent Pearson an email following up on an earlier conversation stating, "Met with Deb [Jorn] . . . . Suggested we get all the DMs [District Managers] in for a day . . . goal to go over the practices in each district where Philidor is working well and identify next 10 practices where we should push harder to build it out that will help fuel growth." Pearson responded, "Good stuff." Philidor's managers were invited to meet with Valeant's board in July 2015.

301.   Well before the purchase option agreement, Philidor was providing monthly data to Valeant, and Valeant had a contractual right to inspect Philidor's books, records, and facilities for compliance—though such formal access was hardly necessary with their own employee, Tanner, effectively managing its operations. And prior to entering into the purchase option agreement, Pearson, Schiller, and Valeant's Board of Directors performed due diligence, including multiple site visits. In fact, the entire Audit and Risk Committee toured Philidor's facility in Pennsylvania prior to the transaction. Valeant included Philidor in its internal control testing and internal audit program for 2015.

302.   Defendants also monitored the secret network of pharmacies Philidor used to route prescriptions. For example, Valeant made approximately 75 shipments to R&O between January and August 2015 and received millions of dollars in payments directly from R&O in return. On September 4, 2015, after R&O became suspicious of the fraud and began withholding payments from Valeant, Valeant's general counsel sent a letter to R&O seeking "immediate payment" to Valeant, further highlighting the lack of separation between the companies. In the

October 19, 2015 conference call, Pearson told investors that R&O was part of Valeant's specialty pharmacy program.

303.    With this level of access, contact, and scrutiny, Defendants knew, or were reckless in not knowing, about Philidor's deceptive practices. As Philidor employees have confirmed, the deceptive practices were widely known, discussed, and even documented in Philidor's training manuals.

304.    As the truth about Philidor began to emerge, in October 2015 Defendants continued to actively misrepresent the relationship between Valeant and Philidor, and to claim to be investigating the relationship and describing the investigation in terms that suggested that, rather than Philidor being the creation of Valeant management, they were learning things for the first time. On October 19, 2015, Defendants presented investors with a list of facts that Valeant purportedly "understood" about Philidor, and Pearson, at a conference attended by Rosiello and Kellen, defended Philidor and the decision to conceal the relationship as "a competitive advantage that we did not want to disclose to our competitors."

305.    On October 26, 2015, at a conference attended by Schiller, Rosiello, Ingram, Provencio, Melas-Kyriazi, Stevenson, Carro, and Kellen, Pearson continued to claim that Philidor was "independent" and repeated that Philidor was concealed for "competitive" reasons. Pearson also assured investors that Valeant had been "working with outside counsel" and have found "no evidence of illegal activity whatsoever at Philidor." At that same conference, Defendants presented investors with another presentation that claimed, among other things, that Philidor was independent and Valeant had no control over management. Then, on October 30, 2015, just a few days later and a little over a week since Philidor became public, Valeant announced that it would be closing Philidor. That Defendants' decision to shutter Philidor so

quickly, rather than investigate the serious allegations involved, further confirms that they were already well aware of Philidor's deceptive practices. It also highlights the control over Philidor that Valeant forcefully denied having just four days earlier.

306.    Further, when Citron's report questioned Valeant's accounting through Philidor, Defendants all publicly defended the accounting. In the October 26, 2015 presentation to investors, Rosiello—flanked by the Board of Directors—represented that they had determined "the appropriate accounting treatment" for Philidor. Ingram also reiterated that the entire Board and the audit committee had reviewed and signed off on the accounting treatment.

307.    In doing so, Defendants knowingly or recklessly disregarded the requirements of ASC 810 and SAB Topic 13, which required them to disclose the "nature, purpose, size and activities" of Philidor, how Philidor was financed, significant judgments and assumptions made in determining whether Valeant needed to consolidate Philidor and/or disclose information about its involvement with Philidor, the "nature of, and changes in, the risks associated with" Valeant's involvement with Philidor, and how Valeant's involvement with Philidor affected Valeant's "financial position, financial performance and cash flows." *See* ASC 810-10-50-5A; ASC 810-10-50-8. Valeant was also required to disclose Philidor as a distinct sales channel in the MD&A in Valeant's periodic filings with the SEC. *See* SAB Topic 13.B.

308.    Rosiello's assertion in the October 26, 2015 presentation that they were not required to disclose Philidor because Valeant's sales to Philidor did not account for more than 10% of its revenues was a cover for their reckless disregard of the accounting rules. Philidor was not a customer of Valeant; it was effectively operating as a division of Valeant. Once Philidor's financials were consolidated with Valeant, the notion that Philidor had to meet the 10% customer

sales threshold for disclosure is rendered even more absurd because at that point even Valeant considered Philidor to be a part of Valeant and not a customer.

309.    Defendants knew that the illegitimate sales channel they created was highly material to Valeant's business. Indeed, their claim that Philidor was not material to Valeant is belied by the adverse financial impact that Philidor's closure had on Valeant and by the market's negative reaction to the several disclosures about Philidor from October 19, 2015 and into the middle of 2016.

310.    The reason that Defendants intentionally concealed Philidor is apparent. The concealment of Valeant's relationship with Philidor was essential to the Enterprise being able to channel sales through Philidor. So long as the PBMs had no idea about the connection between Philidor and Valeant, they had no reason to know about the improper relationship between Valeant and Philidor. Of course, when they eventually found out about Valeant's deceptive use of Philidor to move Valeant products, the three major PBMs—which account for 80% of the market—immediately cut ties with Philidor.

311.    Defendants knew, or at the very least recklessly disregarded, that Valeant's revenue recognition was being manipulated by the recording of fictitious sales where Valeant's ability to collect was not reasonably assured because the transactions occurred outside the normal course of business, that Valeant double-booked this revenue in 2015, and that Valeant did not have effective disclosure controls over financial reporting or effective disclosure controls or procedures in place in 2014 and 2015.

312.    When the ad hoc committee revealed the results of their review of Philidor and Valeant's accounting, they blamed Pearson, Schiller, and Carro. In announcing the restatement of Valeant's financials, ***the ad hoc committee accused Schiller and Carro of "improper***

*conduct" that "resulted in the provision of incorrect information to [the board's Audit and*

*Risk Committee] and the company's auditors."* The ad hoc committee also found that "the tone

at the top of the organization and the performance-based environment at the company, where

challenging targets were set and achieving those targets was a key performance expectation, may

have been contributing factors resulting in the company's improper revenue recognition[.]"

Thus, Pearson encouraged the manipulation of revenue recognition by requiring his employees to

meet aggressive revenue targets. In doing so, he recklessly disregarded that he had established a

corporate culture that facilitated channel stuffing.

### C.    Valeant's Refusal to Pursue Remedies Against Wrongdoers

313.    Valeant's failure to pursue remedies against Pearson, Schiller, Rosiello, Philidor,

and Philidor executives supports an inference that the deceptive business practices alleged herein

were fully approved. Valeant could not pursue such remedies for the wrongdoing it condoned,

and thus was limited to firing the wrongdoers and shutting down Philidor.

314.    In 2014, Valeant instituted a clawback policy, allowing the Company to recover

incentive compensation from management if a restatement is required within three years of the

relevant period and an executive is found to have participated in fraudulent or illegal conduct.

However, as Ingram noted, the Board approved the accounting for Philidor and thus,

notwithstanding Valeant's right to a clawback, Valeant's Board has taken no public action to

recover payments to Pearson, Schiller, or the other executives.

315.    To the contrary, a month after announcing that Pearson would be replaced as the

CEO, the Company retroactively modified his employment agreement to provide him with a $2

million salary for 2016, along with other financial benefits, although Pearson was supposed to

receive a performance bonus but no salary for 2016. Valeant has since provided him a $9 million severance.

316.    Similarly, Valeant's purchase option agreement with Philidor provides broad indemnification rights to the Company, including that Philidor "shall indemnify, defend, and hold harmless" Valeant "from and against any and all Losses" to Valeant "as a result of the operation of the Pharmacy or the performance by the Pharmacy of its duties." However, the purchase option agreement further provides that such liability "shall be reduced by the extent . . . that such Losses are caused by or arise out of (a) the negligence or intentional misconduct of Manufacturer . . . ." Rather than pursue its claims against Philidor, Valeant entered into a mutual release with Philidor, effective as of November 1, 2015.

317.    The allegations above make clear why Valeant has been unwilling to pursue claims against its executives or Philidor—the improper actions that they engaged in were central to Valeant's improper and unsustainable business strategy, and were designed and implemented at the highest levels of the Company.

**D.    Executive Departures**

318.    Widespread executive and director departures, including the Individual Defendants and many Enterprise members, in close temporal proximity to revelations regarding the deceptive practices by Valeant and Philidor, further support an inference of scienter.

319.    On April 29, 2015, just a few months before the scandal would reach the public and just after the false 2014 financial statements were issued, Valeant announced that Schiller would be leaving his position as CFO once a successor was appointed.

320.    Kornwasser left the Company in July 2015. CNBC subsequently attempted to contact Kornwasser, but received a call from Valeant's crisis management department who said

Kornwasser was not interested in discussing Valeant or Philidor. Representative Cummings noted Kornwasser was never made available when the House Oversight Committee asked Valeant to produce him for an interview.

321.    On or about March 2, 2016, it was reported that Jorn, head of the U.S. Gastrointestinal and Dermatology divisions, was leaving the company "effective immediately." Jorn was responsible for some of Valeant's top selling drugs, including Jublia, a dermatology drug that was sold in massive quantities through Philidor.

322.    On March 21, 2016, Valeant issued a press release regarding the restatement and material weaknesses of its internal controls. It also confirmed Pearson would be leaving the Company. Moreover, the Company admitted that Schiller and Carro engaged in "improper conduct" and provided inaccurate information to the Ad Hoc Committee investigating the false revenues. Schiller was asked to resign from the Board. Carro was replaced as controller. Thus, the Ad Hoc Committee review resulted in Pearson, Schiller, and Carro being forced out of Valeant.

323.    On April 29, 2016, Valeant announced that seven of its board members would not be standing for re-election. This included Pearson and Schiller, as well as Mason Morfit (of ValueAct), Provencio (chair of the Audit Committee), Goggins, Farmer, and Melas-Kyriazi (member of the Audit Committee). Notably, Provencio, Goggins, and Morfit were also members of the Ad Hoc Committee.

324.    On May 20, 2016, Valeant stated in a filing with the SEC that Stolz had resigned as Senior Vice President of Neurology, Dentistry and Generics. Stolz had been involved in both the price increases and the pricing discounts Pearson promised Congress but failed to deliver.

E.      **Executive Compensation**

325.    Valeant's unusual compensation structure provided incredibly rich compensation packages based on achieving increasingly challenging performance goals, backed by the threat of termination. This emphasis on results over ethics led to a culture of, and motive to engage in, fraudulent practices.

326.    For example, at a May 28, 2014 conference, Pearson stated "there's been a lot of turnover at the senior ranks; but that has been, by and large, our decision, not their decisions, as we continue to upgrade talent." Pearson bluntly acknowledged "[t]here's no tenure at Valeant. It's up and out. . . . It's more like a professional services firm than a sort of traditional pharmaceutical company." Pearson also admitted that the compensation system at Valeant was entirely dependent on increasing the stock price, stating: "So, our Company senior management and the Board—we—there's only one metric that really counts, and it's total return to shareholders. That's how we're paid. We have a unique pay model, that at least we—at least—if we don't at least achieve a 15% total return to shareholders each year, compounded annual growth rate, that basically the equity we receive in terms of our stock grabs is worth nothing."

327.    A December 12, 2013 Board of Directors presentation regarding Valeant's 2014 budget reflected these aggressive targets. The presentation noted that "[b]udget reflects stretched targets for all business units," and there would be "[n]o bonuses to be paid for performance <90% of base budget."

328.    While executives who missed budgets were punished with forfeiture of bonuses or worse, Valeant's highest ranking executives received millions of dollars for achieving the increasingly aggressive financial targets. For example, in 2014, Pearson's base compensation was $2 million and Schiller's was $1 million. However, under the bonus program they could

115

earn multiples of their base salary. That year, Pearson received an $8 million bonus, four times his base compensation, and Schiller received a $2.4 million bonus, 2.4 times his base compensation.

329.    The lavish salaries and bonuses paled in comparison to the rewards for inflating Valeant's stock price as high as possible until 2017. Industry observers noted that Valeant's compensation scheme paid Pearson "like a hedge fund manager." For example, on April 22, 2014, the Company filed a proxy statement with the SEC disclosing that the value of Pearson's shares on March 31, 2014 was approximately $1.3 billion.

330.    The compensation program provided Pearson the opportunity to become a billionaire and obtain wealth far beyond even a typical highly paid CEO. It also incentivized Pearson and other Valeant executives to use any means necessary to increase the stock price through 2017 at the expense of the long-term health of the Company and shareholder interests.

331.    Moreover, Pearson was allowed to effectively cash out a portion of his stock, pledging it as collateral for $100 million loaned to him by Goldman Sachs in 2014.

332.    With such powerful incentives, Pearson made statements to drive up the stock price, including in an October 27, 2014 letter Pearson wrote to Allergan's Board of Directors, which was publicly disclosed by the Company. In it, Pearson stated: "We believe our stock is trading at artificially low levels."

333.    On January 13, 2015, the Company filed a Form 8-K with the SEC announcing it had entered into an amended and restated employment agreement with Pearson. Pearson stopped earning an annual base salary, but his "target bonus opportunity" was increased from $6 million to $10 million. Again, as large as it was, the cash bonus paled in comparison to the hundreds of

millions of dollars in compensation Pearson would receive if he successfully drove Valeant's share price higher.

334.     During the relevant period, millions of dollars of Schiller's executive compensation hinged on meeting challenging share price increases. On top of their extreme compensation, Pearson and Schiller were permitted personal use of Valeant's $60 million fleet of private jets, which they used to fly friends and family for vacations.

335.     On March 21, 2016, the Company admitted that its aggressive compensation and performance goal practices contributed to the wrongdoing stating: "the Company has determined that the tone at the top of the organization and the performance-based environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation, may have been contributing factors resulting in the Company's improper revenue recognition" and other misconduct detailed in the press release. This "tone" was created by Pearson, among others, who recklessly disregarded that by imposing aggressive revenue targets, he had created a corporate culture that encouraged manipulation of revenue recognition and facilitated channel stuffing.

336.     The "tone at the top" material weakness further supports an inference of scienter as accounting and internal control guidance makes clear the importance "top management" has in setting an appropriate tone. *See* SEC Staff Accounting Bulletin No. 99. As CEO during the relevant period, Pearson had ultimate responsibility for Valeant's internal control system and setting the "tone at the top" to prioritize ethical business and accounting practices and compliance over personal financial compensation, which he recklessly failed to do. As the COSO Framework states, "[t]he influence of the CEO on an entire organization cannot be overstated." COSO Framework at 84.

### F.      Inflating Valeant's Stock Price To Facilitate Acquisitions

337.    In addition to personal compensation, the Individual Defendants had motive to conceal their fraudulent business practices described herein to artificially inflate Valeant's stock price to more cheaply acquire other companies and continue its acquisition strategy.

338.    For example, in May 2014, Valeant offered cash and shares of Valeant stock in exchange for Allergan shares of stock. Thus, Defendants had an incentive to increase the price of Valeant shares to hit or exceed their $46 billion offer to Allergan, which was to be substantially funded with Valeant shares.

339.    Valeant also took advantage of the artificially inflated price of its securities to conduct numerous debt and equity offerings during the relevant period, including one of the largest high-yield debt offerings in history, which generated in the aggregate nearly $15 billion of cash for the Company from the investing public at artificially inflated prices. Valeant also used proceeds from an approximately $10.1 billion offering of senior notes in March 2015 to acquire Salix, and proceeds from a $3.2 billion offering of senior notes in July 2013 to acquire Bausch & Lomb.

### G.      Internal Valeant Communications and Congressional Testimony

340.    Pearson and Schiller knew, or at the very least recklessly disregarded, that between January 1, 2013 and September 30, 2015, Valeant's steep revenue growth was driven not by organic volume increases, but rather primarily by Valeant's unsustainable practice of acquiring medications and drastically increasing their prices. Indeed both Pearson and Schiller have since admitted that Valeant's growth was the result of price increases, and not what was previously represented to the market.

341.    In reaction to Allergan's public challenges to Valeant's business model, Pearson repeatedly led investors to believe that Valeant did not rely heavily on price increases to drive revenue growth. After one instance, when Pearson told investors on May 21, 2015 that "organic growth is more volume than price and will continue to be," Schiller sent him an email with the subject line "price/volume" in which he corrected Pearson: "Last night, one of the investors asked about price versus volume for Q1. Excluding [M]arathon, price represented about 60% of our growth. If you include [M]arathon, price represents about 80%." Despite this clear internal awareness that price was the dominant driver of revenue, Pearson never retracted his statement. Indeed, he continued to make misleading statements about the role of price in revenue growth. For example, on July 23, 2015, he claimed that Valeant's "base strategy is, how do we grow organically through volume[.]"

342.    On April 27, 2016, Pearson appeared before Congress. In his prepared remarks, Pearson confessed that Valeant had "made mistakes" and that he was too aggressive in seeking price increases to drive revenue: "[T]he company was too aggressive—and I, as its leader, was too aggressive—in pursuing price increases on certain drugs. Let me state plainly that it was a mistake to pursue, and in hindsight I regret pursuing, transactions where a central premise was planned increase in the prices of the medicines . . . ."

343.    Schiller later confirmed that 80% of Valeant's growth in the first quarter of 2015 was the result of price increases in his February 4, 2016 testimony before Congress.

344.    During that hearing, Pearson was questioned by Senator Claire McCaskill about whether growth was driven by price rather than volume between the first quarter of 2013 and the third quarter of 2015 for all but one quarter. In response, Pearson admitted that, "Yes, pricing has driven more growth than volume."

345.     Indeed, as discussed in ¶¶ 64–73, Valeant's practice of driving revenue growth through price increases was devised in late 2012 by Pearson, Schiller, and other top executives, and formed the core of its operations. Rather than follow the traditional model of developing new drugs by investing in R&D, Pearson and Schiller implemented a strategy of acquiring already developed drugs and increasing revenues through price hikes. Pearson and Schiller were thus well aware that organic volume increases were not the primary driver of Valeant's revenue growth.

## VIII.  RELIANCE

346.     During the relevant period, Plaintiff reasonably relied on the material misstatements alleged herein when purchasing Valeant securities.

347.     There is a presumption of reliance established by the fraud-on-the-market doctrine because, among other things:

(a)     The Defendants made public misrepresentations or failed to disclose material facts during the relevant period;

(b)     The misrepresentations and omissions were material;

(c)     The Company's securities traded in efficient markets;

(d)     The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff purchased Valeant securities between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

348.     At all relevant times, the market for Valeant's securities was efficient for the following reasons, among others:

120

(a)     Valeant's common stock met the requirements for listing, and was listed and actively traded on the NYSE and the TSX, highly efficient and automated markets;

(b)     As a regulated issuer, Valeant filed periodic reports with the SEC and the NYSE;

(c)     Valeant regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Valeant was covered by the following analysts during the relevant period: Piper Jaffray; Deutsche Bank Markets Research; Wells Fargo Securities; J.P. Morgan; RBC Capital Markets; TD Securities Inc.; Scotiabank Equity Research; Morgan Stanley; Canaccord Genuity; BMO Capital Markets; Sadif Analytics; BTIG LLC; Morningstar Equity Research; Guggenheim; Evercore ISI; CIBC World Markets; Minkabu; Rodman & Renshaw; Moody's Investor Services; and Wright Investor Services.

349.    As a result of the foregoing, the market for Valeant's securities promptly digested current information regarding Valeant from all publicly available sources and reflected such information in the price of Valeant securities. Under these circumstances, all purchasers of Valeant securities during the relevant period suffered similar injury through their purchase of Valeant securities at artificially inflated prices, and a presumption of reliance applies.

350.    Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against

Defendants are primarily predicated upon omissions of material fact for which there was a duty to disclose.

351.    In addition, Plaintiff directly relied on Defendants' false and misleading statements alleged herein when deciding to purchase Valeant securities.

352.    For example, during the relevant period, Plaintiff engaged outside investment managers, including T. Rowe Price Associates, Inc. (hereinafter "T. Rowe Price"), to manage its investment portfolios and to make investment decisions on behalf of Plaintiff.

353.    As an investment manager to Plaintiff, T. Rowe Price employed an active investment strategy based on an analytical, research-based investment process. Under this process, a portfolio manager, with the assistance of equity analysts, made the decisions whether to purchase, sell or hold shares for Plaintiffs. Factors considered by the portfolio manager and analysts included, among other things, Valeant's financial performance and a review of the Company's strengths, weaknesses and opportunities.

354.    Throughout the Relevant Period, both the portfolio manager and the analysts at T. Rowe Price performed rigorous independent and fundamental research including reading and relying upon publicly available information concerning Valeant from the following sources: (a) Valeant's public statements, plans and press releases; (b) Valeant's corporate website and materials posted on its website; (c) analyst reports and earnings conference calls involving Valeant; (d) Valeant's periodic securities filings with the SEC and the NYSE, including its Forms 10-K; (e) other regulatory filings and reports regarding Valeant; and (f) industry conferences and conference transcripts involving Valeant.

355.    In particular, the portfolio manager and the analysts at T. Rowe Price read and relied on statements in Valeant's 2013 and 2014 Annual Reports on Forms 10-K, including the

Company's audited financial statements. The portfolio manager and the analysts used the Company's reported revenues, among other things, as metrics to analyze Valeant's current and future operations and financial performance, and in making decisions whether to invest in Valeant or its competitors. In so doing, the portfolio manager and analysts also read and relied on statements in the 2013 and 2014 Forms 10-K attesting to the effectiveness of the Company's internal financial and disclosure controls.

356.    On or about February 28, 2014, the portfolio manager and analysts at T. Rowe Price, on behalf of Plaintiff, read and reviewed the 2013 10-K and accompanying press release, including specifically, the false and misleading financial statements contained therein. In reliance upon the false and misleading statements in the 2013 10-K, T. Rowe Price purchased Valeant common stock on behalf of Plaintiff.

357.    Similarly, on or about February 25, 2015, T. Rowe Price, on behalf of Plaintiff, read and reviewed the 2014 10-K, as well as the accompanying press release, including specifically, the false and misleading financial statements contained therein. In reliance upon the false and misleading statements in the 2014 10-K, T. Rowe Price purchased Valeant common stock on behalf of Plaintiff.

358.    Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about Plaintiff's portfolio managers' investment decisions with respect to Valeant securities. Plaintiff's portfolio managers did not know, and in the exercise of reasonable diligence could not have known, of Defendants' false and misleading statements alleged herein when deciding that the Plaintiff should purchase, sell, or hold Valeant common stock during the Relevant Period.

## IX.    LOSS CAUSATION

359.    During the relevant period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Valeant securities and operated as a fraud or deceit on Plaintiff by making the materially false and misleading statements and omissions recited above.

360.    Defendants' false and misleading statements and material omissions caused, or were a substantial contributing factor, in causing Valeant securities to trade at artificially inflated prices between January 15, 2013 and April 15, 2016, when Plaintiff's Investment Managers purchased the Valeant securities on its behalf. As a series of partial disclosures corrected Defendants' statements, the artificial inflation was removed from the price of Valeant's securities and the price of Valeant securities declined, causing substantial damage to Plaintiff.

361.    Each of the declines discussed above in the price of the Valeant securities was statistically significant at a high level after taking into account changes on the same days in the overall securities market and in relevant industry indices. Furthermore, as set forth above, each of the price declines in Valeant's securities is attributable to the disclosure of previously concealed information relating to the materially false and misleading statements and omissions alleged herein. The timing and magnitude of the price declines negate any inference that the losses suffered by Plaintiff were caused by other changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the alleged fraudulent conduct. As the truth about the fraud was revealed, the price of Valeant securities declined, the artificial inflation was removed, and Plaintiff suffered damages.

## X. NO SAFE HARBOR

362. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Valeant who knew that those statements were false when made.

## XI. DAMAGES

363. As described herein, Defendants engaged in the Enterprise to personally enrich individual members and to artificially inflate the price of Valeant securities. Pursuant to that scheme, Defendants made numerous false and misleading statements and omissions concerning material information about Valeant, Philidor, and other members of the Enterprise. This unlawful course of conduct, and specifically the Enterprise's misinformation campaign, had the effect of artificially inflating the price of Valeant securities and causing Valeant common stock to trade at inflated values at all relevant times prior to exposure of the Enterprise and its scheme.

364.    Defendants' materially false and misleading statements and omissions in furtherance of the Enterprise's scheme were highly material to investors in Valeant securities.

365.    Specifically, the Enterprise executed a misinformation campaign, which purposely concealed Valeant's fundamental business model and falsely attributed Valeant performance to having a valuable portfolio of drugs, increased sales volume, and superior marketing capabilities rather than disclose Valeant's true business model, which consisted of acquisitions of drugs, price gouging of those drugs, and then deceptive and illegal sales practices to ensure sales of those drugs. These matters were material to investors because Valeant's true business model was in fact inherently flawed, unsustainable, and repugnant.

366.    Defendants' unlawful course of conduct under the Enterprise's scheme, and specifically the misinformation campaign, are particularly egregious because Valeant investors necessarily experience an information deficit concerning the internal workings of Valeant, and they must therefore depend upon Valeant and its agents to fully and truthfully represent information about the company, its operations, and other factors that impact the value of its securities. Plaintiff placed substantial trust in Valeant and other members of the Enterprise to perform their roles in good faith, and Defendants' breaches of Plaintiff's trust through the Enterprise's misinformation campaign and other unlawful conduct are thus highly material to investors.

367.    The materiality of Defendants' misinformation campaign is evidenced by the inflated price at which Valeant securities were trading during the misinformation campaign, as compared with the massively reduced prices that Valeant securities traded for after the Enterprise was exposed, and the market reacted to the revelation of Valeant's true business model, its price gouging, and deceptive and illegal sales practices.

368.    As a result of the Defendants' participation in the Enterprise's fraudulent scheme, and the misinformation campaign executed in connection therewith, at all relevant times, Plaintiff, and all other Valeant investors, invested in Valeant securities at prices which were artificially inflated. Valeant securities would not have traded at the inflated prices that they did if Defendants had disclosed to investors the true nature of Valeant's business model. Thus, in reliance on Defendants' and the Enterprise's materially misleading misinformation campaign, Plaintiff purchased Valeant securities at significantly higher prices than their actual value.

369.    Had Plaintiff known the truth hidden by the Defendants' and the Enterprise's misinformation campaign, it would not have purchased Valeant securities at the prices it did. Indeed, Plaintiff may not have invested in Valeant at all in the face of the inherently unsustainable and risky business model on which Valeant was truly operating.

370.    When the Enterprise's fraudulent scheme was exposed, and the true nature of Valeant's unsustainable and risky business model was exposed, the value of Valeant securities plummeted over 90%, wiping out tens of billions of dollars in value, and causing enormous losses to Plaintiff and other Valeant investors.

371.    Accordingly, Defendants' participation in the Enterprise's fraudulent scheme, and the misinformation campaign, material misrepresentations, and omissions executed in connection therewith, were the proximate causes of the damages Plaintiff has sustained in connection with its investments in Valeant securities.

## XII.    CAUSES OF ACTION

### COUNT I

### RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(c)
### (Against all Defendants)

372.    Plaintiff restates each and every allegation of ¶¶ 1–371 as if fully set forth herein.

373.     Defendants are persons within the meaning of N.J. STAT. ANN. 2C:41-1(b).

374.     Defendants comprise an association, associations and or/are associated-in-fact Enterprise as those terms are defined in N.J. STAT. ANN. 2C:41-1(c). The Enterprise has an existence beyond that which is merely necessary to commit predicate acts and, among other things, oversaw and coordinated the commission of numerous predicate acts on an on-going basis in furtherance of the scheme and efforts to conceal the scheme, each of which caused direct injury to Plaintiff. The Enterprise was operated, managed, and controlled by, among others, Valeant, Pearson, Schiller, Rosiello, Carro, Philidor, and Andrew Davenport.

375.     During the relevant period, Defendants agreed to conduct and participate in, and conducted and participated in, the Enterprise's scheme through a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-1(d). Defendants' conduct involved more than two incidents of racketeering conduct, and therefore constituted a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-1(d)(1). This pattern consisted of repeated, continuous incidents of racketeering activity that had the same or similar purposes, results, participants, victims, or methods of commission, and are interrelated by distinguishing characteristics rather than isolated incidents within the meaning of N.J. STAT. ANN. 2C:41-1(d)(2).

376.     It was the purpose of the Enterprise to create and disseminate false and misleading statements and information concerning Valeant and its operations, with the objective of misleading investors, including Plaintiff, and profiting by that conduct through the sale of publicly-traded Valeant securities, which were inflated to unjustifiable prices. This extensive market-manipulation scheme was intended to, and did, provide substantial profits to the Enterprise's members and caused enormous harm to Plaintiff. The Enterprise operated by the

Defendants achieved these objectives by the conduct of racketeering activity, including, among other conduct:

     (a)    astronomical price gouging;

     (b)    creating a nationwide network of secret captive pharmacies designed to conceal the Enterprise's efforts to ensure sales of Valeant's price-gouged drugs;

     (c)    employing deceptive and illegal practices in the filling of prescriptions and seeking of reimbursements from insurers to ensure sales of, and reimbursements for, Valeant's price-gouged drugs;

     (d)    misleading patients, doctors, insurers and other end payors to ensure sales of Valeant's price-gouged drugs;

     (e)    misleading the investing public as to the nature of Valeant's business model, its current operations, and its future prospects; and

     (f)    committing accounting fraud and other violations of GAAP in furtherance of the Enterprise's common goal of inflating the price of Valeant securities.

377. The Defendants knowingly and intentionally participated in the conduct of the Enterprise, and the entities and enterprises associated with the Enterprise, directly and indirectly through a pattern of racketeering activity, including by committing, among others, the following predicate acts:

     (a)    fraud in the offering, sale, and purchase of securities in violation of N.J. STAT. ANN. 49:3-71 and 15 U.S.C. §§ 78j and 78ff, and 17 C.F.R. § 240.10b-5, which are incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(p);

(b)      use of the wires in the United States or foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343, which is incorporated as "racketeering activity" under the NJ RICO statute pursuant to N.J. STAT. ANN. 2C:41-1(a)(2);

(c)      use of the mails in the United States to commit a fraud in violation of 18 U.S.C. § 1341, which is incorporated as "racketeering activity" under N.J. STAT. ANN. 2C:41-1(a)(2);

(d)      fraudulent concealment of racketeering activity and other fraudulent practices, including numerous false and misleading statements and omissions for the purpose of promoting the sale of securities in violation of N.J. STAT. ANN. 2C:21-7(i), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(e)      use, control, and operation of Valeant and Philidor, among other corporate entities in furtherance and promotion of criminal objectives in violation of N.J. STAT. ANN. 2C:21-9(c), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(f)      perpetration of an illegal kickback scheme in violation of N.J. STAT. ANN. 2C:21-10, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o);

(g)      money laundering in violation of N.J. STAT. ANN. 2C:21-25, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o), and in violation of 18 U.S.C. § 1956, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2);

(h)     interstate travel or transportation in aid of the Enterprise in violation of 18 U.S.C.A. § 1952, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2); and

(i)     illegal monetary transactions in violation of 18 U.S.C. § 1957, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

378.    As set forth herein, beginning at least as early as January 2013, as part of their pattern of racketeering activities and in furtherance of and to assist their manipulative scheme, each of the Defendants knowingly, willfully, and unlawfully made misrepresentations or omissions of material fact for the purpose of improperly inflating the price of Valeant securities by misleading Plaintiff and the investing public concerning Valeant's business model and sustainability, engaging in massive, improper price gouging and deceptive and illegal sales practices, misleading patients, doctors, and insurers and other end payors to ensure sales of and reimbursement for Valeant products, creating and disseminating false and misleading reports and information concerning Valeant's performance, including by committing accounting fraud, among other fraudulent conduct, all for the unlawful purpose of inducing investors to buy and own Valeant securities at ever-rising prices. Such actions were intended to, and did, constitute false statements of material fact and/or omissions of material fact, on which Defendants intended for Plaintiff and the investing public to rely, and on which Plaintiff and the investing public reasonably relied in electing to purchase and own Valeant securities, which they would not have done but for Defendants' fraudulent conduct. Such misrepresentations and omissions, constitute securities fraud in violation of N.J. STAT. ANN. 49:3-70 and N.J. STAT. ANN. 2C:2-6, which conduct independently constitutes violations of 15 U.S.C. §§ 78j and 78ff, and 17 C.F.R. § 240.10b-5.

131

379.     As set forth herein, in furtherance of and for the purpose of executing and attempting to execute the Enterprise's scheme, each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and the U.S. mails by both making and causing to be made wire communications and mailings. These wire communications and mailings were made, among other reasons, for the purposes of (i) communicating with one another to effectuate the dissemination of false and misleading statements and information necessary to perpetrate the Enterprise's scheme to improperly inflate the price of Valeant securities, and harm Plaintiff, among other investors, (ii) disseminating false and misleading statements and information concerning the Valeant business model and the corresponding value of Valeant securities; and (iii) coordinating their manipulation of the market for Valeant securities. These false wire communications caused direct injury to Plaintiff's businesses and property.

380.     Each use of a wire communication and/or mailing as described herein in connection with the Enterprise's scheme constitutes a separate and distinct violation of N.J. STAT. ANN. 2C:41-1(a)(2), by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343. The Defendants used the wires and mails to perpetrate their fraudulent scheme and to disseminate the fraudulent statements and misinformation concerning Valeant's business model and the value of Valeant securities, and each caused direct injury to Plaintiff's business and property.

381.     Defendants also spoke on the phone and used electronic mail and U.S. mail regularly to conduct the activities of the Enterprise, causing direct injury to Plaintiff. The total number of phone calls, e-mails, and mailings, is not yet known, nor are the identities of all

Enterprise members, but each such call, e-mail, and U.S. mailing as described herein constitutes a separate mail or wire communication in furtherance of the Enterprise's fraudulent scheme.

382.     As set forth herein, throughout the duration of the Enterprise's fraudulent scheme, from receipt of the first ill-gotten proceeds of the Enterprise, Defendants have transported and/or possessed property they knew or reasonably should have believed to be derived from their criminal activity. In furtherance of the Enterprise, Defendants engaged in myriad transactions involving the proceeds of their fraudulent scheme, property that Defendants knew or reasonably should have believed to be derived from criminal activity, with the intent to facilitate and/or promote the criminal activity underlying the Enterprise and with knowledge that the transactions were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of such proceeds, and/or to avoid reporting requirements under law. In addition to participating directly in this misconduct, Defendants directed, organized, financed, planned, managed, supervised, and/or controlled such conduct. This conduct constitutes money laundering in violation of N.J. STAT. ANN. 2C:21-25, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o), and in violation of 18 U.S.C.A. § 1956, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

383.     Defendants made numerous false and misleading written statements in the form of press releases, proxy statements, annual reports, and security filings with regulatory agencies, for the purpose of promoting the sale of securities, and omitted information required by law to be disclosed in written documents relating to those securities. This conduct constitutes fraudulent concealment of racketeering activity and other fraudulent practices, including the making of false and misleading statements and omissions for the purpose of promoting the sale of securities in

violation of N.J. STAT. ANN. 2C:21-7(i), which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(1)(o) and (p).

384.    In furtherance of the Enterprise, Defendants traveled in interstate and/or foreign commerce and used the mail and other facilities in interstate or foreign commerce to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of the unlawful activities underlying the Enterprise, as set forth herein. Specifically, as set forth above, Defendants travelled between Valeant's headquarters in New Jersey to Philidor's offices in Pennsylvania, among other states in the United States, to facilitate acquisitions of pharmaceutical companies and/or pharmacies to facilitate and expand the Enterprise's fraudulent scheme. Likewise, as set forth above, Defendants employed the mail in furtherance of the Enterprise's fraudulent scheme. This conduct constitutes interstate travel or transportation in aid of the Enterprise in violation of 18 U.S.C.A. § 1952, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

385.    Defendants have knowingly engaged and/or attempted to engage in monetary transactions in criminally derived property, including the proceeds of the Enterprise's fraudulent scheme, of a value greater than $10,000 within the United States, which was derived from the unlawful activities set forth herein. This conduct constitutes illegal monetary transactions in violation of 18 U.S.C. § 1957, which is incorporated as racketeering activity under N.J. STAT. ANN. 2C:41-1(a)(2).

386.    Each of the predicate acts referred to in the preceding paragraphs was for the purpose of executing the Enterprise's fraudulent scheme, and Defendants and Enterprise members engaged in such acts with the specific intent of furthering that scheme, willfully and

with knowledge of its illegal and fraudulent nature. Each of the Defendants performed or participated in the performance of at least two of the predicate acts set forth herein.

387.    The conduct and actions set forth herein were related to each other by virtue of common participants, common victims, common methods, and the common purpose and common result of a concerted campaign of misinformation concerning Valeant's true business model, growth strategy, and sales practices to artificially inflate the value of Valeant securities and enrich the members of the Enterprise to the harm and detriment of Plaintiff, among other investors. The Defendants' activities were interrelated, not isolated, and involved a calculated series of repeated violations of the law in order to conduct, conceal, and promote fraudulent activity. The Enterprise existed with the members identified herein and others yet unknown since at least 2008, and the conduct and activities continued through at least October 2015.

388.    The Defendants' willful and knowing direct and indirect participation in the Enterprise's affairs through the pattern of racketeering and activity described herein constitutes a violation of N.J. STAT. ANN. 2C:41-2(c).

389.    These violations of N.J. STAT. ANN. 2C:41-2(c) caused Plaintiff to suffer direct injury to its business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the Enterprise's wrongful actions described herein. Plaintiff, therefore, is entitled to recover from the Defendants the amount in which it has been damaged, to be trebled in accordance with N.J. STAT. ANN. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## COUNT II

### RACKETEERING IN VIOLATION OF N.J. STAT. ANN. 2C:41-2(d)
### (Against all Defendants)

390.    Plaintiff restates each and every allegation of ¶¶ 1–371 as if fully set forth herein.

391.    Beginning as early as January 2013, the Defendants and all members of the Enterprise agreed to facilitate the scheme described herein to manage, operate, conduct, and participate in the conduct of the affairs of the Enterprise and conspired to do the same within the meaning of N.J. STAT. ANN. 2C:5-2 through a pattern of racketeering activity within the meaning of N.J. STAT. ANN. 2C:41-2(d).

392.    Each of the Defendants and enterprise members being persons intimately involved in the transactions carried on by and the affairs of the Enterprise—which was engaged in, and the activities of which affected, trade and commerce—unlawfully and willfully conspired, confederated, and agreed with each other to violate N.J. STAT. ANN. 2C:41-2(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise, through a pattern of racketeering activity, all in violation of N.J. STAT. ANN. 2C:41-2(d).

393.    Part of the conspiracy was that each Defendant personally committed or agreed to commit two or more fraudulent and illegal racketeering acts and conducted and agreed to conduct the affairs of the Enterprise through the pattern of racketeering in violation of N.J. STAT. ANN. 2C:41-2(c) described above.

394.    These violations of N.J. STAT. ANN. 2C:41-2(c) caused Plaintiff to suffer direct injury to its business and property through massive losses in investment opportunities and gains, and fees and expenses, caused by the Enterprise's wrongful actions described herein. Plaintiff therefore, is entitled to recover from the Defendants the amount in which it has been damaged, to be trebled in accordance with N.J. STAT. ANN. 2C:41-4(c), together with interest and the costs of this suit, including reasonable attorneys' fees.

## COUNT III

### AIDING AND ABETTING RACKETEERING IN VIOLATION OF
### N.J. STAT. ANN. 2C:41-2(c) AND (d)
### (Against all Defendants)

395.    Plaintiff restates each and every allegation of ¶¶ 1–371 as if fully set forth herein.

396.    Defendants aided and abetted the Enterprise in executing its fraudulent scheme and racketeering acts in violation of N.J. STAT. ANN. 2C:41-2(c) and (d) alleged herein. Defendants willingly, and substantially participated in the Enterprise's fraudulent scheme with knowledge of the numerous violations of NJ RICO and the underlying pattern of racketeering activity perpetrated by the Enterprise.

397.    Plaintiff was injured as a direct and proximate result of Defendant's aiding and abetting the Enterprise's violations of NJ RICO alleged herein.

## COUNT IV

### VIOLATIONS OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT OF 1934
### AND RULE 10b-5
### (Against all Defendants Valeant, Pearson, and Rosiello)

398.    Plaintiff restates each and every allegation of ¶¶ 1–371 as if fully set forth herein.

399.    This claim is brought by Plaintiff against Defendants Valeant, Pearson, and Rosiello for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, for purchases of Valeant securities prior to March 16, 2016.

400.    During the relevant period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

401.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff related to the purchase and/or acquisition of Valeant securities.

402.   In addition to the duties of full disclosure imposed on the Defendants by their affirmative false and misleading statements to the public, Defendants had a duty under SEC Regulations S-X (17 C.F.R. §210.1, et seq.) and S-K (17 C.F.R. §229.10, et seq.) to promptly disseminate truthful information with respect to Valeant's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information.

403.   As a direct and proximate cause of Defendants' wrongful conduct, Plaintiff suffered damages in connection with their purchases and acquisitions of Valeant securities in domestic transactions during the relevant period. In reliance on the integrity of the market, Plaintiff paid artificially inflated prices for Valeant securities and experienced losses when the artificial inflation was removed from the securities as a result of the revelations and price declines detailed herein. Plaintiff would not have purchased or acquired Valeant securities at the prices it paid, or at all, if it had been aware that those prices had been inflated by the Valeant Defendants' misleading statements and omissions.

404.     By virtue of the conduct alleged herein, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiff.

## COUNT V

**VIOLATIONS OF SECTION 18 OF THE SECURITIES EXCHANGE ACT OF 1934**
**(Against Defendants Valeant, Pearson, and Rosiello)**

405.     Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1–371 above as if set forth herein. As to this Cause of Action, Plaintiff expressly disclaims any allegation of fraud or intentional misconduct.

406.     This claim is brought by Plaintiff against Defendants Valeant, Pearson, and Rosiello violations of Section 18 of the Exchange Act, 15 U.S.C. § 78r, for purchases of Valeant securities made before March 16, 2016.

407.     As alleged above, Defendants Valeant, Pearson, and Rosiello filed or caused to be filed with the SEC documents regarding Valeant that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

408.     As alleged herein, Defendants Valeant and Pearson caused (at least negligently) statements to be made in Valeant's 2013 10-K, including statements concerning preparation of financial statements in accordance with GAAP, which statements were, at the time and in light of the circumstances under which they were made, false or misleading.

409.     As alleged herein, Defendants Valeant and Pearson caused (at least negligently) statements to be made in Valeant's 2014 10-K, including statements concerning preparation of financial statements in accordance with GAAP, the revenues reported for the quarter and year ended December 31, 2014, and the effectiveness of Valeant's internal controls over financial

reporting and of Valeant's disclosure controls and procedures, which statements were, at the time and in light of the circumstances under which they were made, false or misleading.

410.    As alleged herein, Defendants named in this count caused (at least negligently) statements to be made in Valeant's 3Q2014 10-Q, 1Q2015 10-Q, 2Q2015 10-Q, and/or 3Q2015 10-Q, including statements concerning the lack of changes in Valeant's internal controls over financial reporting and the effectiveness of Valeant's disclosure controls and procedures, which statements were, at the time and in light of the circumstances under which they were made, false or misleading.

411.    In purchasing Valeant's securities, Plaintiff's Investment Managers read, reviewed, and relied on Valeant's 2013 10-K, 2014 10-K, 3Q2014 10-Q, 1Q2015 10-Q, 2Q2015 10-Q, and 3Q2015 10-Q.

412.    Specifically, Plaintiff's Investment Managers read, reviewed, and relied upon information contained in Valeant's 2013 10-K, 2014 10-K, 3Q2014 10-Q, 1Q2015 10-Q, 2Q2015 10-Q, and 3Q2015 10-Q (to the extent each such document was on file with the SEC at the time) in making each purchase on behalf of Plaintiff, as described above in ¶¶ 351–58.

413.    Had it known the true facts, Plaintiff would not have purchased the Valeant securities and/or would not have purchased them at the inflated prices it paid.

414.    Upon disclosure of the true facts, the price of Valeant securities dropped, and Plaintiff suffered damages in an amount to be proven at trial.

415.    By reason of the foregoing, Defendants Valeant, Pearson, and Rosiello are liable to Plaintiff for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

## COUNT VI

## VIOLATIONS OF SECTION 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934
### (Against Defendants Pearson and Rosiello)

416.    Plaintiff repeats and realleges each and every allegation in ¶¶ 1–373 above as if fully set forth herein.

417.    This claim is brought by Plaintiff against Defendants Pearson and Rosiello for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), for purchases of Valeant securities prior to March 16, 2016.

418.    During their tenures as officers and/or directors of Valeant, Pearson and Rosiello were controlling persons of Valeant within the meaning of Section 20(a) of the Exchange Act. By reason of their positions of control and authority as officers and/or directors of Valeant, these Defendants had the power and authority to cause Valeant to engage in the conduct complained of herein. These Defendants were able to, and did, control, directly and indirectly, the decision-making of Valeant, including the content and dissemination of Valeant's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

419.    In their capacities as senior corporate officers and/or directors of Valeant, and as more fully described herein, Pearson and Rosiello participated in the misstatements and omissions set forth above. These Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and had access to non-public information regarding Valeant's deceptive and risky business practices. Pearson and Rosiello had the ability to influence and direct, and did so influence and direct, the activities of each of the Valeant Defendants in their violations of Section 10(b) of the Exchange Act and Rule 10b-5.

141

420.     As a result, Pearson and Rosiello individually and as a group, were control persons within the meaning of Section 20(a) of the Exchange Act.

421.     As set forth above, Valeant violated Section 10(b) of the Exchange Act. By virtue of their positions as controlling persons, and as a result of their aforesaid conduct and culpable participation, Pearson and Rosiello are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Valeant is liable to Plaintiff.

422.     By reason of the foregoing, Valeant, Pearson and Rosiello violated Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), and are liable to Plaintiff.

## COUNT VII

### COMMON LAW FRAUD / FRAUDULENT INDUCEMENT
### (Against all Defendants)

423.     Plaintiff restates and realleges each allegation in ¶¶ 1–373 above as if fully set forth herein.

424.     Each of the Defendants made, authorized, or caused the representations at issue, which are identified and summarized above.

425.     The material representations set forth above were fraudulent, and Defendants' representations fraudulently omitted material statements of fact.

426.     Each of the Defendants knew or recklessly disregarded that their representations and omissions were false and/or misleading at the time they were made. Each made the misleading statements with an intent to defraud Plaintiff.

427.     The Defendants had reason to expect that Plaintiff was among the class of persons who would receive and rely on such representations, and intended that their misleading statements would induce Plaintiff to purchase Valeant securities.

428.    Plaintiff justifiably relied on the Defendants' false representations and misleading omissions in purchasing Valeant securities.

429.    Had Plaintiff known the true facts regarding Valeant's business as set forth above, it would not have purchased Valeant securities at the prices it had.

## COUNT VIII

### NEGLIGENT MISREPRESENTATION
### (Against all Defendants)

430.    Plaintiff repeats and realleges each and every allegation contained in ¶¶ 1–373 above as if set forth herein. As to this Cause of Action, Plaintiff expressly disclaims any allegation of fraud or intentional misconduct.

431.    Defendants authorized or caused the representations and/or omissions set forth above.

432.    Defendants supplied false information for use by Plaintiff in making an investment decision.

433.    Defendants made misrepresentations that they knew, or should have known, to be false in order to induce Plaintiff to purchase Valeant securities.

434.    Defendants breached their duty to exercise reasonable care in making these misrepresentations to Plaintiff.

435.    Moreover, Defendants had a duty to disclose certain information concerning Philidor. Defendants breached that duty by failing to disclose such information.

436.    Plaintiff reasonably relied on the information Defendants provided and was damaged as a result of these misrepresentations and omissions. Plaintiff would not have purchased Valeant securities at all, or at the inflated prices it paid, had it known the true facts

143

regarding, *inter alia*, Valeant's reported revenues, and the effectiveness of Valeant's internal controls over financial reporting and its disclosure controls and procedures.

437.    By reason of the foregoing, Defendants are liable to Plaintiff for negligent misrepresentation.

438.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiff has suffered damages in an amount to be proven at trial.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Awarding Plaintiff compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including pre-judgment and post-judgment interest, and trebled as allowed by law;

B.    Awarding Plaintiff extraordinary, injunctive and/or equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as this Court may deem just and proper.

## XIV.   JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues so triable.

Dated: September 27, 2019                    Respectfully submitted,

                                             **LABATON SUCHAROW LLP**

                                             s/Margaret A. Schmidt
                                             Margaret A. Schmidt

                                             Serena P. Hallowell (*pro hac vice forthcoming*)
                                             Eric J. Belfi (*pro hac vice forthcoming*)
                                             Thomas W. Watson (*pro hac vice forthcoming*)
                                             140 Broadway
                                             New York, NY 10005
                                             Tel: (212) 907-0700
                                             Fax: (212) 818-0477
                                             mschmidt@labaton.com
                                             shallowell@labaton.com
                                             ebelfi@labaton.com
                                             twatson@labaton.com

                                             *Counsel for Plaintiff*